**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | S4 11-CR-205 (AKH) |
| | : | |
| NICOLÁS MADURO MOROS, et al., | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION OF CILIA ADELA FLORES DE MADURO**
**TO DISMISS THE FOURTH SUPERSEDING INDICTMENT**
**BASED ON SOVEREIGN IMMUNITY**

# TABLE OF CONTENTS


Page

PRELIMINARY STATEMENT .....1

FACTUAL BACKGROUND AND ALLEGATIONS IN THE INDICTMENT .....6

A. Ms. Flores de Maduro's Three Decades of Public Service .....7

B. The Indictment's Allegations Against Ms. Flores de Maduro .....7

C. The Abduction, and Venezuela's Assertion of Ms. Flores de Maduro's Immunity .....9

LEGAL STANDARD .....11

ARGUMENT .....14

I. THE INDICTMENT MUST BE DISMISSED BECAUSE MS. FLORES DE MADURO SHARES THE ABSOLUTE STATUS-BASED IMMUNITY OF VENEZUELA'S HEAD OF STATE .....14

A. Mr. Maduro Is Venezuela's Head of State, and the Executive's Refusal to Recognize His Government Is Irrelevant to Immunity. .....14

B. Head-of-State Immunity Has Always Extended to the Head of State's Immediate Family, Above All the Spouse. .....15

C. Recognizing Ms. Flores de Maduro's Immunity Applies Established Executive-Branch Policy; It Creates Nothing New. .....17

D. Non-Recognition of a Government Cannot Defeat an Immunity That Belongs to the Recognized State of Venezuela. .....20

E. Immunity Attached When the Grand Jury Returned the Indictment, and the Government's Extraordinary Violation Cannot Extinguish It. .....23

F. The Marcos Cases Confirm, Rather Than Defeat, Ms. Flores de Maduro's Immunity. .....25

II. INDEPENDENTLY, THE INDICTMENT MUST BE DISMISSED BECAUSE IT ALLEGES ONLY ACTS UNDERTAKEN IN MS. FLORES DE MADURO'S OFFICIAL CAPACITIES OR AT THE DIRECTION OF VENEZUELA'S HEAD OF STATE. .....27

A. Conduct-Based Immunity Extends to All Who Act on the Sovereign's Behalf — Officeholders and Agents Alike. .....28

B. Every Allegation Against Ms. Flores de Maduro Describes Official Acts and State Instrumentalities .....29

C. Ms. Flores de Maduro's Acts as First Lady Were the Acts of a Functional Official, Performed at the Direction of the Head of State, and Are Attributable to Venezuela. .....31

D. Allegations of Corrupt Motive and Personal Enrichment Do Not Defeat the Immunity. ....32

E. Venezuela Has Asserted Her Immunity Through Formal Diplomatic Channels — the Showing the Executive's Own Practice Treats as Sufficient....34

F. Cordones Does Not Control. ....36

III. NO DEFERENCE IS OWED TO THE EXECUTIVE POSITION THAT MS. FLORES DE MADURO LACKS IMMUNITY. ....38

CONCLUSION ....41

**LIST OF EXHIBITS**

The following exhibits are attached directly to the motion. No affidavit or declaration is submitted in support of the motion.

Ex. A Suggestion of Immunity of the United States and Affirmation of Abraham D. Sofaer, Legal Adviser of the Department of State, *Mumtaz v. Ershad*, Index No. 74258/89 (Sup. Ct. N.Y. Cnty. May 30, 1990)

Ex. B Identical Letters dated 3 January 2026 from the Permanent Representative of the Bolivarian Republic of Venezuela to the United Nations, addressed to the Secretary-General and the President of the Security Council, U.N. Docs. A/80/586–S/2026/5

Ex. C Letter of Acting Legal Adviser James H. Thessin to Acting Assistant Attorney General Stuart E. Schiffer (Mar. 19, 2001), *Leutwyler v. Office of Her Majesty Queen Rania Al-Abdullah*, No. 00 Civ. 5485 (GEL) (S.D.N.Y.)

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Agency of Canadian Car & Foundry Co. v. American Can Co.*,
253 F. 152 (S.D.N.Y. 1918), modified on other grounds, 258 F. 363 (2d Cir. 1919) ............22

*Ass'n of Am. Physicians & Surgeons v. Clinton*,
997 F.2d 898 (D.C. Cir. 1993) ..........17, 31

*Belhas v. Ya'alon*,
515 F.3d 1279 (D.C. Cir. 2008) ..........13, 35, 38

*Bradley v. Fisher*,
80 U.S. 335 (1871)..........32, 34

*Brown v. United States*,
12 U.S. (8 Cranch) 110 (1814)..........2

*Butters v. Vance Int'l, Inc.*,
225 F.3d 462 (4th Cir. 2000) ..........28, 29, 31

*Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*,
433 F.2d 686 (2d Cir. 1970)..........20

*Case Concerning the Arrest Warrant of 11 April 2000 (Dem. Rep. Congo v. Belg.)*,
Judgment, 2002 I.C.J. 3 ..........4, 23, 24

*Celestin v. Caribbean Air Mail, Inc.*,
30 F.4th 133 (2d Cir. 2022) ..........37

*Cohens v. Virginia*,
19 U.S. (6 Wheat.) 264 (1821)..........2

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
932 F.3d 126 (3d Cir. 2019)..........21

*Devi v. Silva*,
861 F. Supp. 2d 135 (S.D.N.Y. 2012)..........6

*Doe 1 v. Buratai*,
318 F. Supp. 3d 218 (D.D.C. 2018), aff'd on other grounds, 792 F. App'x 6 (D.C. Cir. 2019)
..........13, 33, 35, 38

*Doe v. Zedillo Ponce de León*,
No. 3:11-cv-1433 (D. Conn.)..........35

*Dorman v. Higgins*,
821 F.2d 133 (2d Cir. 1987)..........32, 34

*Duke of Brunswick v. King of Hanover*,
2 H.L. Cas. 1 (1848)....................32, 37

*Estate of Domingo v. Marcos*,
1983 U.S. Dist. LEXIS 20372 (W.D. Wash. July 14, 1983) ....................17, 18

*Ex parte Republic of Peru*,
318 U.S. 578 (1943)....................2, 12, 38

*Fifield v. Insurance Co. of Pennsylvania*,
47 Pa. 166....................20

*Ford v. Surget*,
97 U.S. 594 (1878)....................20

*Foremost-McKesson, Inc. v. Islamic Republic of Iran*,
905 F.2d 438 (D.C. Cir. 1990) ....................13

*Guaranty Trust Co. v. United States*,
304 U.S. 126 (1938)....................21

*Heaney v. Government of Spain*,
445 F.2d 501 (2d Cir. 1971)....................30

*In re Doe*,
860 F.2d 40 (2d Cir. 1988)....................1, 12, 16, 23, 25, 26

*In re Grand Jury Proceedings*,
5 F. Supp. 2d 21 (D.D.C. 1998) ....................17, 31

*In re Grand Jury Proceedings, Doe No. 700*,
817 F.2d 1108 (4th Cir. 1987) .................... 5, 15-17, 22, 25, 26, 39

*In re Terrorist Attacks on Sept. 11, 2001*,
122 F. Supp. 3d 181 (S.D.N.Y. 2015)....................12, 30, 34, 35

*Jimenez v. Aristeguieta*,
311 F.2d 547 (5th Cir. 1962) ....................32, 33

*Kadic v. Karadžić*,
70 F.3d 232 (2d Cir. 1995)....................20

*Kashef v. BNP Paribas S.A.*,
925 F.3d 53 (2d Cir. 2019)....................37

*Kilroy v. Windsor*,
Civ. No. C-78-291, 1978 U.S. Dist. LEXIS 20419 (N.D. Ohio Dec. 7, 1978)....................15

*Kline v. Kaneko*,
141 Misc. 2d 787 (Sup. Ct. N.Y. Cnty. 1988), aff'd sub nom.
Kline v. Cordero de la Madrid, 154 A.D.2d 959 (1st Dep't 1989).4, 12, 15, 16, 18, 19, 33, 39, 40

*Leutwyler v. Office of Her Majesty Queen Rania Al-Abdullah*,
184 F. Supp. 2d 277 (S.D.N.Y. 2001)....................................................4, 12, 16, 18, 19, 39

*Matar v. Dichter*,
563 F.3d 9 (2d Cir. 2009) ..............................................................................................27

*National Petrochemical Co. of Iran v. M/T Stolt Sheaf*,
860 F.2d 551 (2d Cir. 1988).............................................................................................21

*Republic of Austria v. Altmann*,
541 U.S. 677 (2004)........................................................................................................39

*Republic of Mexico v. Hoffman*,
324 U.S. 30 (1945)...................................................................... 2, 3, 12, 13, 18-20, 38

*Republic of Philippines v. Marcos*,
806 F.2d 344 (2d Cir. 1986)......................................................................................32, 33

*Rein v. Socialist People's Libyan Arab Jamahiriya*,
162 F.3d 748 (2d Cir. 1998).............................................................................................13

*Rosenberg v. Lashkar-e-Taiba*,
980 F. Supp. 2d 336 (E.D.N.Y. 2013), aff'd sub nom.
Rosenberg v. Pasha, 577 F. App'x 22 (2d Cir. 2014)..............................................31, 34, 35

*Russian Socialist Federated Soviet Republic v. Cibrario*,
235 N.Y. 255 (1923) .......................................................................................................21

*Salimoff & Co. v. Standard Oil Co. of New York*,
262 N.Y. 220 (1933) .......................................................................................................20

*Samantar v. Yousuf*,
560 U.S. 305 (2010)........................................................................... 11-13, 18, 28

*Saudi Arabia v. Nelson*,
507 U.S. 349 (1993)........................................................................................................29

*Sokoloff v. National City Bank*,
239 N.Y. 158 (1924) .......................................................................................................21

*The Paquete Habana*,
175 U.S. 677 (1900)......................................................................................................2, 3

*The Sapphire*,
78 U.S. 164 (1870)....................................................................................................22, 23

*Thorington v. Smith*,
75 U.S. 1 (1869)..............................................................................................................20

*Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*,
731 F. Supp. 619 (S.D.N.Y. 1990)....................................................................................22

*Tribunal Supremo de Justicia, Sala Constitucional,*
Sentencia No. 0001, Exp. No. 26-0001 (Jan. 3, 2026) (Venez.)....10, 11, 26, 40

*Trump v. United States,*
603 U.S. 593 (2024)....32, 34

*Türkiye Halk Bankasi A.S. v. United States,*
598 U.S. 264 (2023) ("Halkbank II")....11, 12, 36, 40

*Underhill v. Hernandez,*
65 F. 577 (2d Cir. 1895), aff'd, 168 U.S. 250 (1897)....27, 28

*United States v. Cordones,*
2022 WL 815229 (S.D.N.Y. Mar. 17, 2022).... 36-38

*United States v. Insurance Cos.,*
89 U.S. 99 (1875)....20

*United States v. Khobragade,*
15 F. Supp. 3d 383 (S.D.N.Y. 2014)....4, 12, 24, 25, 27

*United States v. Tantoco,*
No. 87 Cr. 598 (S.D.N.Y.)....1

*United States v. Toscanino,*
500 F.2d 267 (2d Cir. 1974)....13

*United States v. Turkiye Halk Bankasi A.S.,*
16 F.4th 336 (2d Cir. 2021) ("Halkbank I")....11, 36

*United States v. Türkiye Halk Bankasi A.S.,*
120 F.4th 41 (2d Cir. 2024) ("Halkbank III")....3, 6, 12, 13, 29, 30, 36, 39, 40

*Upright v. Mercury Business Machines Co.,*
13 A.D.2d 36 (1st Dep't 1961)....21

*Valores Mundiales, S.L. v. Bolivarian Republic of Venezuela,*
87 F.4th 510 (D.C. Cir. 2023)....21

*Venezuela US SRL v. Bolivarian Republic of Venezuela,*
789 F. Supp. 3d 1 (D.D.C. 2025), aff'd, 178 F.4th 679 (D.C. Cir. 2026)....21

*Victory Transport, Inc. v. Comisaria General de Abastecimientos y Transportes,*
336 F.2d 354 (2d Cir. 1964)....29

*W.S. Kirkpatrick & Co. v. Env't Tectonics Corp., Int'l,*
493 U.S. 400 (1990)....37

*Wulfsohn v. Russian Socialist Federated Soviet Republic,*
234 N.Y. 372 (1923)....21

*Yousuf v. Samantar*,
699 F.3d 763 (4th Cir. 2012) ....................39, 40

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
576 U.S. 1 (2015)....................20

*Zivotofsky v. Clinton*,
566 U.S. 189 (2012)....................2

**Statutes and Rules**

3 U.S.C. § 105(e) ....................17, 19, 31

28 U.S.C. § 2241(c)(4)....................28

Act of Aug. 29, 1842....................28

**Treaties and International Materials**

Draft Articles on the Responsibility of States for Internationally Wrongful Acts,
arts. 4, 5, 7, 8, U.N. Doc. A/56/10 (2001)....................28, 31

Letter dated 3 January 2026 from the Permanent Representative of the Bolivarian
Republic of Venezuela to the United Nations, U.N. Docs. A/80/586–S/2026/5 (Jan. 3, 2026)9

Press Release, U.N. Secretary-General, 'Power of Law' Must Prevail in Venezuela,
Secretary-General Tells Security Council, U.N. Doc. SG/SM/22974 (Jan. 5, 2026)....................10

U.N. Charter art. 2, para. 4....................9, 11

U.N. SCOR, 81st Sess., 10085th mtg., U.N. Doc. S/PV.10085 (Jan. 5, 2026) ....................1, 9, 10, 26

Vienna Convention on Diplomatic Relations,
arts. 29, 31(1), 37(1), Apr. 18, 1961, 23 U.S.T. 3227....................15, 17

**Other Authorities**

1 Op. Att'y Gen. 81 (1797)....................28

1 L. Oppenheim, *International Law* § 348 (8th ed. 1955)....................15, 20

Letter of Acting Legal Adviser James H. Thessin to Acting Assistant Attorney General
Stuart E. Schiffer (Mar. 19, 2001) (Ex. C)....................16, 19, 39

Letter of Legal Adviser Harold Hongju Koh to Acting Assistant Attorney General
Stuart F. Delery (Sept. 7, 2012), *Doe v. Zedillo Ponce de León*,
No. 3:11-cv-1433 (D. Conn.), ECF 38-1 ....................35

Letter of Secretary of State Daniel Webster (1841)....................28

Notice of OFAC Sanctions Actions,
83 Fed. Reg. 50,144 (Oct. 4, 2018)....................35

Notice of Suggestion of Immunity, *Kenemore v. Maduro Moros*, No. 1:25-cv-23652 (S.D. Fla. July 20, 2026), ECFs 75 & 75-1 ....................................... 12, 40

Restatement (Third) of the Foreign Relations Law of the United States § 464 (Am. L. Inst. 1987) ....................................... 15

Statement of Interest of the United States, *Sabbithi v. Al Saleh*, No. 1:07-cv-115 (D.D.C.), ECF 48 ....................................... 6

Suggestion of Immunity, *Doe v. Zedillo Ponce de León*, No. 3:11-cv-1433 (D. Conn.), ECF 38 ....................................... 35

Suggestion of Immunity of the United States and Affirmation of Abraham D. Sofaer, Legal Adviser of the Department of State, *Mumtaz v. Ershad*, Index No. 74258/89 (Sup. Ct. N.Y. Cnty. May 30, 1990) (Ex. A) ....................................... 2, 3, 6, 18, 19

Tr. of Oral Arg., *Türkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264 (2023) (No. 21-1450) ....................................... 40

*What are colectivos? An essential clarification*, PSUV (Oct. 28, 2014) ....................................... 8

## PRELIMINARY STATEMENT

No court of the United States has ever presided over the criminal trial of the spouse of a sitting foreign head of state. The closest this Nation has come was the prosecution of Imelda Marcos. That prosecution began only after her husband was no longer head of state.[1] Courts permitted proceedings against the *former* first lady only because her own government had expressly waived "any residual sovereign, head of state, or diplomatic immunity" she might enjoy. *In re Doe*, 860 F.2d 40, 43 (2d Cir. 1988). The Bolivarian Republic of Venezuela has done precisely the opposite. Two days after the armed abduction of Cilia Adela Flores de Maduro, the First Lady of Venezuela, Venezuela stood before an emergency session of the United Nations Security Council and demanded that the United States "be required to fully respect the immunities of President Nicolás Maduro and First Lady Cilia Flores and ensure their immediate release and safe return to Venezuela." U.N. SCOR, 81st Sess., 10085th mtg. at 23, U.N. Doc. S/PV.10085 (Jan. 5, 2026) ("S/PV.10085"); *infra* Background C. Venezuela's assertion, and the centuries of settled law it invokes, deprives this Court of jurisdiction over Ms. Flores de Maduro.

This immunity is not Ms. Flores de Maduro's personal privilege; it is an attribute of Venezuela's sovereignty, and only Venezuela may surrender it. American courts have permitted criminal process to reach a foreign state's leaders or their families only where the state itself surrendered their immunity or declined to claim it; where the state claims it — as Venezuela emphatically has — respect for that sovereignty compels dismissal.

[1] Ferdinand Marcos was deposed and fled the Philippines in February 1986. *See In re Doe*, 860 F.2d 40, 42 (2d Cir. 1988) (recounting the February 1986 flight to Hawaii). Her indictment was not returned until 1988. *United States v. Tantoco, et al.*, No. 87 Cr. 598 (S.D.N.Y.).

None of this asks the Court to intrude on the Executive's conduct of foreign relations, where the Judiciary rightly defers. Claims involving a friendly sovereign "are normally presented and settled in the course of the conduct of foreign affairs by the President and by the Department of State," and when the Executive elects to resolve them "by diplomatic negotiations . . . rather than by continued litigation in the courts," the courts honor "the action of the political arm of the Government taken within its appropriate sphere" rather than "embarrass the executive arm of the Government in conducting foreign relations." *Ex parte Republic of Peru*, 318 U.S. 578, 587-88 (1943); *see Republic of Mexico v. Hoffman*, 324 U.S. 30, 35 (1945). That deference is a rule of judicial restraint in aid of diplomacy, not a warrant for the Executive to dictate the outcome of a case it has chosen to bring. Here the Executive did not elect diplomacy. It elected this Court, and it invaded a foreign capital to bring Ms. Flores de Maduro before it. She does not ask the Court to second-guess whatever assessment of the national interest lay behind that choice; she asks the Court to do what the choice requires — decide whether the law permits the criminal trial of the spouse of a sitting head of state whose government has claimed her immunity. That is a question of law, and "[i]nternational law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction, as often as questions of right depending upon it are duly presented for their determination." *The Paquete Habana*, 175 U.S. 677, 700 (1900).[2] Nor is

[2] The Court is "not being asked to supplant a foreign policy decision of the political branches with the courts' own unmoored determination" of what American policy toward Venezuela should be; it is asked to decide a question of law, which "is a familiar judicial exercise." *Cf. Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012); *see id.* at 194 ("the Judiciary has a responsibility to decide cases properly before it, even those it 'would gladly avoid'" (quoting *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821))). *The Paquete Habana* itself is the model. The Navy had seized the vessels, they were libelled as prize of war, and the United States defended their condemnation before the Court; the Court, "sitting as the highest prize court of the United States, and administering the law of nations," adjudged the captures "unlawful, and without probable cause" and ordered restitution "with damages and costs," 175 U.S. at 714, invoking *Brown v. United States*, 12 U.S. (8 Cranch) 110 (1814), for the rule that enemy property which "by the modern usage of nations is not subject to capture as prize of war, cannot be condemned by a prize court, even by direction of the executive, without express authority from Congress." *Id.* at 711. The Executive has taken the same view of the governing law. In the *Mumtaz* filing described below, the Legal Adviser of the Department of State affirmed that "[p]rinciples of customary international law, as part of the law of nations, have been recognized by U.S. courts as part of U.S. law, absent a controlling federal statute or treaty," citing *The Paquete Habana*, 175 U.S. at 700,

the answer supplied by the Executive's position in this case, however expressed. Even the decisions that established deference to Executive suggestions of immunity tied it to "the established policy" of the United States, *Hoffman*, 324 U.S. at 36, and forbade the courts "to deny an immunity which our government has seen fit to allow," *id.* at 35. The established policy of the United States, certified by the Executive itself in case after case, is that the spouse of a sitting head of state is immune from the jurisdiction of American courts. *Infra* Point I.C. The Second Circuit, for its part, defers to an Executive denial of immunity that is "consistent with the common law," but has expressly left open whether any deference is owed where the denial "derogated from the common law." *United States v. Türkiye Halk Bankasi A.S.*, 120 F.4th 41, 49, 58-59 (2d Cir. 2024) ("*Halkbank III*"); *see* Maduro Mem. Point III. This is that case.

Ms. Flores de Maduro is married to Nicolás Maduro Moros, the President of Venezuela. When the grand jury returned the Fourth Superseding Indictment ("the Indictment") under seal on December 23, 2025, Mr. Maduro was, as the Indictment itself alleges, the "*de facto*" ruler of Venezuela, exercising the powers of the Venezuelan presidency. ¶¶ 2, 5 (ECF 260). Ms. Flores de Maduro was Venezuela's First Lady and a sitting deputy of its National Assembly. Eleven days later, on January 3, 2026, United States armed forces invaded Venezuela and forcibly abducted Ms. Flores de Maduro and her husband from Caracas so that they could be brought before this Court.

The charges against Ms. Flores de Maduro must be dismissed for two independent reasons, each of which builds on the Memorandum of Law submitted by Mr. Maduro in support of his

---

and stated that "[t]here are no federal statutes or treaties on the subject of head of state immunity." Suggestion of Immunity and Affirmation of Abraham D. Sofaer, Legal Adviser of the Department of State, *Mumtaz v. Ershad*, Index No. 74258/89 (Sup. Ct. N.Y. Cnty. May 30, 1990) (attached as Ex. A) (the "*Mumtaz* Suggestion" and the "Sofaer Affirmation"); Sofaer Affirmation ¶ 2. There is accordingly no "controlling executive or legislative act" to displace the law of nations here. *Cf. The Paquete Habana*, 175 U.S. at 700.

motion to dismiss (ECF 320-1) (the "Maduro Memorandum" or "Maduro Mem."), which Ms. Flores de Maduro joins and adopts in full.

*First*, Ms. Flores de Maduro shares the absolute status-based immunity of Venezuela's head of state. Under customary international law, incorporated into the common law, the immunity of a head of state has always extended to the members of his or her immediate family — above all, to the spouse. The United States has repeatedly recognized precisely that immunity. When the First Lady of Mexico was sued in New York, the United States Attorney for this District appeared, suggested her immunity to the state court, and moved successfully to dismiss, because "[u]nder general principles of international law, heads of State and immediate members of their families are immune from suit." *Kline v. Kaneko*, 141 Misc. 2d 787, 788 (Sup. Ct. N.Y. Cnty. 1988), *aff'd sub nom. Kline v. Cordero de la Madrid*, 154 A.D.2d 959 (1st Dep't 1989). When Jordan's Queen Rania was sued in this District, every claim against her was dismissed. *Leutwyler v. Office of Her Majesty Queen Rania Al-Abdullah*, 184 F. Supp. 2d 277, 280 (S.D.N.Y. 2001). Because Mr. Maduro was and remained until his abduction, at a minimum, Venezuela's *de facto* head of state — a fact the Indictment concedes and the Maduro Memorandum establishes — Ms. Flores de Maduro enjoys the same absolute immunity from this Court's criminal jurisdiction.

Under customary international law, the mere issuance of criminal process against a person protected by status-based immunity itself violates that immunity. *See Case Concerning the Arrest Warrant of 11 April 2000 (Dem. Rep. Congo v. Belg.)*, Judgment, 2002 I.C.J. 3, ¶¶ 70-71. In this District, "criminal immunity precludes the exercise of jurisdiction by the courts over an individual whether the incident occurred prior to or during the period in which such immunity exists." *United States v. Khobragade*, 15 F. Supp. 3d 383, 387 (S.D.N.Y. 2014) (quoting the State Department's own guidance). The government cannot cure the defect by pointing to its subsequent abduction of

Ms. Flores de Maduro and her husband. The first protection status-based immunity affords is the exemption of the protected person from arrest and detention in the foreign state. *See In re Grand Jury Proceedings, Doe No. 700*, 817 F.2d 1108, 1110 (4th Cir. 1987) ("*Doe No. 700*") (the immunity ensures that leaders are not "subject to detention, arrest or embarrassment in a foreign country's legal system"). An immunity that could be extinguished by the very seizure it forbids would be no immunity at all.

*Second*, and independently, Ms. Flores de Maduro is entitled to conduct-based immunity, because the Indictment alleges no private conduct by her at all.[3] Every allegation against Ms. Flores de Maduro describes acts undertaken through public offices she held — deputy of the National Assembly, President of the National Assembly, Attorney General of Venezuela, member of the National Constituent Assembly — or at the direction of her husband, the head of state, and through the instrumentalities of the Venezuelan state: narcotics "previously seized by Venezuelan law enforcement," "armed military escorts," and state-sponsored organizations. ¶ 21(d). Under the common law, such acts are attributable to Venezuela itself, and this Court can no more require Venezuela's First Lady to answer for them than it could require Venezuela to answer for them directly.

Neither the Executive's "illegitimacy" label nor its account of Ms. Flores de Maduro's motives changes any of this, for the reasons set out in the Maduro Memorandum and below. Recognition is irrelevant to immunity; motive is irrelevant to the official character of an act; and

[3]Nothing in this motion concedes any allegation in the Indictment. Ms. Flores de Maduro disputes the government's factual allegations and its account of her motives, and Venezuela has protested the proceedings against her to the United Nations, describing her seizure as a "kidnapping" and demanding her immediate release. *Supra* Background C. Because immunity is a threshold jurisdictional bar, the arguments here necessarily take the Indictment's allegations as the government has pleaded them and demonstrate that even on the government's own telling, the Indictment charges only official conduct. To show that the acts *alleged* would be official is not to admit that they occurred. Ms. Flores de Maduro denies she has ever trafficked narcotics, profited from narcotics trafficking, unlawfully possessed machine guns, or committed any offense — in the name of the Venezuelan state or otherwise.

no court has ever extended deference to an Executive immunity position taken "in derogation of the common law" — a step the Second Circuit has expressly left open, and one the government has said it would not take against a foreign state. *Halkbank III*, 120 F.4th at 46, 52, 58-59. Nor are the stakes of the government's theory abstract. If a forum executive's refusal to recognize a foreign head of state could strip his family of immunity, then any government on earth could expose the First Lady of the United States to arrest and criminal trial abroad by the simple expedient of announcing that it no longer recognizes the American President. The United States itself has warned that a deviation from the international consensus on the scope of diplomatic immunity "would create an acute risk of reciprocation by other States, potentially subjecting U.S. diplomats to controversial litigation in foreign jurisdictions." *Devi v. Silva*, 861 F. Supp. 2d 135, 142 (S.D.N.Y. 2012) (quoting Statement of Interest of the United States, *Sabbithi v. Al Saleh*, No. 1:07-cv-115 (D.D.C.), ECF 48 at 21). The State Department has said the same about heads of state, placing "particular importance on the appropriate assertion of head of state immunity because of its implication for reciprocal treatment of our President if subject to the jurisdiction of a foreign state," and stating that the United States "would clearly expect another state to extend head of state immunity to our President if named as a defendant in a case similar to this one." Sofaer Affirmation ¶ 6, Ex. A. The rule the government proposes is one the United States would never accept for itself. The Indictment against Ms. Flores de Maduro should be dismissed with prejudice.

## **FACTUAL BACKGROUND AND ALLEGATIONS IN THE INDICTMENT**

The full factual background — Mr. Maduro's lawful accession to the presidency, his continuous exercise of its powers, the Executive's course of dealing with his government, and the January 3, 2026 invasion and abduction — is set out in the Maduro Memorandum at 4–13, which Ms. Flores de Maduro adopts. The facts specific to Ms. Flores de Maduro follow.

### A. Ms. Flores de Maduro's Three Decades of Public Service

Cilia Adela Flores de Maduro has served in the government of Venezuela for most of her adult life, and the Indictment concedes each of the offices she has held. She was a deputy of Venezuela's National Assembly, and in 2006 she became the first woman to serve as President of the National Assembly — succeeding Mr. Maduro in that role when he departed to become Minister of Foreign Affairs — an office she held until 2011. ¶ 8. From 2012 to 2013 she served as Attorney General of Venezuela. *Id.* Beginning in 2017 she served as a member of the National Constituent Assembly, *id.*, and since 2021 she has served again as an elected deputy of the National Assembly, the office she held the day of her abduction. Mr. Maduro was elected to the presidency in April 2013 and sworn in on April 19, 2013; on July 15, 2013, Ms. Flores de Maduro and Mr. Maduro married, and Venezuela continually recognized her as its First Lady. And even in the Indictment's words, she "is the *de facto* First Lady of Venezuela." ¶ 8.

### B. The Indictment's Allegations Against Ms. Flores de Maduro

The grand jury returned the operative Fourth Superseding Indictment under seal on December 23, 2025, and it was unsealed on January 3, 2026. ECF 258, 260. Ms. Flores de Maduro had never previously been charged in this action, which was initiated in 2011. She is named in Counts Two, Three, and Four.[4]

The Indictment's allegations against Ms. Flores de Maduro are few, and every one of them is tethered to her public offices, her family, or both. *Paragraph 3* alleges that drug trafficking "concentrated power and wealth in the hands of MADURO MOROS's family," including "the

[4]Ms. Flores de Maduro is charged only in Counts Two (cocaine-importation conspiracy), Three, and Four (possession of, and conspiracy to possess, machineguns and destructive devices). ¶¶ 25-35; ECF 260 (docket text). She is not charged in Count One, the narco-terrorism conspiracy. The firearms counts are, as to her, predicated exclusively on Count Two. ¶¶ 32, 35.

purported First Lady of Venezuela." *Paragraph 8* recites her offices, as detailed above. *Paragraph 18* groups her with Venezuelan "officials and their family members" who allegedly "partnered with narcotics traffickers and narco-terrorist groups." Continuing, the Indictment attributes to her only parts of three overt acts:

*Paragraph 21(b)* alleges that in approximately 2007, while Ms. Flores de Maduro was President of the National Assembly, she "attended a meeting" at which she accepted money "to broker a meeting between a large-scale drug trafficker and the director of Venezuela's National Anti-Drug Office," and that a portion of later payments to that director was paid to her. The alleged act — arranging access to the head of a national law-enforcement agency — is an exercise of official influence that only a senior official of the Venezuelan state could perform.

*Paragraph 21(d)* alleges that between 2004 and 2015 — a period spanning her service as National Assembly deputy, President of the National Assembly, Attorney General, and First Lady — Ms. Flores de Maduro and Mr. Maduro "worked together to traffic cocaine, much of which had been *previously seized by Venezuelan law enforcement*, with the assistance of *armed military escorts*"; that they "maintained their own groups of state-sponsored gangs known as *colectivos*"; and that they "ordered" acts of violence in connection with that conduct. (emphasis added).[5]

*Paragraph 21(k)* alleges no act by Ms. Flores de Maduro at all. It recounts recorded statements by two of her relatives, who in 2015 allegedly sought drug proceeds "to support a campaign by FLORES DE MADURO in connection with a late-2015 election for the Venezuelan National Assembly."

[5]As explained in the Maduro Memorandum, according to the political party that has governed Venezuela since 2007, "colectivos" are community organizations that "work to preserve, make effective, and deepen the rights enshrined in the Constitution" and can be "guided by the government." Maduro Mem. at 13 n.2 (quoting *What are colectivos? An essential clarification*, PSUV (Oct. 28, 2014)).

The Indictment nowhere alleges that Ms. Flores de Maduro undertook any act in a private capacity. Quite the opposite- the government's theory is that she *misused* public office and state instrumentalities: military escorts, law-enforcement seizures, state-sponsored organizations, the diplomatic and electoral machinery of the Venezuelan state. *See* ¶¶ 1-3, 16, 18, 21.

### C. The Abduction, and Venezuela's Assertion of Ms. Flores de Maduro's Immunity

On January 3, 2026, United States armed forces forcibly abducted Ms. Flores de Maduro together with her husband, killing at least 100 people in the process. Maduro Mem. at 7. Venezuela immediately protested the operation as a violation of its sovereignty and of the United Nations Charter. Within hours, Venezuela transmitted identical letters of protest to the U.N. Secretary-General and the President of the Security Council — circulated to every Member State as an official document of the United Nations — condemning the operation as an armed attack on Venezuela in violation of Article 2(4) of the U.N. Charter. Letter dated 3 January 2026 from the Permanent Representative of the Bolivarian Republic of Venezuela to the United Nations, U.N. Docs. A/80/586–S/2026/5 (Jan. 3, 2026) (attached as Ex. B). Two days later, at an emergency session of the U.N. Security Council, Venezuela's Permanent Representative, Ambassador Samuel Moncada, described "the kidnapping of the constitutional President of the Republic, Nicolás Maduro Moros, and the First Lady, Cilia Flores" — naming Ms. Flores de Maduro — and called that kidnapping "a direct violation of an essential norm of the international legal order: the personal immunity of Heads of State in office," an immunity that "is not an individual privilege" but "an institutional guarantee that protects the sovereignty of States and the stability of the international system." S/PV.10085, at 22. He then demanded, first among Venezuela's demands to the Council, that the United States "be required to fully respect the immunities of President Nicolás Maduro and First Lady Cilia Flores and ensure their immediate release and safe return to Venezuela." *Id.*

at 23. Venezuela did not stand alone. In remarks delivered on his behalf, the Secretary-General told the Council that "the power of the law must prevail," stressed "the imperative of full respect, by all, for international law, including the Charter of the United Nations," and called for "[r]espect for the principles of sovereignty, political independence and territorial integrity of States." Press Release, U.N. Secretary-General, *'Power of Law' Must Prevail in Venezuela, Secretary-General Tells Security Council, Citing Heightened Risk of Regional Instability*, U.N. Doc. SG/SM/22974 (Jan. 5, 2026); *see also* S/PV.10085, at 2-4 (statement as delivered, including that the Secretary-General "remain[s] deeply concerned that the rules of international law have not been respected with regard to the 3 January military action"). The Group of Friends in Defense of the Charter of the United Nations emphasized "the importance of ensuring strict respect for the inviolability of the immunities accorded to Heads of State and Government under international law," *id.* at 33 (Eritrea, on behalf of the Group). And the Non-Aligned Movement "reaffirm[ed] the inviolability of the immunities accorded to Heads of States and Government under international law, which constitute a fundamental pillar of sovereign equality, peace, coexistence and stable international relations." *Id.* at 36 (Uganda, on behalf of the Coordinating Bureau of the Non-Aligned Movement). On the day of the abduction itself, Venezuela's highest court declared the operation a "foreign military aggression" whose purpose was "the kidnapping of the Constitutional President Nicolás Maduro Moros," classified his absence as a forced one, and directed the Executive Vice President to discharge the functions of the office as a caretaker ("Encargada") during that forced absence — expressly not making a determination that the office had become vacant, only that for continuity of government during President Maduro's absence someone else needed to be provided the ability to govern. Tribunal Supremo de Justicia, Sala Constitucional, Sentencia No. 0001, Exp. No. 26-0001 (Jan. 3, 2026) (unofficial English translation attached as Exhibit 1 to the Declaration

of Barry J. Pollack ("Pollack Decl.")) ("TSJ Sentencia No. 0001"). Venezuela has thus asserted Ms. Flores de Maduro's immunity by name, in the most formal and public diplomatic forum that exists: the chamber of the Security Council, where its Permanent Representative demanded respect for her immunity and the Group of Friends in Defense of the Charter of the United Nations named her as well. Its letters of protest, circulated to every Member State as official documents of the United Nations, condemned the operation as an armed attack in violation of Article 2(4) of the Charter. It has demanded her release; it has not waived her immunity; and it has never disclaimed her or the offices through which she is alleged to have acted.

## LEGAL STANDARD

Foreign sovereign immunity — including head-of-state immunity and foreign-official conduct-based immunity — raises a threshold jurisdictional question "distinct from the merits of the charges at issue." *United States v. Turkiye Halk Bankasi A.S.*, 16 F.4th 336, 344 (2d Cir. 2021) ("*Halkbank I*"), *aff'd in part, vacated in part, remanded*, 598 U.S. 264 (2023) ("*Halkbank II*"). Two bodies of immunity law exist, and the Foreign Sovereign Immunities Act is not the one that governs here: the FSIA is a civil statute that "does not apply to criminal proceedings," *Halkbank II*, 598 U.S. at 274, and it does not reach individual foreign officials in any event, *Samantar v. Yousuf*, 560 U.S. 305, 324-25 (2010). Ms. Flores de Maduro's immunities therefore arise under the common law, which the FSIA left intact for the cases the statute does not cover. *Halkbank II*, 598 U.S. at 280-81. Prior to the FSIA, in civil cases, where the Executive Branch did not initially appear as a party, courts used a "two-step procedure" to determine whether to recognize a defendant's immunity. Under the common law's two-step procedure, the foreign state may request a suggestion of immunity from the State Department; and "in the absence of recognition of the immunity by the Department of State," the district court "ha[s] authority to decide for itself whether

all the requisites for such immunity exist[]" — that is, "whether the ground of immunity is one which it is the established policy of the [State Department] to recognize." *Samantar*, 560 U.S. at 311-12 (quoting *Ex parte Republic of Peru*, 318 U.S. at 587, and *Hoffman*, 324 U.S. at 36). The process is similar for criminal prosecutions, where the Executive is a party from the beginning, effectively skipping to the second step to analyze whether the prosecution comports with the common law.[6]

Both positions are already before the Court. The Executive's is expressed in the Indictment it procured. Venezuela's has been expressed through the most formal and public diplomatic channels it has: a demand delivered by its Permanent Representative in the United Nations Security Council, and protest letters circulated as official documents of the United Nations. *Supra* Background C. The common law prescribes no particular form for a foreign state's assertion, and courts credit such assertions however conveyed: in *In re Terrorist Attacks on Sept. 11, 2001*, Saudi Arabia declared, through its Ambassador's declaration filed with the defendant's motion to dismiss, that its "Government respectfully requests this Court grant the motion to dismiss," 122 F.

[6] The common-law immunity analysis survives the Executive's decision to prosecute. In *Halkbank II*, the Supreme Court remanded common-law immunity claims for decision in a pending criminal prosecution, "express[ing] no view" on the defendant's contention that "the Executive Branch cannot unilaterally abrogate common-law immunity by initiating prosecution." 598 U.S. at 280-81. On remand, the Second Circuit deferred to the Executive's denial of immunity only after independently confirming that the prosecution "comports with the substance of that common law." *Halkbank III*, 120 F.4th at 52. Courts have likewise adjudicated immunity in criminal proceedings with the government before them as a party. *See In re Doe*, 860 F.2d at 45 (where the government itself pursued grand-jury process against the Marcoses, the court decided the head-of-state immunity question itself, resolving it on the ground of waiver); *Khobragade*, 15 F. Supp. 3d at 386-88 (dismissing an indictment returned while the defendant held diplomatic immunity, over the government's opposition and notwithstanding a declaration of the State Department's Office of the Legal Adviser concluding that she did "not presently enjoy immunity from prosecution for the crimes charged in the Indictment," *id.* at 387; the court accepted the Department's certification of her status and decided the legal consequence for itself, *id.* at 386 & n.20, 387-88). The measure of the Executive's position is the same whatever the form of its expression — indictment, statement of interest, or declaration: deference extends only to a determination that "comports with the substance of that common law," *Halkbank III*, 120 F.4th at 52, and *Khobragade* dismissed notwithstanding the Department's declaration that no immunity presently barred the prosecution. Nor is the immunity Ms. Flores de Maduro asserts a "new ground[]" awaiting Executive recognition, cf. *Hoffman*, 324 U.S. at 35; it is the ground the Executive's own filings have articulated, from *Kline* to *Leutwyler* to Kenemore. As addressed in Point III, infra, the Executive's decision to bring the Indictment in this case does not comport with the substance of common law and, accordingly, is entitled to no deference.

Supp. 3d 181, 187 (S.D.N.Y. 2015), and immunity followed, *id.* at 188-89; in *Doe 1 v. Buratai*, the court recognized immunity where Nigeria had asserted it by diplomatic note and the State Department, nearly a year later, had made no decision and had "not filed a suggestion of immunity, a suggestion of non-immunity, or any other document with the Court," 318 F. Supp. 3d 218, 224, 231 (D.D.C. 2018), *aff'd on other grounds*, 792 F. App'x 6 (D.C. Cir. 2019); and in *Belhas v. Ya'alon*, the D.C. Circuit relied on a letter from Israel's Ambassador that the defendant attached to his motion to dismiss. 515 F.3d 1279, 1282, 1284 (D.C. Cir. 2008) (pre-*Samantar* decision analyzing the official's immunity under the FSIA, but treating the ambassador's letter as the state's authorization and ratification of his acts). The question of Ms. Flores de Maduro's immunity is for this Court to decide, applying the established grounds of immunity recognized at common law. The Executive's position, expressed here through the Indictment, must itself be measured against those grounds. *Halkbank III*, 120 F.4th at 49, 58-59 (deferring to the Executive's denial of immunity only upon concluding that its position was "consistent with the common law," and reserving the case in which the denial "derogated from the common law"); *Hoffman*, 324 U.S. at 36 (the inquiry is "whether the ground of immunity is one which it is the established policy of the department to recognize"). A finding of immunity deprives the Court of jurisdiction and requires dismissal. Maduro Mem. at 13–14.[7]

[7]Because all proceedings against Ms. Flores de Maduro must be dismissed on sovereign-immunity grounds, she does not now litigate other pretrial motions, including the motion, which she expressly reserves, to dismiss on the ground that the government's violent abduction of Ms. Flores de Maduro and her husband — an operation that reportedly killed more than 100 people — violated due process. *See United States v. Toscanino*, 500 F.2d 267 (2d Cir. 1974); ECF 316 (July 22, 2026 scheduling order contemplating a second round of pretrial motions). Requiring her to litigate such motions now would itself be inconsistent with her immunity. *See Rein v. Socialist People's Libyan Arab Jamahiriya*, 162 F.3d 748, 756 (2d Cir. 1998) ("[S]overeign immunity is an immunity from trial *and the attendant burdens of litigation*[.]") (emphasis added) (quoting *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 443 (D.C. Cir. 1990)) (collateral-order appealability of an FSIA immunity denial). Further, unlike the sovereign immunity motion, which is based solely on the Fourth Superseding Indictment, discovery is relevant to a motion challenging her abduction where the factual circumstances of the abduction will be relevant.

## ARGUMENT

Ms. Flores de Maduro adopts the Maduro Memorandum in full, including its demonstration that head-of-state immunity is absolute and attaches to him regardless of whether he was the recognized head of state as declared by the Venezuelan supreme court on January 3rd, or as the *de facto* head of state as described in the indictment, without regard to recognition (Point I), that the Indictment alleges only official acts entitled to conduct-based immunity (Point II), and that no deference is owed to an Executive immunity determination in derogation of the common law (Point III). This memorandum addresses what those principles mean for her: the head of state's absolute status-based immunity extends to his spouse (Point I, below); the acts alleged against her were official acts of her own offices or acts performed at the head of state's direction (Point II, below);[8] and the Executive's position with respect to her sovereign immunity in the face of Venezuela's formal assertion of her immunity is not a determination to which any deference could be owed (Point III, below).

### I. THE INDICTMENT MUST BE DISMISSED BECAUSE MS. FLORES DE MADURO SHARES THE ABSOLUTE STATUS-BASED IMMUNITY OF VENEZUELA'S HEAD OF STATE.

#### A. Mr. Maduro Is Venezuela's Head of State, and the Executive's Refusal to Recognize His Government Is Irrelevant to Immunity.

The Maduro Memorandum establishes, and Ms. Flores de Maduro will not repeat, that heads of state are absolutely immune from the criminal jurisdiction of foreign courts; that this immunity attaches to the *de facto* head of state without regard to formal recognition by the forum's executive; and that the Indictment itself concedes Mr. Maduro "continued to exercise the powers

[8] As explained in note 3, supra, this framing concedes nothing: immunity is decided on the Indictment's own telling because Ms. Flores de Maduro may not test the evidence at this stage, and to show that the acts alleged would be official is not to admit that they occurred. Mr. Maduro likewise "has pled not guilty and vehemently denies the allegations against him," and his motion proceeds on the same premise. Maduro Mem. at 1.

of the Venezuelan presidency" as the country's "*de facto*" ruler through the date of his abduction. Maduro Mem. Point I; ¶¶ 2, 5. The government's labeling of his government as "illegitimate" cannot strip that immunity, for the reasons the Maduro Memorandum sets out at length. This Point takes that demonstration as its premise and addresses the question specific to Ms. Flores de Maduro: does the head of state's immunity extend to his wife? It does — and always has.

### B. Head-of-State Immunity Has Always Extended to the Head of State's Immediate Family, Above All the Spouse.

Under customary international law, incorporated into the common law, "heads of State *and immediate members of their families* are immune from suit." *Kline v. Kaneko*, 141 Misc. 2d 787, 788 (Sup. Ct. N.Y. Cnty. 1988) (emphasis added), *aff'd sub nom. Kline v. Cordero de la Madrid*, 154 A.D.2d 959 (1st Dep't 1989). Because the head of state is treated as the state itself, the law of nations has never permitted a foreign court to reach the sovereign through the persons closest to him — the spouse and household who share his person, his dignity, and his exposure.[9]

The United States has recognized and applied precisely this rule.[10] In *Kline*, a plaintiff sued Paloma Cordero de la Madrid — the First Lady of Mexico, who "held no official position within the government" — in New York. At Mexico's request, conveyed by diplomatic note, the United States Attorney for this District filed a suggestion of immunity and moved to dismiss. The court,

---

[9] *See* Restatement (Third) of the Foreign Relations Law of the United States § 464 reporters' note 14, at 471 (Am. L. Inst. 1987) ("[o]rdinarily, a proceeding against a head of state or government that is in essence a suit against the state is treated like a claim against the state for purposes of immunity," and a head of state "on an official visit to another country" is "generally given the same personal inviolability and immunities as are accorded to members of special missions, essentially those of an accredited diplomat"); *id.* § 464 cmt. a, at 458 (a diplomatic agent's immunities "are enjoyed also by the members of the agent's family if they are not nationals of the receiving state," traditionally defined to include "the agent's spouse" and "other dependents forming part of the household"); *cf. Doe No. 700, 817 F.2d at 1111 (reasoning by analogy from the Vienna Convention on Diplomatic Relations to head-of-state immunity);* 1 L. Oppenheim, *International Law* § 348, at 759 (8th ed. 1955) (a sovereign abroad "must be exempt from every kind of criminal jurisdiction," and "[t]he consort of a sovereign must be accorded the same protection and exemption").

[10] *See also Kilroy v. Windsor*, Civ. No. C-78-291, 1978 U.S. Dist. LEXIS 20419, at *3 (N.D. Ohio Dec. 7, 1978) (dismissing suit against the Prince of Wales on the Executive's Suggestion of Immunity, the State Department having deemed his visit "a special diplomatic mission" and the Prince "an official diplomatic envoy").

reciting that "[u]nder general principles of international law, heads of State and immediate members of their families are immune from suit" and that "[t]he United States follows that rule and implements it by the filing of a suggestion of immunity," dismissed the complaint against her; the Appellate Division affirmed without opinion. 141 Misc. 2d at 788-89; 154 A.D.2d at 959. In *Leutwyler*, a court in this District dismissed all claims against Queen Rania of Jordan — "the spouse of the King of Jordan, the sitting Head of State of Jordan" — upon a Suggestion of Immunity filed at the request of the Department of State, which had determined that "[u]nder customary rules of international law, recognized and applied in the United States, the Queen is immune from the jurisdiction of the United States courts in this case." Letter of Acting Legal Adviser James H. Thessin to Acting Assistant Attorney General Stuart E. Schiffer at 1 (Mar. 19, 2001) (attached as Ex. C) ("Thessin Letter"); 184 F. Supp. 2d at 280. And in the Marcos grand-jury litigation, both the Fourth Circuit and the Second Circuit treated the immunity of the former First Lady of the Philippines as coextensive with her husband's: proceedings were permitted only because "[r]espect for Philippine sovereignty" required the courts "to honor the Philippine government's revocation of the head-of-state immunity of Mr. and Mrs. Marcos." *Doe No. 700*, 817 F.2d at 1111; *accord In re Doe*, 860 F.2d at 44 (immunity "has been waived by the successor Aquino government"). A waiver presupposes immunity existed to be waived.

The rationale for the rule tracks the rationale for head-of-state immunity itself, which rests on the personification of the state in its ruler, Maduro Mem. at 20, and which exists "to promote comity among nations by ensuring that leaders can perform their duties without being subject to detention, arrest or embarrassment in a foreign country's legal system." *Doe No. 700*, 817 F.2d at 1110. A head of state whose wife may be arrested, detained, and criminally tried by a foreign power is subject to precisely the coercion and indignity the immunity exists to prevent. Indeed, the

seizure of a leader's spouse is among the oldest instruments of coercion known to international relations. See sources cited *supra* note 9. The United States government itself has long treated the President's spouse as an institutional figure: Congress provides by statute for assistance to the President's spouse "in connection with assistance provided by such spouse to the President in the discharge of the President's duties and responsibilities," 3 U.S.C. § 105(e); the D.C. Circuit has accepted the government's argument that "Congress itself has recognized that the President's spouse acts as the functional equivalent of an assistant to the President," *Ass'n of Am. Physicians & Surgeons v. Clinton*, 997 F.2d 898, 904 (D.C. Cir. 1993) (construing FACA); and a federal court has held communications with the First Lady covered by presidential executive privilege, finding that she "is widely seen as an advisor to the President[.]" *In re Grand Jury Proceedings*, 5 F. Supp. 2d 21, 27-28 (D.D.C. 1998) (privilege ultimately held overcome by the grand jury's particularized showing of need). The United States cannot deny to Venezuela's First Lady what it claims for its own.[11]

### C. Recognizing Ms. Flores de Maduro's Immunity Applies Established Executive-Branch Policy; It Creates Nothing New.

The Executive's position in this case does not change the inquiry. Under the common law the question has always been "whether the ground of immunity is one which it is the established

[11] The same rule has governed the family of diplomatic agents for centuries: under the Vienna Convention on Diplomatic Relations, "the members of the family of a diplomatic agent forming part of his household shall, if they are not nationals of the receiving State, enjoy" the same personal inviolability and immunity from criminal jurisdiction as the agent himself. Vienna Convention on Diplomatic Relations arts. 29, 31(1), 37(1), Apr. 18, 1961, 23 U.S.T. 3227. It would be anomalous for the family of an ambassador to enjoy a protection denied to the family of the sovereign the ambassador merely represents. *Cf. In re Grand Jury Proceedings, Doe No. 700*, 817 F.2d 1108, 1111 (4th Cir. 1987) (reasoning from the Convention's provision that "the immunity from jurisdiction of diplomatic agents [and their families] . . . may be waived by the sending State" to the waivability of head-of-state immunity, because "we see no reason that its rationale should not also apply to heads of state"). The *Domingo* court made the same point about the principals: because the FSIA left untouched the immunity of "diplomatic or consular officials," who "enjoy absolute immunity," it "would be illogical to accord a lesser degree of immunity to a foreign head of state than to a diplomat appointed by that head of state." 1983 U.S. Dist. LEXIS 20372, at *6.

policy of the [State Department] to recognize," *Samantar*, 560 U.S. at 312 (quoting *Hoffman*, 324 U.S. at 36) — a policy "long and consistently recognized and often certified by the State Department and for that reason acted upon by the courts even when not so certified." *Hoffman*, 324 U.S. at 36. The government's own filings answer that question. As detailed in *Kline* and in *Leutwyler*, the Executive Branch has, through the United States Attorney for this very District, suggested the immunity of a foreign head of state's spouse, and in *Estate of Domingo v. Marcos* it did so for the wife of a sitting head of state. The Department of State filed a Suggestion of Immunity for President Ferdinand Marcos and his wife, Imelda Marcos, and the district court dismissed the claims against both on December 23, 1982. The Department of Justice, cataloguing its own practice, later described the case as an "action alleging political conspiracy by then President Ferdinand E. Marcos and Imelda Marcos, then First Lady of the Republic of the Philippines, and others dismissed against President and Mrs. Marcos pursuant to suggestion of immunity." *Mumtaz* Suggestion ¶ 4, Ex. A. And when the plaintiffs moved to vacate that dismissal, the court took up "de novo the substantive question of the immunity of those defendants," found no evidence that Congress "intended to eliminate the Suggestion of Immunity procedure as a means of securing the dismissal of an action against a foreign head of state," and held "that it must accede to the Suggestion of Immunity made by the Department of State with respect to defendants Ferdinand Marcos and Imelda Marcos." *Estate of Domingo v. Marcos*, 1983 U.S. Dist. LEXIS 20372, at *4–*6 (W.D. Wash. July 14, 1983); *see id.* at *15. Those suggestions were framed as statements of law, not as favors extended to friendly governments. The *Kline* court, granting the government's suggestion, held that "[u]nder general principles of international law, heads of State and immediate members of their families are immune from suit," and that "[t]he United States follows that rule and implements it by the filing of a suggestion of immunity." 141 Misc. 2d at

788. In *Leutwyler*, the State Department explained that it sought Queen Rania's immunity "[u]nder customary rules of international law, recognized and applied in the United States," and "in view of the foreign policy implications of allowing this action against the spouse of a foreign Head of State to proceed." Thessin Letter at 1. The Executive in each case was certifying a rule of customary international law, which the court agreed with; the Executive was not simply exercising case-by-case grace.

Courts do not simply rely on the Executive's assertion when it comes to suggestions of immunity: they dismiss when the rule the Executive articulates *is* the law. The *Kline* court held the First Lady of Mexico immune "[u]nder general principles of international law"; the Appellate Division unanimously affirmed; and the court dismissed every claim against Queen Rania for the same reason—spouses of heads of state hold the same immunity as the head of state. 141 Misc. 2d at 788-89; 154 A.D.2d at 959; 184 F. Supp. 2d at 280.[12] Spousal immunity has thus entered the law of this forum through the very channel the common law prescribes: the Executive has recognized the ground of immunity, and the courts have given it effect. The Department of Justice has described *Kline* in its own filings as the "dismissal of suit against wife of President of Mexico." *Mumtaz* Suggestion ¶ 3, Ex. A. In *Hoffman* terms, immunity for the immediate family of a head of state is not a "new ground[]" of immunity "which the government has not seen fit to recognize," 324 U.S. at 35; it is a ground the government has repeatedly seen fit to recognize in its own filings

[12] Queen Rania's title, like a first lady's, derives from marriage rather than office. She was Princess Rania, the wife of Prince Abdullah, and upon King Hussein's death "Prince Abdullah and his wife became King and Queen of Jordan." 184 F. Supp. 2d at 281. Jordan is "governed by a king who serves as head of state, chief executive and commander-in-chief," *id*., and the Queen performs her public functions through the Office of Her Majesty the Queen, which is described as "a Jordanian governmental body." Id. at 280; cf. 3 U.S.C. § 105(e). The spouse of Jordan's head of state thus stood precisely where a first lady stands. The State Department recognized her immunity as "the spouse of the King of Jordan, the sitting Head of State of Jordan," Thessin Letter at 1; the court described the Suggestion as an Executive "determination that Queen Rania is a head of state who should be immune from suit in courts of the United States," 184 F. Supp. 2d at 280, and "by order dated June 13, 2001, the Court dismissed all of the claims asserted against Queen Rania." *Id.*

— in 1982, 1988, and 2001 — and one stated in the leading treatise on the law of nations. *See* 1 L. Oppenheim, *International Law* § 348, at 759 (8th ed. 1955); *supra* note 9. And therefore, it is "not for the courts to deny an immunity which our government has seen fit to allow[.]" *Hoffman*, 324 U.S. at 35.

### D. Non-Recognition of a Government Cannot Defeat an Immunity That Belongs to the Recognized State of Venezuela.

The government cannot argue simply that since the Executive declined to recognize Mr. Maduro's government, no immunity can flow from his office or reach his family. The Maduro Memorandum refutes that position as a matter of common law and customary international law. Maduro Mem. Point I. But the argument fails for a further reason specific to the immunity asserted here: it aims at the wrong object. Recognition is a "formal acknowledgement" either "that a particular entity possesses the qualifications for statehood" or "that a particular regime is the effective government of a state." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 11 (2015) (citation omitted). American courts have never treated the Executive's recognition decisions as altering the juridical facts beneath them. Recognition determines whom the United States will deal with — and what privileges a regime may claim from our courts — but where rights turn on whether a government in fact exists and governs, courts have always answered that question for themselves, on the de facto realities.[13] When the Executive recognizes, courts are "bound to accept

[13] *See Kadic v. Karadžić*, 70 F.3d 232, 244–45 (2d Cir. 1995) (holding that an unrecognized entity may satisfy the criteria of statehood, so that its leader's acts may be treated as state action for purposes of the Alien Tort Statute; statehood under international law "does not require recognition by other states"; "an unrecognized state is not a juridical nullity," and "[o]ur courts have regularly given effect to the 'state' action of unrecognized states"); *Ford v. Surget*, 97 U.S. 594, 620 (1878) (Clifford, J., concurring) (summarizing *Fifield v. Insurance Co. of Pennsylvania*, 47 Pa. 166) ("[A]ny government, however violent and wrongful in its origin, must be considered a de facto government if it was in the full and actual exercise of sovereignty over a territory and people large enough for a nation."); *Thorington v. Smith*, 75 U.S. 1, 9–12 (1869); *United States v. Insurance Cos.*, 89 U.S. 99, 101–03 (1875); *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena,* 433 F.2d 686, 699 (2d Cir. 1970) (stating that "the acts of an unrecognized regime which pertain to its purely local, private, and domestic affairs will be given effect," while applying West German law to the extraterritorial question presented); *Salimoff & Co. v. Standard Oil Co. of New York*, 262 N.Y. 220, 227 (1933) ("To refuse to recognize that Soviet Russia is a government regulating the internal affairs of the country, is to give to

that determination, although they are free to draw for themselves its legal consequences in litigations pending before them," *Guaranty Trust Co. v. United States*, 304 U.S. 126, 138 (1938); when it withholds recognition, that choice is "a material fact but only a preliminary one," *Upright v. Mercury Business Machines Co.*, 13 A.D.2d 36, 41 (1st Dep't 1961) — not a finding that the government does not exist, and not even an automatic bar to that government's own resort to our courts, *National Petrochemical Co. of Iran v. M/T Stolt Sheaf*, 860 F.2d 551, 554 (2d Cir. 1988) ("[T]he absence of formal recognition does not necessarily result in a foreign government being barred from access to United States courts.") (reversing dismissal where the Executive Branch had filed a statement of interest asking that Iran be afforded access to United States courts).[14] The United States has never withdrawn its recognition of Venezuela's *statehood*; it maintains diplomatic relations with Venezuela and reopened its embassy in Caracas in March 2026. Maduro

fictions an air of reality which they do not deserve."); *Upright v. Mercury Business Machines Co.*, 13 A.D.2d 36, 38 (1st Dep't 1961) (Breitel, J.) ("A foreign government, although not recognized by the political arm of the United States Government, may nevertheless have de facto existence which is juridically cognizable."); *cf. Sokoloff v. National City Bank*, 239 N.Y. 158, 165–66 (1924) (Cardozo, J.) (declining to give effect to Soviet decrees, but recognizing that the juridical consequences of non-recognition are "subject to self-imposed limitations of common sense and fairness"). Indeed, the same court that held the unrecognized Soviet state immune from suit, *Wulfsohn v. Russian Socialist Federated Soviet Republic*, 234 N.Y. 372, 375–76 (1923), held the same year that the same regime could not sue as plaintiff, *Russian Socialist Federated Soviet Republic v. Cibrario*, 235 N.Y. 255, 262–63 (1923) (distinguishing Wulfsohn): recognition decides what a government may ask of our courts; it does not decide whether the state exists or whether it is immune.

[14] The Venezuela litigation of the past seven years enforced exactly this division. Once the Executive recognized an interim government, courts accepted its appointees — not the government in actual control on the ground — as authorized to speak for Venezuela and PDVSA in American proceedings. *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126, 135 n.2 (3d Cir. 2019) ("As a practical matter, there is reason to believe that Guaidó's regime does not have meaningful control over Venezuela or its principal instrumentalities such as PDVSA. Nonetheless, under Guaranty Trust . . . we recognize Guaidó's regime as authorized to speak and act on behalf of Venezuela in these appeals."). But that recognition moved nothing else: Venezuela remained a foreign state and PDVSA its instrumentality under the FSIA. When the Guaidó-led interim government the Executive had recognized pressed the reverse, arguing that the recognition power forbade courts to give effect to an arbitration the derecognized Maduro government had litigated for the state, the courts rejected the premise. Enforcing the award "in no way 'recognizes' anyone purporting to act on behalf of a sovereign state," *Valores Mundiales, S.L. v. Bolivarian Republic of Venezuela*, 87 F.4th 510, 521 (D.C. Cir. 2023); the award "runs against the foreign state, not any particular government thereof," and "the President's recognition decision in 2019 changed only the government of the Bolivarian Republic of Venezuela that the U.S. would recognize; it did not change the United States' recognition of Venezuela as a sovereign state over its territory," *Venezuela US SRL v. Bolivarian Republic of Venezuela*, 789 F. Supp. 3d 1, 13 (D.D.C. 2025), *aff'd*, 178 F.4th 679, 683-84 (D.C. Cir. 2026) (2-1 decision) (relying on *Valores Mundiales*). A recognition dispute that leaves the state's obligations intact leaves the state's immunity intact as well.

Mem. at 8; see also id. at 26. Whatever the Executive's quarrel with those who govern Venezuela, the state itself remains, in the eyes of the United States, a sovereign equal.

That matters because the immunity asserted in this motion belongs to that state. Head-of-state immunity "is primarily an attribute of state sovereignty, not an individual right," *Doe No. 700*, 817 F.2d at 1111: the head of state is immune because he is treated as the state itself, *supra* Section B & note 9, and his wife is immune because the law of nations does not permit a foreign court to reach the sovereign through his household, *supra* Section B. The question the government's recognition argument actually poses, then, is whether a state recognized by the United States loses its sovereign rights whenever the Executive disputes the credentials of its government. That question was answered more than 150 years ago: "The reigning Emperor, or National Assembly, or other actual person or party in power, is but the agent and representative of the national sovereignty. A change in such representative works no change in the national sovereignty or its rights." *The Sapphire*, 78 U.S. 164, 168 (1870). Ever since, courts have held that "the rights and liabilities of a state are unaffected by a change either in the form or personnel of its government, however accomplished, whether by revolution or otherwise. No other doctrine is thinkable, at least among nations which have any conception of international honor." *Agency of Canadian Car & Foundry Co. v. American Can Co.*, 253 F. 152, 157 (S.D.N.Y. 1918), *modified on other grounds*, 258 F. 363 (2d Cir. 1919); *accord Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 731 F. Supp. 619, 622–23 (S.D.N.Y. 1990). If revolution itself works no change in the sovereign rights of the state, the forum executive's refusal to recognize the officials of a continuing — and, as the Indictment concedes, actually governing — government cannot do so.

The conclusion follows directly. Venezuela, the state the United States recognizes, has asserted this immunity in the chamber of the Security Council, has circulated its protest to every

Member State as an official document of the United Nations, and has demanded the return of its First Lady. *Supra* Background C. And because "it is the state that gives the power to lead and the ensuing trappings of power — including immunity," the state alone could surrender what it has instead asserted. *In re Doe*, 860 F.2d at 45. A dispute about which persons speak for Venezuela is one the recognized state has resolved for itself — and one the Executive has resolved in the same way whenever convenient, dealing with the Maduro government as Venezuela's operative government for prisoner exchanges and presidential negotiations, and ultimately recognizing as head of state an official whose entire claim to office flows from Mr. Maduro's appointment. *Infra* Point III. Non-recognition of a government is a political instrument. It "works no change" in the immunity of the state. *The Sapphire*, 78 U.S. at 168.

### E. Immunity Attached When the Grand Jury Returned the Indictment, and the Government's Extraordinary Violation Cannot Extinguish It.

The grand jury returned the Indictment against Ms. Flores de Maduro under seal on December 23, 2025. On that day, on any account of events, Mr. Maduro was exercising the powers of the Venezuelan presidency from Caracas: the Indictment returned that day alleges in the present tense that he "*is* now . . . the *de facto* . . . ruler of the country," ¶ 5 (emphasis added), and identifies Ms. Flores de Maduro, in the present tense, as "the *de facto* First Lady of Venezuela." ¶ 8. The criminal process instituted against her that day was brought against a person absolutely immune from this Court's jurisdiction.

That timing is dispositive. Under customary international law, the mere *issuance* of criminal process against a person protected by status-based immunity violates the immunity, without regard to whether the process is ever executed. In the *Arrest Warrant* case, the International Court of Justice held that Belgium's issuance and circulation of an arrest warrant for a sitting foreign minister "failed to respect the immunity" he enjoyed — the violation was complete

upon issuance. 2002 I.C.J. 3, ¶¶ 70-71. The Court so held in a prosecution for war crimes and crimes against humanity: having "carefully examined State practice," it was "unable to deduce" any "form of exception" to the immunity from criminal jurisdiction of "incumbent Ministers for Foreign Affairs" who are "suspected of having committed war crimes or crimes against humanity." *Id.* ¶ 58; *see id.* ¶ 51 (treating together the immunities of "the Head of State, Head of Government and Minister for Foreign Affairs"). Immunity "may well bar prosecution for a certain period or for certain offences" yet confers no impunity, because "[i]mmunity from criminal jurisdiction and individual criminal responsibility are quite separate concepts" — the first procedural, the second substantive. Id. ¶ 60. And though conventions against serious crimes may oblige states to extend their criminal jurisdiction, "such extension of jurisdiction in no way affects immunities under customary international law," which "remain opposable before the courts of a foreign State." Id. ¶ 59. An immunity that admits no exception for crimes against humanity admits none for the narcotics offenses alleged here. The same judgment catalogued the only routes around such immunity — trial in the official's own country, waiver by the state, prosecution of a *former* official for acts "committed during that period of office in a private capacity," or certain international tribunals, *id.* ¶ 61 — and none is present here: the United States is not Venezuela; Venezuela has waived nothing and demands her release; Ms. Flores de Maduro held her offices and her status the day the Indictment was returned, and the acts alleged are official, *infra* Point II; and this Court is not an international tribunal. This District's law is in accord: "criminal immunity precludes the exercise of jurisdiction by the courts over an individual whether the incident occurred prior to or during the period in which such immunity exists," and "the Government may not proceed on an Indictment obtained when [the defendant] was immune from the jurisdiction of the Court." *Khobragade*, 15 F. Supp. 3d at 387-88 (dismissing indictment returned while the defendant held

diplomatic immunity, even though she had since lost that immunity). The Indictment against Ms. Flores de Maduro was obtained while she was immune, and it cannot stand. *Khobragade* observed that a new indictment might follow once a former diplomat's immunity had lapsed, *id.* at 388; here, Venezuela has neither waived Ms. Flores de Maduro's immunity nor removed her husband from office, so the immunity that barred the Indictment the day it was returned bars this prosecution today. *Infra* Section F.

Nor can the government argue that the January 3, 2026, abduction, or the Executive's subsequent recognition of a new acting President, retroactively validated the charge. The argument would be circular in the way the Maduro Memorandum has already exposed: it would mean the Executive can extinguish an immunity whose very first protection is freedom from arrest and detention simply by arresting and detaining the protected persons. On that theory, head-of-state immunity, and the immunity of the head of state's family, would exist only until the moment the United States saw fit to violate it. That is not the law; it is the negation of the law. *See* Maduro Mem. at 29 (a rule under which non-recognition defeats immunity would render head-of-state immunity "a nullity"); *cf. Doe No. 700*, 817 F.2d at 1110 (immunity exists "to promote comity among nations by ensuring that leaders can perform their duties without being subject to detention [or] arrest").

### F. The Marcos Cases Confirm, Rather Than Defeat, Ms. Flores de Maduro's Immunity.

The grand-jury litigation cases involving Ferdinand and Imelda Marcos provide the strongest support. In each, the courts proceeded against the former First Lady of the Philippines only *after*, and expressly *because*, the government of the Philippines had waived "any residual sovereign, head of state, or diplomatic immunity" of "former Philippine President Ferdinand Marcos and his wife Imelda Marcos." *In re Doe*, 860 F.2d at 43-44 (holding "that whatever

immunity the Marcoses — assuming, without deciding, that Mrs. Marcos as a former First Lady of the Philippines is a head-of-state for purposes of this doctrine — possessed as heads-of-state has been waived by the successor Aquino government"); *Doe No. 700*, 817 F.2d at 1111 (holding that "the current Philippine government has waived whatever head-of-state immunity was enjoyed by Ferdinand and Imelda Marcos," out of "[r]espect for Philippine sovereignty"). Both decisions rested on waiver: whatever immunity the former First Lady held was the Philippines' to remove, and the Philippines removed it. Neither court needed to decide the question presented here, because neither faced a sitting First Lady whose government asserts, rather than waives, her immunity. Venezuela has not removed Ms. Flores de Maduro's immunity. Rather, it has asserted it — formally, publicly, and at the highest level: by demand of its Permanent Representative before the Security Council, naming Ms. Flores de Maduro and demanding respect for the immunities of the President and his wife. S/PV.10085, at 22-23; *supra* Background C. If "[r]espect for Philippine sovereignty" required honoring the Philippines' waiver, then respect for Venezuelan sovereignty requires honoring Venezuela's assertion. The immunity belongs to the state, supra Section D, and the state to which it belongs has spoken.

The Marcos courts' further observation that there may be "respectable authority for denying head-of-state immunity to a former head-of-state for private or criminal acts," *In re Doe*, 860 F.2d at 45, does not apply here for three reasons. First, Mr. Maduro is not a "former" head of state: Venezuela recognizes no lawful removal; no election has been held; the Indictment itself alleged his present rule the day it was returned; and on the day of the abduction, Venezuela's highest court declared him the kidnapped "Constitutional President," classified his absence as forced, and expressly declined to declare the office vacant. TSJ Sentencia No. 0001 (Pollack Decl. Ex. 1). Next, the acts alleged against Ms. Flores de Maduro are official, not "private." *Infra* Point

II. Lastly, the charges against her were instituted while the immunity indisputably subsisted — the *Khobragade* bar to prosecution the Marcos cases never presented, because the Marcoses were charged only after they had fled the Philippines and their successor government had waived immunity. The one historical precedent for prosecuting a first lady thus rested on the one thing the government does not have: the consent by waiver of the sovereign.

## II. INDEPENDENTLY, THE INDICTMENT MUST BE DISMISSED BECAUSE IT ALLEGES ONLY ACTS UNDERTAKEN IN MS. FLORES DE MADURO'S OFFICIAL CAPACITIES OR AT THE DIRECTION OF VENEZUELA'S HEAD OF STATE.

Even if Ms. Flores de Maduro did not share her husband's status-based immunity, the Indictment would still have to be dismissed, because every act it attributes to her is an official act attributable to the Venezuelan state. The governing law is set out in the Maduro Memorandum, Point II, and adopted here: under the common law, current and former foreign officials — and those who act on the sovereign's behalf — are immune for "acts performed in [their] official capacity," *Matar v. Dichter*, 563 F.3d 9, 14 (2d Cir. 2009); the inquiry turns on attribution, not lawfulness, *see Underhill v. Hernandez*, 65 F. 577, 579 (2d Cir. 1895), *aff'd*, 168 U.S. 250 (1897); and allegations of corrupt motive or criminal intent cannot strip an official act of its official character, *see* Maduro Mem. at 36–39. Four showings specific to Ms. Flores de Maduro follow: the allegations against her describe official acts on their face (Section B); her acts as First Lady were the acts of a functional official performed at the head of state's direction, and so attributable to Venezuela (Section C); allegations of corrupt motive and personal enrichment do not defeat the immunity (Section D); and Venezuela has asserted her immunity through a formal state request — the very showing that, under the State Department's own articulated practice, completes the case for conduct-based immunity (Section E).

### A. Conduct-Based Immunity Extends to All Who Act on the Sovereign's Behalf — Officeholders and Agents Alike.

From the founding era, the common law has immunized not only ministers and officers but any "person acting under a commission from the sovereign of a foreign nation" for "what he does in pursuance of his commission." 1 Op. Att'y Gen. 81, 81 (1797); *see also* Letter of Secretary of State Daniel Webster (1841), *quoted in Underhill*, 65 F. at 581 (one whose acts were "a public transaction authorized by the British authorities" ought not "to be holden personally responsible, in the ordinary tribunals of law"); *cf.* Act of Aug. 29, 1842 (now 28 U.S.C. § 2241(c)(4)), enacted after the New York courts declined to discharge McLeod, *see Underhill*, 65 F. at 581. The principle is one of attribution: "the acts of the official representatives of the state are those of the state itself, when exercised within the scope of their delegated powers." *Underhill*, 65 F. at 579. Customary international law states the same rule: conduct is attributable to the state when carried out by its organs, by those exercising elements of governmental authority, or by persons "acting on the instructions of, or under the direction or control of," the state. Draft Articles on the Responsibility of States for Internationally Wrongful Acts, arts. 4, 5, 8, U.N. Doc. A/56/10 (2001) (attribution rules for state responsibility); *see* Maduro Mem. at 37 (Article 7: attribution holds even where the actor "exceeds its authority or contravenes instructions"). United States courts apply the rule to persons who hold no office at all. In *Butters v. Vance International, Inc.*, the Fourth Circuit extended sovereign immunity — there, the FSIA's derivative immunity, before *Samantar* assigned individual immunity to the common law — to a private contractor guarding a member of the Saudi royal family: "[p]roviding security for the royal family in this country is not a commercial act," a sovereign's "decision as to how best to secure the safety of its leaders" is "quintessentially an act 'peculiar to sovereigns,'" and a contractor that was "following Saudi Arabia's orders" shares the sovereign's immunity. 225 F.3d 462, 464-66 (4th Cir. 2000). Likewise, the wife of the head of

state, acting at his direction and through the state's own military and law-enforcement apparatus, acts on the sovereign's behalf.

### B. Every Allegation Against Ms. Flores de Maduro Describes Official Acts and State Instrumentalities.

*First*, ¶ 21(b) alleges that, while President of the National Assembly, Ms. Flores de Maduro brokered "a meeting between a large-scale drug trafficker and the director of Venezuela's National Anti-Drug Office." Whatever else may be said of that allegation, the act it describes — arranging access to the head of a state law-enforcement agency — is an exercise of the official access and influence that attend high office; it is not something a private citizen does. The act falls within the "strictly political or public acts" that the Second Circuit has treated as sovereign — "internal administrative acts," *Victory Transport, Inc. v. Comisaria General de Abastecimientos y Transportes*, 336 F.2d 354, 360 (2d Cir. 1964); *see Halkbank III*, 120 F.4th at 56 — and it concerns the state's police power, which "has long been understood for purposes of the restrictive theory as peculiarly sovereign in nature." *Saudi Arabia v. Nelson*, 507 U.S. 349, 361 (1993); *see id.* at 362 ("Exercise of the powers of police and penal officers is not the sort of action by which private parties can engage in commerce."); *Butters*, 225 F.3d at 465 (quoting *Nelson*). The allegation that she accepted money in connection with the act goes to motive, not to the act's official character, and motive is irrelevant. *Infra* Section D.

*Second*, ¶ 21(d), the core allegation against her, describes conduct that is governmental in every element. The narcotics were "previously seized by Venezuelan law enforcement": they were contraband in the custody of the state, and the disposition of state-seized contraband is a uniquely governmental function. The transport allegedly proceeded "with the assistance of armed military escorts": "acts concerning the armed forces" are among the "strictly political or public acts" to which immunity attaches. *Halkbank III*, 120 F.4th at 56; *Victory Transport*, 336 F.2d at 360. The

"colectivos" she allegedly "maintained" are, by the governing party's own description organizations that may be "guided by the government" and that serve to effectuate the government's goals. And she allegedly "ordered" acts: language of authority, not of private crime. The firearms counts rest on the same allegations: the "machineguns and destructive devices" the government invokes are the weapons of Venezuela's military escorts and state-sponsored organizations. ¶¶ 31-35. A charge that a foreign official stands criminally liable for the arms carried by her state's own soldiers is a charge concerning the Venezuelan military, and "acts concerning the armed forces" belong to the sovereign. *Halkbank III*, 120 F.4th at 56.

*Third*, ¶ 21(k) alleges no act by Ms. Flores de Maduro whatsoever. It describes recorded statements of two relatives to informants and identifies her only as the intended beneficiary of funds for "a campaign . . . in connection with a late-2015 election for the Venezuelan National Assembly." Standing for election to a national legislature is public, political activity — and in any event, the statements of others cannot convert Ms. Flores de Maduro's candidacy into a private criminal act of her own. There is nothing in ¶ 21(k) to which immunity even attaches; it alleges no conduct by her at all.

The Indictment thus stands in precisely the posture *Heaney v. Government of Spain* described: where the pleading itself alleges that the defendant was "an employee and agent of the . . . Government," that allegation "might well be sufficient to dispose of" the claim against the official, because a pleader who "alleges no facts, as distinguished from legal conclusions," cannot "defeat a claim of immunity." 445 F.2d 501, 504, 506 n.5 (2d Cir. 1971) (affirming dismissal of both the state and its consular official, the latter also on the ground of consular immunity); *accord In re Terrorist Attacks on Sept. 11, 2001*, 122 F. Supp. 3d 181, 188-89 (S.D.N.Y. 2015) (official immune where "[p]laintiffs' allegations… only relate to decisions and actions he took as the

director of…two Saudi instrumentalities," notwithstanding allegations that he used them to fund al Qaeda); *Rosenberg v. Lashkar-e-Taiba*, 980 F. Supp. 2d 336, 342 (E.D.N.Y. 2013) (former Directors General of Pakistani intelligence immune from claims that they coordinated the Mumbai attacks, where the State Department determined the complaint "refers not to any private conduct by defendants"), *aff'd sub nom. Rosenberg v. Pasha*, 577 F. App'x 22 (2d Cir. 2014) (summary order).

### C. Ms. Flores de Maduro's Acts as First Lady Were the Acts of a Functional Official, Performed at the Direction of the Head of State, and Are Attributable to Venezuela.

For the portion of the charged period after 2013, "First Lady" was not simply a title, but rather a working public role. As a matter of function, the First Lady of Venezuela, like the First Lady of the United States, is an institutional figure who performs public duties on behalf of the state. Similarly, Congress funds the President's spouse's assistance "to the President in the discharge of the President's duties and responsibilities," 3 U.S.C. § 105(e); the D.C. Circuit has accepted that the presidential spouse acts as "the functional equivalent of an assistant to the President," *AAPS*, 997 F.2d at 904; and a federal court extended executive privilege to her communications on the finding that "Mrs. Clinton is widely seen as an advisor to the President." *In re Grand Jury Proceedings*, 5 F. Supp. 2d at 27-28.

As a matter of attribution, the point is more fundamental. The Indictment's own theory is that Ms. Flores de Maduro acted *with and through* her husband, the head of state, and through state instrumentalities under his command. ¶¶ 3, 18, 21(d). Acts performed "on the instructions of, or under the direction or control of" the state are the state's acts, Draft Articles art. 8, and one who acts on the sovereign's orders shares the sovereign's immunity, *see Butters*, 225 F.3d at 466 (agents "enjoy derivative immunity when following the commands of a foreign sovereign employer"; "[i]f

Vance was following Saudi Arabia's orders . . . , Vance would be entitled to derivative immunity"). The government cannot have it both ways: its Indictment alleges that the family *was* the apparatus of Venezuelan state power — that drug trafficking "concentrated power and wealth in the hands of MADURO MOROS's family," ¶ 3, within "a patronage system run by those at the top," ¶ 16 — and then asks this Court to treat the family's alleged acts as private frolics. On the Indictment's own telling, whatever Ms. Flores de Maduro allegedly did, she did as part of the governing structure of Venezuela, at the direction of its ruler. That is attribution to the state and immunity attaches.

### D. Allegations of Corrupt Motive and Personal Enrichment Do Not Defeat the Immunity.

Allegations of corrupt motive, self-enrichment, and criminality do not alter the official character of the acts alleged. The Maduro Memorandum establishes the governing principles at length — conduct-based immunity turns on attribution, not lawfulness; "if it is a sovereign act, then, whether it be according to law or not according to law, we cannot inquire into it." *Duke of Brunswick v. King of Hanover*, 2 H.L. Cas. 1, 17, 21 (1848). An official act does not become private because it "allegedly violates a generally applicable law," *Trump v. United States*, 603 U.S. 593, 619 (2024); and "[t]he allegation of malicious or corrupt motives could always be made," which is why motive is categorically irrelevant to absolute immunities, *Bradley v. Fisher*, 80 U.S. 335, 354 (1871); *Dorman v. Higgins*, 821 F.2d 133, 139 (2d Cir. 1987). Ms. Flores de Maduro adopts that showing and develops additional points specific to her.

*First*, the personal-enrichment line of cases — *Jimenez v. Aristeguieta*, 311 F.2d 547 (5th Cir. 1962), and the Marcos civil litigation, *e.g.*, *Republic of Philippines v. Marcos*, 806 F.2d 344, 358-60 (2d Cir. 1986) — do not hold that an allegation of enrichment converts official conduct into private conduct. *Jimenez* was an extradition case in which the act-of-state defense failed on

the extradition court's affirmative finding that each charged act was "for the private financial benefit" of the accused — "financial crimes for his own private personal gain" that the court characterized as "common crimes committed by the Chief of State done in violation of his position and not in pursuance of it," 311 F.2d at 552, 557-58 — and the Marcos cases proceeded on the *requesting state's* theory: the Republic of the Philippines itself sued its former ruler and disclaimed his acts, and the Second Circuit observed that "when a state comes into our courts and asks that our courts scrutinize its actions, the justification for application of the doctrine may well be significantly weaker." 806 F.2d at 359. *Marcos* itself preserved the distinction that matters here — between "acts of Marcos as head of state, which may be protected from judicial scrutiny even if illegal under Philippine law, and his purely private acts." *Id.* Where — as here and as in *Kline* — the foreign state claims the official and her conduct, those cases are inapplicable. That line, moreover, concerns the character of the act, not its motive, and in each case the state whose office was at issue had itself disclaimed the acts: Venezuela sought Pérez Jiménez's extradition for them, and the Republic of the Philippines sued Marcos over them. Here, by contrast, the state whose offices and instrumentalities are alleged to have been used has asserted Ms. Flores de Maduro's immunity and demanded her release, *supra* Background C, and every act alleged against her is an exercise of office or of state instrumentalities, whatever its alleged purpose. *Supra* Section B. The line that matters is the one *Doe 1 v. Buratai* drew in applying conduct-based immunity: "it is also appropriate to look to statements of the foreign state that either authorize or ratify the acts at issue," and where a state has embraced its officials' acts as its own, "it is not the Court's role to probe the sincerity, truth, or ethics" of that decision; the state's "authorization and ratification establishes that the defendants acted in their official capacities." 318 F. Supp. 3d at 232-33 (citation omitted). Venezuela's posture here is the opposite of the disclaiming sovereign's: far from disclaiming Ms.

Flores de Maduro, it stood before the Security Council to demand that the United States respect her immunity and release her. *Supra* Background C.

*Second*, as to ¶ 21(b): the allegation that Ms. Flores de Maduro received payments in connection with brokering official access is an allegation about *why* she exercised her office's influence, not *whether* the act was an exercise of office. Under *Bradley*, *Dorman*, and *Trump*, that is the end of the matter: "since absolute immunity spares the official any scrutiny of his motives, an allegation that an act was done pursuant to a conspiracy has no greater effect than an allegation that it was done in bad faith or with malice, neither of which defeats a claim of absolute immunity." *Dorman*, 821 F.2d at 139. Were the rule otherwise, "conduct-based immunity would be meaningless if it only protected officials who were not accused of any wrongdoing." Maduro Mem. at 36.

### E. Venezuela Has Asserted Her Immunity Through Formal Diplomatic Channels — the Showing the Executive's Own Practice Treats as Sufficient.

The State Department's own articulation of its practice confirms that Ms. Flores de Maduro is entitled to conduct-based immunity. As Judge Daniels has summarized, the Department "has consistently recommended conduct-based sovereign immunity when (1) the foreign state requests it, and (2) the defendant acted in his official capacity on behalf of a recognized foreign government." *In re Terrorist Attacks*, 122 F. Supp. 3d at 188. In making the official-capacity determination, the Department's stated rule is that "[o]n their face, acts of defendant foreign officials who are sued for exercising the powers of their office are treated as acts taken in an official capacity." *Id.* at 189 (quoting the Department's Statement of Interest in *Rosenberg*). Both elements are satisfied. Venezuela has asserted Ms. Flores de Maduro's immunity — in the very manner the Department's practice contemplates, which considers "a foreign government's request (*if there is*

*such a request*)," *In re Terrorist Attacks*, 122 F. Supp. 3d at 188 n.11 (quoting the *Rosenberg* Statement of Interest) — by demanding in the Security Council that the United States respect the immunities of its President and First Lady. *Supra* Background C. No particular form is required: Nigeria's request was a diplomatic note the State Department never acted upon, *Buratai*, 318 F. Supp. 3d at 224, 231; Saudi Arabia's was its Ambassador's declaration filed with the motion to dismiss, *In re Terrorist Attacks*, 122 F. Supp. 3d at 187-89; Israel's was its Ambassador's letter attached to the motion, *Belhas*, 515 F.3d at 1282, 1284. Venezuela's demand was delivered in the most formal diplomatic forum on earth.

As for official capacity, the Department's rule is satisfied on the face of the Indictment, *supra* Section B, and the Executive's own prior determination removes any doubt: OFAC designated Ms. Flores de Maduro "for being a current or former official of the Government of Venezuela." Notice of OFAC Sanctions Actions, 83 Fed. Reg. 50,144, 50,145 (Oct. 4, 2018). Nor does a state's backing of its official require conceding any allegation. In *Doe v. Zedillo*, the State Department recognized the conduct-based immunity of Mexico's former President where Mexico — without conceding the truth of any allegation — stated that "any actions that former President Ernesto Zedillo carried out in connection with the events alleged in the complaint were taken in the course of his official duties as head of state." Letter of Legal Adviser Harold Hongju Koh to Acting Assistant Attorney General Stuart F. Delery (Sept. 7, 2012), *Doe v. Zedillo Ponce de León*, No. 3:11-cv-1433 (D. Conn.), ECF 38-1. The Department's filing in the same case states the framework in terms: the State Department "also considers a foreign government's request for a suggestion of immunity, averring that the acts of its former official that are the subject of a lawsuit were taken (if at all) in an official capacity." Suggestion of Immunity ¶ 7, *Doe v. Zedillo*, ECF 38. Venezuela's protest proceeds on the same footing: it demands respect for the "immunities" of its

President and First Lady without conceding a single allegation. The Indictment, for its part, alleges acts that are exercises of the powers of Ms. Flores de Maduro's successive offices. *Supra* Section B. The recognition element cannot be deployed against her for the reasons the Maduro Memorandum establishes: recognition is a political act with no effect on immunity, and in all events the United States' own conduct — from prisoner exchanges to a presidential envoy's direct negotiations with Mr. Maduro in Caracas — acknowledged the Maduro government as Venezuela's operative government throughout. Maduro Mem. at 26.

### F. Cordones Does Not Control.

This Court's decision in *United States v. Cordones*, 2022 WL 815229 (S.D.N.Y. Mar. 17, 2022), denying conduct-based immunity to a retired general charged in an earlier indictment in this case, does not govern Ms. Flores de Maduro's motion. *Cordones* addressed only conduct-based immunity; it described status-based immunity as "afforded to sitting heads-of-state" and did not consider it, *id.* at *4, so it has no bearing on Point I. Nor does it govern the conduct-based claim here, for reasons the Court's own opinion identifies. *First*, *Cordones* applied *Halkbank I*'s holding that the decision to prosecute "manifest[s]" an Executive determination against immunity — a holding the Court treated as binding Circuit law even while observing that it was "not required to defer to the Executive Branch's views on whether [it] may exercise jurisdiction." 2022 WL 815229, at *5. Since then, the Supreme Court has vacated *Halkbank I*'s common-law holding and remanded, "express[ing] no view" on the contention that "the Executive Branch cannot unilaterally abrogate common-law immunity by initiating prosecution," *Halkbank II*, 598 U.S. at 280-81, and the Second Circuit has deferred to the Executive only after satisfying itself that the prosecution "comports with the substance of that common law" — expressly reserving whether deference could ever extend to a determination "in derogation of the common law." *Halkbank III*, 120 F.4th at 46,

52, 58-59; *see* Maduro Mem. Point III. *Second*, in *Cordones* there was "no indication that Venezuela ha[d] sought a suggestion of immunity for Defendant Cordones." 2022 WL 815229, at *4. Venezuela has asserted Ms. Flores de Maduro's immunity by name — before the Security Council. *Supra* Background C. *Third*, Mr. Cordones — who had broken with the Maduro government years earlier and did not "even dispute engaging in the conduct charged," *id.* at *5 — stood in no position to claim that Venezuela stood behind his acts, whereas Venezuela stands behind Ms. Flores de Maduro's. *Finally*, to the extent Cordones reasoned from *Kashef v. BNP Paribas S.A.*, 925 F.3d 53 (2d Cir. 2019), that acts violating a state's own laws cannot be official, *Kashef* is an act-of-state case, and the Second Circuit has since explained that the act-of-state doctrine "is not a principle of abstention, a grant of immunity, or a bar on liability based on compliance with foreign laws"; it is "a 'rule of decision' for the merits" that does not "bar an inquiry into the 'motivation' for, rather than the 'validity' of, a foreign sovereign act." *Celestin v. Caribbean Air Mail, Inc.*, 30 F.4th 133, 137-39 (2d Cir. 2022) (quoting *W.S. Kirkpatrick & Co. v. Env't Tectonics Corp., Int'l*, 493 U.S. 400, 406-08 (1990)) (internal quotation marks omitted); see Maduro Mem. Point II (immunity turns on attribution, not lawfulness; *Duke of Brunswick*; ILC art. 7). Nor does the Court's alternative holding that Mr. Cordones "was not acting in his official capacity" — because "his mere status as a high-ranking general does not make his conduct official," and an "abuse of power . . . does not render his conduct 'official' or immune from prosecution," *Cordones*, 2022 WL 815229, at *2 — reach Ms. Flores de Maduro. That holding rested on the Court's assessment that Mr. Cordones's intervention "was meant to thwart the application of" Venezuelan law rather than to exercise it, and could not be said to have been "to the benefit of the state or in furtherance of some overriding national interest," *id.* — an assessment made without any statement from Venezuela that it stood behind his acts. Venezuela has made that

statement as to Ms. Flores de Maduro, *supra* Background C, and under the conduct-immunity cases a state's ratification of its official's acts "establishes that the defendants acted in their official capacities." *Buratai*, 318 F. Supp. 3d at 233; *see Belhas*, 515 F.3d at 1283-84. The Court's further remark that "a rogue official of a rogue state is not entitled to immunity against a criminal prosecution," *Cordones*, 2022 WL 815229, at *4 n.2, rested on the Executive's non-recognition of Mr. Maduro's government — a position that cannot defeat an immunity belonging to the recognized state of Venezuela, *supra* Point I.D, and one that has since given way to the Executive's recognition, as Venezuela's head of state, of an official whose authority derives from Mr. Maduro's presidency. *Infra* Point III.

## III. NO DEFERENCE IS OWED TO THE EXECUTIVE POSITION THAT MS. FLORES DE MADURO LACKS IMMUNITY.

Ms. Flores de Maduro adopts Point III of the Maduro Memorandum: the Executive's decision to prosecute is not an immunity "determination" entitled to conclusive deference, and in any event no deference is owed where the Executive's position is in derogation of the common law. Two additional observations apply to her.

*First*, when courts do defer to Executive suggestions of immunity, they defer because the suggestion applies principles supplied by the law of nations — not because immunity is the Executive's to confer or withhold at will. *Hoffman* bounds the deference in both directions: it is "not for the courts to deny an immunity which our government has seen fit to allow," and courts may not "allow an immunity on new grounds which the government has not seen fit to recognize." 324 U.S. at 35. The suggestion practice treats immunity as substantive law: a court that relinquishes jurisdiction upon a suggestion does so "in conformity to an overriding principle of substantive law" — a principle the Court described as one of respect for the Executive's conduct of foreign relations, but a principle of law nonetheless. *Ex parte Republic of Peru*, 318 U.S. at 588; *cf.*

*Republic of Austria v. Altmann*, 541 U.S. 677, 701-02 (2004) (Executive views on a "pure question of statutory construction" "merit no special deference," while a State Department opinion on a particular pending case "might well be entitled to deference as the considered judgment of the Executive on a particular question of foreign policy"); in every spousal case the suggestion invoked that law — "general principles of international law" in *Kline*, and "customary rules of international law" applied to "the spouse of a foreign Head of State" in *Leutwyler*. Thessin Letter at 1. The reserved case is defined by the government's own concession. In *Halkbank III*, the Second Circuit opened its analysis of the scope of common-law immunity by recording that "[i]t is undisputed in this case that the United States would not subject Turkey — a state qua state — to criminal prosecution; indeed, the government acknowledges that doing so would be 'in derogation of the common law.'" 120 F.4th at 52 (quoting Appellee's Br. at 34). And it closed by leaving "for another day whether deference to the Executive in this context should be cabined if, unlike here, the Executive's denial of immunity to a foreign sovereign derogated from the common law — for instance, if the Executive indicted a state qua state." *Id.* at 59. This prosecution lies on the far side of the line the government itself drew. Head-of-state immunity "is primarily an attribute of state sovereignty, not an individual right," *Doe No. 700*, 817 F.2d at 1111, and, as the Second Circuit recounted in *Halkbank III*, is "tied closely to the sovereign immunity of foreign states," 120 F.4th at 52 n.8 (quoting *Yousuf v. Samantar*, 699 F.3d 763, 769 (4th Cir. 2012)); the immunity Ms. Flores de Maduro asserts is that same immunity, reaching the head of state's household because a foreign court may not reach the sovereign through his family. *Supra* Points I.B, I.D. To prosecute the head of state of a recognized foreign state, and his wife, is to reach the person of the sovereign — which is what the government told the Supreme Court it "would not endeavor" to do to the sovereign

itself. 120 F.4th at 52.[15] The same footnote's description of the Fourth Circuit's view that the Executive's "pronouncement as to head-of-state immunity is entitled to absolute deference," given "the Executive's constitutionally delegated powers" to recognize foreign heads of state, 120 F.4th at 52 n.8 (discussing *Yousuf*, 699 F.3d at 772-73), does not point the other way: the deference it describes attaches to an Executive pronouncement grounded in the recognition power, and the only recognition the Executive has made here is of Venezuela as a state and, most recently, of an official who derives her authority from Mr. Maduro as its head of state.

*Second*, the asymmetry of the Executive's conduct disposes of any claim to deference. In *Kline*, the Executive suggested the immunity of Mexico's First Lady from a civil suit. In *Kenemore v. Maduro Moros*, the State Department has suggested the immunity of Delcy Rodríguez — whose claim to office flows entirely from Mr. Maduro's allegedly "illegitimate" 2018 and 2024 re-election — as Venezuela's sitting head of state. Notice of Suggestion of Immunity, *Kenemore v. Maduro Moros*, No. 1:25-cv-23652 (S.D. Fla. July 20, 2026), ECFs 75 & 75-1; *see* Maduro Mem. at 8. Ms. Rodríguez's authority to act as anything, however, derives from the Sala Constitucional's decision of January 3, 2026 — a ruling premised on Mr. Maduro's status as the kidnapped "Constitutional President," whose functions Ms. Rodríguez may discharge only as caretaker ("Encargada") during his forced absence. TSJ Sentencia No. 0001 (Pollack Decl. Ex. 1). The government the United States has since recognized has never departed from that premise. *See supra* Point I.F. The Executive cannot borrow that decision's conclusion — that Ms. Rodríguez

[15] Asked at oral argument in *Halkbank II* whether the United States could have indicted Turkey itself, counsel for the United States answered: "we do acknowledge that there is a strong customary international law principle against prosecuting a state qua state. We would not endeavor to do so." Tr. of Oral Arg. at 50-51, *Halkbank II*, 598 U.S. 264 (No. 21-1450). He then described when a court might decline to defer to the Executive on a question of immunity: where the basis for the immunity is well established, "[t]hat could be the very rare case where the court does decide not to defer to the executive, where it's really just bucking an established trend, as opposed to perhaps trying to nudge the law in a particular direction, as we might be perceived to be trying to do in this case." *Id.* at 51. The immunity of a sitting head of state and his household is exactly such an established rule. *Supra* Point I.

wields presidential powers and enjoys head-of-state immunity — while repudiating its premise: that the United States kidnapped the sitting President and his wife whom it now prosecutes. An Executive that recognizes head-of-state immunity for the official Mr. Maduro appointed and is empowered to act in his stead to the extent he cannot because he has been abducted by the United States, while prosecuting the wife of the head of state it concedes actually ruled until it abducted him, is not applying "established policy" to which courts defer; rather it is using immunity as a shield when convenient to its needs, while wielding it as a sword when it does not. Deference to that position would make the immunity of foreign leaders and their families "nothing more than prosecutorial discretion." Maduro Mem. at 29.

## CONCLUSION

For the foregoing reasons, and for the reasons stated in the Maduro Memorandum, Ms. Flores de Maduro respectfully requests that the Court find that Ms. Flores de Maduro is entitled to sovereign immunity, both as the spouse of Venezuela's head of state and for the official acts alleged, and dismiss the Fourth Superseding Indictment against her, with prejudice, for a lack of jurisdiction.

Dated: September 2, 2026

Respectfully submitted,

PARKER, SÁNCHEZ & DONNELLY PLLC

By: /s/ M. Andrés Sánchez-Ross
M. Andrés Sánchez-Ross
Mark E. Donnelly
700 Louisiana Street, Suite 4520
Houston, Texas 77002
Tel.: 713-659-7200
andres@psd.law

Attorneys for Defendant
Cilia Adela Flores de Maduro