UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

– v. –

S5 11 Cr. 205 (AT)

NICOLÁS MADURO MOROS and
CILIA ADELA FLORES DE MADURO,

Defendants.

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT CILIA ADELA FLORES DE MADURO'S MOTION TO DISMISS THE FIFTH SUPERSEDING INDICTMENT FOR LACK OF JURISDICTION ON GROUNDS OF SOVEREIGN IMMUNITY**

## TABLE OF CONTENTS


PRELIMINARY STATEMENT ....................................................................................1

BACKGROUND ....................................................................................................6

A. Procedural History ..........................................................................................6

B. Ms. Flores de Maduro's Offices and the S5's Allegations Against Her..........................7

C. The United States Recognized the Government Ms. Flores de Maduro Served Until January 23, 2019; Dealt With It as Venezuela's Government for the Seven Years That Followed; and Has Recognized the Government That Now Defends Her Since March 2026 .10

1. Express Recognition, 2006 to January 23, 2019 ..............................................10

2. January 2019 to January 2026: The Executive Withheld the Word and Continued the Dealings ..........................................................................................11

3. Formal Recognition of the Government of Acting President Rodríguez, March 2026 15

D. The Seizure, and Venezuela's Assertion of Ms. Flores de Maduro's Immunity ...........17

LEGAL STANDARD..............................................................................................20

ARGUMENT .........................................................................................................21

POINT I .................................................................................................................21

MS. FLORES DE MADURO IS IMMUNE FROM THE CRIMINAL JURISDICTION OF THIS COURT BY VIRTUE OF HER STATUS, AND NEITHER THE PASSAGE OF TIME NOR THE EXECUTIVE'S NON-RECOGNITION OF MR. MADURO CAN STRIP VENEZUELA OF AN IMMUNITY THAT BELONGS TO IT .....................................21

A. Ms. Flores de Maduro Shares the Status-Based Immunity of Venezuela's Head of State, Which Attached When the Indictment Was Returned and When She Was Seized ........21

1. The Immunity Belongs to Venezuela, and the Executive's Withholding of Formal Recognition From a Government It Dealt With as Venezuela's Did Not Strip It................21

2. The Violation Is Measured When Criminal Process Issued and When Ms. Flores de Maduro Was Seized — Not "at the Time of Court Proceedings" .......................................29

3. The Government's Remaining Authorities Do Not Support Denying a Recognized State's Assertion of Immunity for Its Head of State's Household ......................................32

B. Independently, Ms. Flores de Maduro Holds a Residual, Status-Derived Immunity for Every Act the S5 Alleges During the Period in Which the United States Recognized the Government She Served.........................................................................................35

1. Recognition Validated the Acts of the Recognized Government From Its Inception 36

2. The Executive's Established Policy Recognizes Residual Immunity for Former Heads of State and Senior Officials for Acts Exercising the Powers of Their Office..........37

3. The S5's Allegations Against Ms. Flores de Maduro Fall Within That Policy .........41

4. The Authorities the Government Relies Upon Do Not Support Its Position .............42

C. The Government the United States Recognizes Has Asserted, Not Waived, Ms. Flores de Maduro's Immunity, in Every Form the Executive's Own Practice Treats as Sufficient ....44

POINT II ........................................................................................................................50

INDEPENDENTLY, MS. FLORES DE MADURO IS ENTITLED TO CONDUCT-BASED IMMUNITY; ILLEGALITY UNDER VENEZUELAN LAW DOES NOT MAKE AN ACT OF STATE ORGANS A PRIVATE ACT, AND CORDONES DOES NOT RESOLVE THIS MOTION........................................................................................................................50

A. Illegality Under Venezuelan Law Does Not Make an Act of State Organs a Private Act, and the Government's Authorities Hold Nothing to the Contrary ...................................51

B. Cordones Does Not Resolve This Motion ...................................................................54

POINT III........................................................................................................................57

COUNT TWO CHANGES NOTHING: STATUS IMMUNITY IS INDIFFERENT TO THE GRAVITY OF THE CHARGE, AND THE GOVERNMENT HAS PLEADED THE TORTURE CONSPIRACY AS THE EXERCISE OF STATE AUTHORITY "UNDER THE COLOR OF LAW"..........................................................................................................................57

A. Status-Based Immunity Admits No Exception for the Gravity of the Offense .............58

B. The Government Has Pleaded Count Two as Official Conduct, and the Conduct Alleged Falls Within the Recognized Period and the Executive's Own Residual-Immunity Practice ..........................................................................................................................61

POINT IV........................................................................................................................63

UNDER HALKBANK III, THE DEFERENCE THE GOVERNMENT INVOKES IS OWED ONLY TO AN EXECUTIVE POSITION THAT COMPORTS WITH THE COMMON LAW, AND THE POSITION TAKEN IN THIS PROSECUTION DOES NOT ...................................63

A. Halkbank III Deferred to a Denial of Immunity Because It Comported With the Common Law, and Reserved the Case in Which the Executive's Position Does Not.............63

B. The Executive's Position in This Prosecution Derogates From the Common Law, as Its Own Conduct Toward Venezuela in 2026 Confirms .............................................................65

C. The Rule the Government Proposes Is One the United States Has Rejected for Itself .67

CONCLUSION ...............................................................................................................69

# TABLE OF AUTHORITIES

## Cases


*Am. Justice Ctr. (AJC), Inc. v. Modi*, No. 14 Civ. 7780 (AT), 2015 U.S. Dist. LEXIS 177427 (S.D.N.Y. Jan. 14, 2015) ........ 22, 59

*Belhas v. Ya'alon*, 515 F.3d 1279 (D.C. Cir. 2008) ........ 47

*Broidy Capital Management LLC v. Muzin*, 12 F.4th 789 (D.C. Cir. 2021) ........ 44, 45, 46

*Cabiri v. Assasie-Gyimah*, 921 F. Supp. 1189 (S.D.N.Y. 1996) ........ 52

*Celestin v. Caribbean Air Mail, Inc.*, 30 F.4th 133 (2d Cir. 2022) ........ 51

*Doe 1 v. Buratai*, 318 F. Supp. 3d 218 (D.D.C. 2018), *aff'd on other grounds*, 792 F. App'x 6 (D.C. Cir. 2019) ........ 47

*Doe v. De Leon*, 555 F. App'x 84 (2d Cir. 2014) ........ 50

*Doe v. Qi*, 349 F. Supp. 2d 1258 (N.D. Cal. 2004) ........ 52

*Doğan v. Barak*, 932 F.3d 888 (9th Cir. 2019) ........ 43, 60, 62

*Eliahu v. Jewish Agency for Israel*, 919 F.3d 709 (2d Cir. 2019) ........ 51, 56

*Ex parte Republic of Peru*, 318 U.S. 578 (1943) ........ 20

*Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980) ........ 52, 62

*Giraldo v. Drummond Co.*, 808 F. Supp. 2d 247 (D.D.C. 2011), *aff'd*, 493 F. App'x 106 (D.C. Cir. 2012) ........ passim

*Guaranty Trust Co. v. United States*, 304 U.S. 126 (1938) ........ 28, 36

*Habyarimana v. Kagame*, 696 F.3d 1029 (10th Cir. 2012) ........ 22, 38, 59

*Hilao v. Marcos (In re Estate of Ferdinand Marcos, Human Rights Litigation)*, 25 F.3d 1467 (9th Cir. 1994) ........ 46, 62

*In re Doe*, 860 F.2d 40 (2d Cir. 1988) ........ passim

*In re Grand Jury Proceedings, Doe No. 700*, 817 F.2d 1108 (4th Cir. 1987) ........ 3, 30, 44, 65

*In re Terrorist Attacks on Sept. 11, 2001*, 122 F. Supp. 3d 181 (S.D.N.Y. 2015) ........ 40, 47

*Iran Handicraft & Carpet Export Center v. Marjan International Corp.*, 655 F. Supp. 1275 (S.D.N.Y. 1987), *aff'd*, 868 F.2d 1267 (2d Cir. 1988) (table) ........ 25

*Jimenez v. Aristeguieta*, 311 F.2d 547 (5th Cir. 1962) ........ 39, 53

*Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995) ........ 32, 52, 61

*Kaplun v. United Nations Relief & Works Agency*, No. 24 Civ. 4765 (AT), ECF 69 (S.D.N.Y. Sept. 30, 2025) ........ 44, 51, 59, 64

*Kashef v. BNP Paribas S.A.*, 925 F.3d 53 (2d Cir. 2019) ........ 51

*Lafontant v. Aristide*, 844 F. Supp. 128 (E.D.N.Y. 1994) ........ passim

*Leutwyler v. Office of Her Majesty Queen Rania Al-Abdullah*, 184 F. Supp. 2d 277 (S.D.N.Y. 2001)....................22

*Libra Bank Ltd. v. Banco Nacional de Costa Rica*, 676 F.2d 47 (2d Cir. 1982)....................44

*Manoharan v. Rajapaksa*, 711 F.3d 178 (D.C. Cir. 2013)....................22, 59

*Matar v. Dichter*, 563 F.3d 9 (2d Cir. 2009).................... passim

*Murarka v. Bachrack Bros.*, 215 F.2d 547 (2d Cir. 1954)....................24

*National Petrochemical Co. of Iran v. M/T Stolt Sheaf*, 860 F.2d 551 (2d Cir. 1988)....................25, 26

*Oetjen v. Central Leather Co.*, 246 U.S. 297 (1918)....................4, 36

*Republic of Mexico v. Hoffman*, 324 U.S. 30 (1945).................... passim

*Republic of the Philippines v. Marcos*, 862 F.2d 1355 (9th Cir. 1988) (en banc)....................53, 54

*Rosenberg v. Lashkar-e-Taiba*, 980 F. Supp. 2d 336 (E.D.N.Y. 2013), *aff'd sub nom. Rosenberg v. Pasha*, 577 F. App'x 22 (2d Cir. 2014).................... passim

*Samantar v. Yousuf*, 560 U.S. 305 (2010)....................20, 37, 40, 52

*Saudi Arabia v. Nelson*, 507 U.S. 349 (1993)....................61

*The Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116 (1812)....................30, 43

*Sikhs for Justice v. Singh*, 64 F. Supp. 3d 190 (D.D.C. 2014)....................29, 40, 41

*Sokoloff v. National City Bank*, 239 N.Y. 158 (1924)....................25

*Tachiona v. Mugabe*, 169 F. Supp. 2d 259 (S.D.N.Y. 2001), *rev'd in part on other grounds*, 386 F.3d 205 (2d Cir. 2004)....................22, 59

*Türkiye Halk Bankası A.Ş. v. United States*, 598 U.S. 264 (2023) ("*Halkbank II*")....................20, 64

*Underhill v. Hernandez*, 168 U.S. 250 (1897).................... passim

*United States v. Belfast*, 611 F.3d 783 (11th Cir. 2010)....................61

*United States v. Belmont*, 301 U.S. 324 (1937)....................4, 36, 43

*United States v. Campo Flores*, No. 15 Cr. 765 (PAC) (S.D.N.Y.), *aff'd*, 945 F.3d 687 (2d Cir. 2019)....................9, 10

*United States v. Cordones*, No. 11 Cr. 205 (AKH), 2022 WL 815229 (S.D.N.Y. Mar. 17, 2022).................... passim

*United States v. Khobragade*, 15 F. Supp. 3d 383 (S.D.N.Y. 2014)....................3, 30, 31

*United States v. Kuznetsov*, 442 F. Supp. 2d 102 (S.D.N.Y. 2006)....................33

*United States v. Noriega*, 746 F. Supp. 1506 (S.D. Fla. 1990), *aff'd*, 117 F.3d 1206 (11th Cir. 1997).................... passim

*United States v. Pink*, 315 U.S. 203 (1942)....................36

*United States v. Saab Moran*, No. 19 Cr. 20450 (S.D. Fla. Dec. 23, 2022), ECF 197....................32, 33

*United States v. Texas*, 507 U.S. 529 (1993)....................59

*United States v. Toscanino*, 500 F.2d 267 (2d Cir. 1974)....................7

*United States v. Türkiye Halk Bankası A.Ş.*, 120 F.4th 41 (2d Cir. 2024) ("*Halkbank III*") . passim

*United States v. Türkiye Halk Bankası A.Ş.*, 16 F.4th 336 (2d Cir. 2021) ("*Halkbank I*"), *aff'd in part, vacated in part*, 598 U.S. 264 (2023) ....................20, 55

*Upright v. Mercury Business Machines Co.*, 13 A.D.2d 36 (1st Dep't 1961)....................25

*Victory Transport Inc. v. Comisaria General*, 336 F.2d 354 (2d Cir. 1964)....................37

*W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp.*, 493 U.S. 400 (1990) ....................51

*West v. Atkins*, 487 U.S. 42 (1988) ....................61

*Wulfsohn v. Russian Socialist Federated Soviet Republic*, 234 N.Y. 372 (1923) ....................25

*Xuncax v. Gramajo*, 886 F. Supp. 162 (D. Mass. 1995)....................52

*Ye v. Zemin*, 383 F.3d 620 (7th Cir. 2004)....................22

*Yousuf v. Samantar*, 699 F.3d 763 (4th Cir. 2012) .................... passim

*Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1 (2015)....................28, 36

**Foreign and International Decisions**

*Case Concerning the Arrest Warrant of 11 April 2000 (Dem. Rep. Congo v. Belg.)*, Judgment, 2002 I.C.J. 3 (Feb. 14).................... passim

Cour de cassation [Cass.] ass. plén., July 25, 2025, No. C 24-84.393 (Fr.) ....................34

*R v. Bow Street Metropolitan Stipendiary Magistrate, ex parte Pinochet Ugarte (No. 3)*, [2000] 1 A.C. 147 (H.L.) (U.K.)....................31, 58

Tribunal Supremo de Justicia, Sala Constitucional, Sentencia No. 0001, Exp. No. 26-0001 (Jan. 3, 2026) (Venez.)....................16, 18, 33

Tribunal Supremo de Justicia, Sala Constitucional, Sentencia No. 0724, Exp. No. 26-0495 (June 10, 2026) (Venez.)....................16, 31

Tribunal Supremo de Justicia, Sala Constitucional, Sentencia No. 0824, Exp. No. 26-0987 (Aug. 11, 2026) (Venez.) ....................16

**Statutes**

18 U.S.C. § 2340....................57, 58, 61

18 U.S.C. § 2340A.................... passim

18 U.S.C. § 3238....................7

42 U.S.C. § 1983....................61

Torture Victim Protection Act of 1991, Pub. L. No. 102-256, 106 Stat. 73 (28 U.S.C. § 1350 note) ....................59, 60, 62

**Treaties, International Instruments and United Nations Documents**

Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, S. Treaty Doc. No. 100-20 (1988), 1465 U.N.T.S. 85..........60

Identical Letters dated 3 January 2026 from the Permanent Representative of the Bolivarian Republic of Venezuela to the United Nations addressed to the Secretary-General and the President of the Security Council, U.N. Docs. A/80/586–S/2026/5 (Jan. 3, 2026) ....................18, 62

International Law Commission, Articles on Responsibility of States for Internationally Wrongful Acts, with commentaries, Report of the ILC on the work of its fifty-third session, U.N. Doc. A/56/10 (2001) ....................39, 53, 54

International Law Commission, Draft Articles on Immunity of State Officials from Foreign Criminal Jurisdiction, adopted on first reading (2022) ....................34

U.N. SCOR, 81st Year, 10085th mtg., U.N. Doc. S/PV.10085 (Jan. 5, 2026).................... passim

Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 23 U.S.T. 3227, 500 U.N.T.S. 95 ....................11, 26, 44, 60

**Executive Branch Materials**

Brief for the United States as Amicus Curiae, *Ali v. Warfaa*, No. 15-1345 (U.S. May 2017) ....................22

Brief for the United States in Opposition, *Türkiye Halk Bankası A.Ş. v. United States*, No. 24-1144 (U.S. Aug. 6, 2025)....................64

Comments from the United States on the ILC's Draft Articles on Criminal Immunity of State Officials as Adopted by the Commission in 2022 on First Reading (submitted for the Commission's 2024 session), https://legal.un.org/ilc/sessions/75/pdfs/english/iso_us.pdf....................34, 59, 60

*Diplomatic Recognition: A Foreign Relations Outline*, 77 Dep't St. Bull. 462 (Oct. 10, 1977) ....................25

Exec. Order No. 14203, 90 Fed. Reg. 9369 (Feb. 12, 2025) ....................6, 67

Letter from the Senior Bureau Official for Western Hemisphere Affairs, Department of State, to the United States Attorney for the Southern District of New York (Mar. 10, 2026), filed at *In re Claims Against the Valero-Petrocedeño Account*, No. 20 Misc. 249 (LGS) (SN) (S.D.N.Y. Mar. 11, 2026), ECF 228-1 ("Kozak Ltr.") ......... passim

Memorandum from T. Elliot Gaiser, Assistant Attorney General, Office of Legal Counsel, U.S. Department of Justice, for the Legal Advisor, National Security Council, *Re: Proposed War Department Operation to Support Law Enforcement Efforts in Venezuela* (Dec. 23, 2025) (public redacted version) ....................27

Notice of OFAC Sanctions Actions, 83 Fed. Reg. 50,144 (Oct. 4, 2018) ....................11

Press Release, U.S. Dep't of Justice, *Former Syrian Assad Prison Official Convicted of Torture and Immigration Fraud* (Mar. 16, 2026) ....................62

Press Release, U.S. Dep't of Justice, *Man Charged for Torturing Prisoners* (Dec. 14, 2023) ....62

Statement of Interest and Suggestion of Immunity, *Giraldo v. Drummond Co.*, No. 1:10-mc-00764 (D.D.C. Mar. 31, 2011), ECF 13 ("Uribe SOI") ....38, 41, 43

Statement of Interest and Suggestion of Immunity, *Rosenberg v. Lashkar-e-Taiba*, No. 10-cv-5381 (E.D.N.Y. Dec. 17, 2012), ECF 35 ("Rosenberg SOI") .... passim

Statement of Interest of the United States, *Matar v. Dichter*, No. 05 Civ. 10270 (WHP) (S.D.N.Y. Nov. 17, 2006), ECF 36 ("Dichter SOI") .... passim

Suggestion of Immunity and Affirmation of Abraham D. Sofaer, Legal Adviser, Department of State, *Mumtaz v. Ershad*, Index No. 74258/89 (Sup. Ct. N.Y. Cnty. May 30, 1990) ....68

Suggestion of Immunity and Statement of Interest of the United States, *Kenemore v. Maduro Moros*, No. 25-cv-23652 (S.D. Fla. July 20, 2026), ECF 75 ("Kenemore SOI"), and Letter of the Legal Adviser, Department of State (June 11, 2026), ECF 75-1 ("Rubinstein Ltr.") .... passim

Suggestion of Immunity Submitted by the United States of America, *Doe v. Zedillo Ponce de León*, No. 3:11-cv-1433 (D. Conn. Sept. 7, 2012), ECF 38, and Ex. 1 (Letter of the Legal Adviser), ECF 38-1 ("Zedillo SOI") .... passim

Suggestion of Immunity, *Am. Justice Ctr. (AJC), Inc. v. Modi*, No. 14 Civ. 7780 (AT) (S.D.N.Y. Oct. 19, 2014), ECF 3 ....22

U.S. Department of State, Digest of United States Practice in International Law 2019 ....11

**Legislative Materials**

H.R. Rep. No. 102-367, pt. 1 (1991) ....60

S. Exec. Rep. No. 101-30 (1990) ....60

**Other Authorities**

Gaceta Oficial de la República Bolivariana de Venezuela No. 40.821 (Jan. 5, 2016) ....7

Government filings and trial transcript in *United States v. Campo Flores*, No. 15 Cr. 765 (PAC) (S.D.N.Y.), ECF 53 (July 22, 2016), ECF 162 (Feb. 13, 2017) and ECF 180 (Sept. 11, 2017) ....10

Indictment, *United States v. Correa*, No. 20-cr-148 (D. Colo. June 2, 2020), Doc. 1 ....62

## PRELIMINARY STATEMENT

Cilia Adela Flores de Maduro is innocent of every charge in the Fifth Superseding Indictment — the two counts the grand jury added on October 6, 2026, and the three it carried forward — and every allegation the new indictment incorporates from the Fourth. She has never trafficked narcotics, financed anyone's terrorism, agreed with anyone that machineguns or destructive devices would be possessed in furtherance of drug trafficking, or ordered, agreed to, or condoned the torture of any human being. ¶¶ 10–16, 19, 22–24, 44.[1] These are accusations she would fully challenge, and defeat, at trial. She should not have to. The charges against her are barred at the threshold, because she is immune from the criminal jurisdiction of this Court, and that immunity is not hers to lose or the prosecution's to take. It belongs to the Bolivarian Republic of Venezuela, which has claimed it by name.

Ms. Flores de Maduro moved to dismiss the Fourth Superseding Indictment on September 2, 2026, joining the motion of her husband, Nicolás Maduro Moros. ECF 324, 325; ECF 320, 321. The government opposed on October 2. ECF 338. Four days later the grand jury returned the S5, which adds Ms. Flores de Maduro to Count One (narco-terrorism conspiracy) and charges both defendants in a new Count Two (conspiracy to commit torture, 18 U.S.C. § 2340A). This

---

[1] Citations in the form "¶ __" are to the Fifth Superseding Indictment, S5 11 Cr. 205 (Oct. 6, 2026), ECF 342 ("S5"). The allegations of the Fourth Superseding Indictment, ECF 260 (Dec. 23, 2025) ("S4"), "are realleged and incorporated by reference" in the S5. ¶ 4 n.1. Citations to the S4 are in the form "S4 ¶ __." "Flores Mem." is Ms. Flores de Maduro's September 2, 2026 memorandum of law (ECF 325); "Maduro Mem." is Mr. Maduro's (ECF 321); "Gov't Opp." is the government's October 2, 2026 opposition (ECF 338); "Segura Decl." is the declaration of Assistant Secretary Juan Pablo Segura filed with it (ECF 338-1). Transcripts are cited by date, docket number, and page:line. "Decl." is the accompanying Declaration of M. Andrés Sánchez-Ross, which reproduces the public statements and documents cited below, with the address at which each was viewed and the date of review, and indexes the copies preserved. "Kenemore SOI" is the Suggestion of Immunity filed by the United States in *Kenemore v. Maduro Moros*, No. 25-cv-23652 (S.D. Fla. July 20, 2026), ECF 75; "Rubinstein Ltr." is the letter of the Department of State's Legal Adviser filed with it, ECF 75-1; "Kozak Ltr." is the letter of the Department's Senior Bureau Official for Western Hemisphere Affairs to the United States Attorney for this District (Mar. 10, 2026), filed at *In re Claims Against the Valero-Petrocedeño Account*, No. 20 Misc. 249 (LGS) (SN) (S.D.N.Y. Mar. 11, 2026), ECF 228-1.

memorandum renews the September 2 motion as to the S5, incorporates the September 2 memoranda in full, and answers the government's opposition. The new indictment does not change the immunity analysis. It confirms it. The S5 re-pleads the case as a twenty-five-year exercise of the powers of the Venezuelan state — "control over Venezuela's military, judiciary, and law enforcement agencies," ¶ 3, and, in Count Two, acts "under the color of law." ¶ 44. And of the acts the S5 attributes to Ms. Flores de Maduro personally, all but one fall between 2006 and 2015, ¶¶ 10–13, 15, 22–24; S4 ¶ 21(b), (d), (k) — squarely within the period in which the United States recognized the government in which she held office. Segura Decl. ¶¶ 3–5; Gov't Opp. at 5.

The government's opposition rests on three propositions. The first is that the Executive Branch has "determined" that the defendants are not immune, that the determination is expressed by the decision to indict them, and that the Court owes it "absolute deference" on head-of-state immunity and "near-conclusive deference" on conduct-based immunity. Gov't Opp. at 1, 7, 13, 16. The second is that status-based immunity "depends on status at the time of court proceedings," and that because the United States withdrew recognition from Mr. Maduro on January 23, 2019, any immunity he once had, and any immunity his wife shares, has been "utterly irrelevant" for "nearly eight years." *Id.* at 19. The third is that Venezuela has not asserted immunity on her behalf, that the acts charged violate Venezuelan law, and that the Court should therefore "adhere to" Judge Hellerstein's "decision in *Cordones*." *Id.* at 32; *see id.* at 6–7, 23–31.

Each proposition fails on the government's own authorities and its own record. The Second Circuit has deferred to an Executive denial of immunity only after satisfying itself that the denial was "consistent with the scope of such immunity recognized at common law," and has twice reserved the case in which the denial "derogated from the common law — for instance, if the Executive indicted a state qua state," a derogation the government conceded. *United States v.*

*Türkiye Halk Bankası A.Ş.*, 120 F.4th 41, 46, 52, 58–59 (2d Cir. 2024) ("*Halkbank III*"). This is that case. The common law — as the Executive has itself stated it in writing to the courts for twenty years — recognizes the status immunity of a head of state and his household and the residual immunity of a recognized government's former officials for acts exercising the powers of their offices, and it leaves the waiver of both to the state. *Infra* Points I.B.2, I.C, IV. Head-of-state immunity is "primarily an attribute of state sovereignty, not an individual right," *In re Grand Jury Proceedings, Doe No. 700*, 817 F.2d 1108, 1111 (4th Cir. 1987), and the prosecution of the sitting head of state of a recognized foreign state, and of his wife, reaches the sovereign through the persons the law of nations has always protected first.

As for timing, the government mistakes the question. Whether criminal process violates a status immunity is judged when the process issues and when the person is seized, not at some later date chosen by the prosecuting state. *Case Concerning the Arrest Warrant of 11 April 2000 (Dem. Rep. Congo v. Belg.)*, 2002 I.C.J. 3, ¶¶ 70–71 (Feb. 14); *United States v. Khobragade*, 15 F. Supp. 3d 383, 387–88 (S.D.N.Y. 2014). On December 23, 2025, when the grand jury returned the S4 under seal, the government's own pleading alleged that Mr. Maduro "is now" the ruler of Venezuela and that Ms. Flores de Maduro "is" its First Lady. S4 ¶¶ 5, 8.[2] On January 3, 2026, when United States forces abducted them in Caracas, the President announced that the United States would "run the country" in their absence. Decl. ¶ 58. The government's theory is that the Executive's refusal to recognize Mr. Maduro after January 2019 dissolved the immunity. But

[2]The S5 recasts both paragraphs in the past tense: Mr. Maduro "was previously the President of Venezuela, and later became the de facto but illegitimate ruler of the country," and Ms. Flores de Maduro "was previously the First Lady of Venezuela … and later became the de facto but illegitimate First Lady." ¶¶ 7–8. The change was made after this motion was first filed. It does not remove the government's position from the record. The S5 "reallege[s] and incorporate[s] by reference" every allegation of the S4, ¶ 4 n.1 — including the allegations that Mr. Maduro "is now … the de facto but illegitimate ruler of the country" and that Ms. Flores de Maduro "is the de facto First Lady of Venezuela." S4 ¶¶ 5, 8.

recognition is the Executive's acknowledgment of who speaks for a state; it is not a power to decide which foreign states' officials may be seized and tried. Nor does the Executive's refusal to use the word, between January 2019 and January 2026, end the question. For seven years, across three administrations, the United States dealt with the Maduro government as the government of Venezuela — by agreement, by exchange of prisoners, by license, by repatriation, and, in the final weeks, by dealing with Mr. Maduro directly: a telephone call from the President, and what the Secretary of State described as "multiple very, very, very generous offers." Decl. ¶¶ 46, 61; *infra* Background C.2. Its position today proceeds from the same premise. The Executive's own plan for what it calls Venezuela's transition, published by the Department of State on October 26, 2026, makes its next step a declaration that the presidency is vacant: "Delcy will have to declare a vacancy in the presidency, a permanent vacancy. Right now they haven't done that." Decl. ¶ 94. One declares a vacancy in an office that someone holds. On the Executive's own account, then, the office whose immunity Venezuela asserts was Mr. Maduro's on January 3, 2026, and its holder is absent from it today for a single reason: he is in United States custody. A government the United States treats as able to bind Venezuela, and an office it treats as not yet vacated, are what the law of immunity protects, whatever label the Executive attached to them. And even on the government's theory, a theory not supported by the facts, non-recognition beginning January 23, 2019 cannot reach what came before it. For the thirteen years in which nearly every act attributed to Ms. Flores de Maduro is alleged to have occurred, the United States recognized the Venezuelan government she served, and recognition "validates all the actions and conduct of the government so recognized from the commencement of its existence." *Oetjen v. Central Leather Co.*, 246 U.S. 297, 302–03 (1918); *United States v. Belmont*, 301 U.S. 324, 330 (1937). The Executive's own, repeatedly certified policy is that former heads of state and former senior officials retain a residual

immunity for acts "exercising the powers of their office," and it has applied that policy to allegations of state violence, terrorism, and "cooperation with illegal drug smuggling." *Infra* Point I.B.

As for Venezuela's position, the premise is false. Two days after the seizure, Venezuela's Permanent Representative told the United Nations Security Council, with the United States in the chamber, that the operation had violated "the personal immunity of Heads of State in office," and demanded that the United States "fully respect the immunities of President Nicolás Maduro and First Lady Cilia Flores and ensure their immediate release." U.N. SCOR, 81st Year, 10085th mtg. at 22–23, U.N. Doc. S/PV.10085 (Jan. 5, 2026). Venezuela's highest court, its National Assembly, its Foreign Minister, its Procurador General, and the acting President whose government the United States formally recognized in March 2026 have said the same thing in every forum available to a state, and the Procuraduría General has said it under penalty of perjury in this Court. *Infra* Background D. The government the United States formally recognized in March 2026 has declared that Mr. Maduro "is the legitimate president" and that "[b]oth President Maduro and Cilia Flores, the first lady, are both innocent." *Infra* Point I.C. A foreign state cannot assert an official's immunity more plainly than that, and under settled law a state's immunity is lost only by its own express waiver, never by a prosecutor's characterization of its silence. *Lafontant v. Aristide*, 844 F. Supp. 128, 134 (E.D.N.Y. 1994); *In re Doe*, 860 F.2d 40, 46 (2d Cir. 1988). *Cordones* does not reach this motion. *Infra* Point II.B. That decision concerned the conduct-based immunity of a retired general who had broken with the Venezuelan government, conceded the acts charged, and had no state behind him, and it was decided under a Second Circuit rule the Supreme Court has since vacated.

The principle Ms. Flores de Maduro invokes is one the United States asserts for itself: the President has determined that it is "an unusual and extraordinary threat to the national security and foreign policy of the United States" for a foreign tribunal "to investigate, arrest, detain, or prosecute" current or former United States officials "without consent of that person's country of nationality." Exec. Order No. 14203, 90 Fed. Reg. 9369, 9369–70 (Feb. 12, 2025). Venezuela has not consented to the trial of its President's wife and has said so in every forum open to it. Ms. Flores de Maduro asks for nothing more than the application to Venezuela of the principle the United States demands for its own political leaders. *Infra* Point IV.C.

## BACKGROUND

The full factual background — Mr. Maduro's accession to the presidency, his continuous exercise of its powers, the Executive's course of dealing with his government, and the events of January 3, 2026 — is set out in the Maduro Memorandum at 4–13 and the Flores Memorandum at 6–11, which Ms. Flores de Maduro incorporates. What follows is confined to the facts the S5 and the government's opposition make newly relevant.

### A. Procedural History

The grand jury returned the S4 under seal on December 23, 2025, charging Ms. Flores de Maduro for the first time in this fifteen-year-old case, and the indictment was unsealed on January 3, 2026. ECF 258, 260. At her arraignment on January 5, 2026, she pleaded "Not guilty. Completely innocent." Tr. of Jan. 5, 2026 (ECF 282) at 10:15–16. Under the bifurcated schedule, ECF 316, she and Mr. Maduro moved to dismiss the S4 on sovereign-immunity grounds on September 2, 2026, ECF 320–21, 324–25; the government opposed on October 2, ECF 338; and the grand jury returned the S5 on October 6. On October 15, 2026, Ms. Flores de Maduro was arraigned on the S5 and again pleaded not guilty, Minute Entry (Oct. 15, 2026), and this motion

was set for November 9, 2026 and argument for December 17, 2026. ECF 352 (memo-endorsed Oct. 15, 2026). Ms. Flores de Maduro reserves, as she did in September, all other pretrial motions, including her motion to dismiss on the ground that the manner of her seizure violated due process, *see United States v. Toscanino*, 500 F.2d 267 (2d Cir. 1974), Flores Mem. at 13 n.7; Maduro Mem. at 16; and any motion addressed to venue under 18 U.S.C. § 3238.

### B. Ms. Flores de Maduro's Offices and the S5's Allegations Against Her

Ms. Flores de Maduro has held public office in Venezuela continuously since 2000, and the S5 concedes most of it. She was a deputy of the National Assembly from 2000; in 2006 she became its President, "starting when MADURO MOROS left that role to become Minister of Foreign Affairs," and served until 2011; from 2012 to 2013 she was Venezuela's Procuradora General — the office the S5 translates as "Attorney General," whose constitutional function is to represent and defend the Republic and its officials, ECF 293-1 ¶ 4; and from 2017 to 2020 she was a member of the National Constituent Assembly. ¶ 8. She married Mr. Maduro on July 15, 2013, three months after he was sworn in as President. Flores Mem. at 7. From January 2016 to January 2021 she served as an elected deputy of the National Assembly for the State of Cojedes,[3] and since January 2021 she has again been a sitting deputy — the office she held on the day she was seized. ECF 293-1 ¶ 7 (Procuraduría's declaration that she "was also serving as a deputy in the National Assembly at the time of her abduction"). The Executive Branch has described her, in a sworn declaration filed in this case, as "Venezuela's First Lady and former Attorney General and President of the National Assembly." Declaration of Sara Thannhauser (OFAC) ¶ 10, ECF 294-1

[3]The S4 itself alleges a "late-2015 election for the Venezuelan National Assembly" in which she was a candidate. S4 ¶ 21(k). The Assembly elected on December 6, 2015 was installed on January 5, 2016. Gaceta Oficial de la República Bolivariana de Venezuela No. 40.821 (Jan. 5, 2016) (publishing the Assembly's Acuerdo of that date electing its officers "[e]n sesión del día cinco de enero de 2016").

(Mar. 13, 2026) (describing the September 25, 2018 designation). The S4 pleaded that she "is the de facto First Lady of Venezuela," S4 ¶ 8; the S5, returned nine months after her seizure, now says she "was previously the First Lady of Venezuela." ¶ 8; *see* Preliminary Statement, *supra*, n.2.

The S5's allegations against Ms. Flores de Maduro are, in order of the dates the indictment assigns them, the following. In 2006, while she was a deputy and then President of the National Assembly, she and Mr. Maduro are alleged to have "ordered close associates and members of their security details" to facilitate cocaine shipments "using the Bolivarian National Guard," ¶ 10, to have "ordered members of their security details to kidnap, beat, and murder those who owed them drug money," ¶ 11, and to have "used military officials assigned to their protective details to torture and intimidate." ¶ 19. In 2007, she is alleged to have "offered ELN-aligned groups PDVSA contracts to assist in negotiations with the group," ¶ 13, and to have attended a meeting at which she accepted money "to broker a meeting between a large-scale drug trafficker and the director of Venezuela's National Anti-Drug Office." S4 ¶ 21(b). In 2010, she is alleged to have "ordered the General Counsel of the Venezuelan National Assembly, which she ran at the time, to demand that a drug case be dismissed." ¶ 15. In 2013, "[s]hortly after Chavez's death," she is alleged to have "attended a meeting with the FARC's leadership" at which Mr. Maduro discussed a debt and agreed to sell mines and weapons. ¶ 12. In early 2014, she is alleged to have attended a meeting with Mr. Maduro and the "newly appointed" head of a security service ("CC-2") "to discuss an intelligence report that there was dissension in the military ranks," at which, the S5 alleges, Mr. Maduro "suggested kidnapping five to seven military members and 'drawing the information out of them' through torture" and she "agreed," ¶ 22; to have attended briefings at which CC-2 reported on those detentions, ¶ 23; and to have attended meetings at which Mr. Maduro asked about the treatment of a detained opposition leader ("Victim-3"). ¶ 24. Spanning 2004 to 2015, the S4 alleges

that the couple "worked together to traffic cocaine, much of which had been previously seized by Venezuelan law enforcement, with the assistance of armed military escorts," maintained "state-sponsored" colectivos, and ordered violence. S4 ¶ 21(d). In 2015, two of her relatives are alleged to have sought drug proceeds to support her National Assembly campaign. S4 ¶ 21(k). Finally, in June 2021 Mr. Maduro is alleged to have appointed her vice president of a "Special Commission for the Conduct of the Judicial Revolution," and in 2022 she is alleged to have been present at a meeting at the presidential palace at which Mr. Maduro addressed judges. ¶ 16. The remaining references to her are collective characterizations. ¶¶ 1–6, 9, 14, 18.[4]

Three features of these allegations matter here. First, every one of them describes the exercise of public power through the organs of the Venezuelan state: the National Guard, ¶¶ 10–11; military and police protective details, ¶¶ 11, 19; the state oil company, ¶ 13; the office of the General Counsel of the National Assembly, ¶ 15; the national anti-drug agency, S4 ¶ 21(b); "armed military escorts" and law-enforcement seizures, S4 ¶ 21(d); the intelligence services, ¶¶ 22–24; and a presidential commission on the judiciary, ¶ 16. The S5 alleges no act that Ms. Flores de Maduro took, or could have taken, as a private person: each act it describes was possible only through an office she held or through state forces and state institutions under her or her husband's command, and Count Two charges, in terms, a conspiracy "to commit acts under the color of law." ¶ 44. What the S5 does allege is that the *ends* were private — enrichment, and the protection of "drug money" owed to the defendants. ¶¶ 10–11. That is the government's answer to the immunity claim, Gov't Opp. at 31–32, and it is addressed in Point II.A; for present purposes it is enough that the indictment itself describes the *means* as the state's.[5] Second, every act attributed to her

[4] The S5's statement that Ms. Flores de Maduro "ordered that individuals be tortured to protect her family members' illegal activities," ¶ 6, is a summary; the particulars the indictment supplies as to her are those described in the text.

[5] The one allegation that describes no act of hers at all, S4 ¶ 21(k), derives from the prosecution of two of her nephews in this District. *United States v. Campo Flores*, No. 15 Cr. 765 (PAC) (S.D.N.Y.), *aff'd*, 945 F.3d 687 (2d Cir. 2019).

personally but the 2021–2022 commission falls between 2006 and 2015 — within the period in which the United States recognized the government in which she served. *Infra* Background C. Third, the new Count One rests, as to her, on the same allegations as Count Three. Compare ¶¶ 40–42 with ¶¶ 46–51.

## C. The United States Recognized the Government Ms. Flores de Maduro Served Until January 23, 2019; Dealt With It as Venezuela's Government for the Seven Years That Followed; and Has Recognized the Government That Now Defends Her Since March 2026

### *1. Express Recognition, 2006 to January 23, 2019*

The United States recognized the governments of Hugo Chávez and Nicolás Maduro as the government of Venezuela until January 23, 2019. The government's declarant describes the period as one of "successive Chavista governments," Segura Decl. ¶ 3, and its brief fixes the date on which "the Executive Branch withdrew its recognition of Maduro Moros as the President of Venezuela" at January 23, 2019, when it recognized Juan Guaidó as interim President. Gov't Opp. at 5; *see* Segura Decl. ¶¶ 4–5. Mr. Maduro's memorandum records that "the United States recognizes that Mr. Maduro was de jure leader of Venezuela from at least 2013 through 2019." Maduro Mem. at 28; see *id.* at 5. During that period the Executive dealt with Ms. Flores de Maduro as a Venezuelan official: on September 25, 2018, the Treasury Department designated "Venezuela's First Lady and former Attorney General and President of the National Assembly Flores" under an executive order authorizing sanctions against "current or former officials of the

---

The public record of that case shows that the government did not allege that Ms. Flores de Maduro knew of, directed, or benefited from the nephews' conduct; it described their references to her campaign as their "stated" motive, Gov't Sentencing Mem. at 1, 8, *Campo Flores*, ECF 180 (Sept. 11, 2017); its own case agent testified that one defendant "said that the money was actually for him" and had told the campaign story "to protect himself from getting robbed," Trial Tr. 154:9–17, *Campo Flores* (quoted at Gov't Mem. at 36, ECF 162 (Feb. 13, 2017)); and the Second Circuit recounted the same recantation. 945 F.3d at 702–03. The government described her in that case as "a Venezuelan official." Gov't Mem. at 1 & n.1, *Campo Flores*, ECF 53 (July 22, 2016).

Government of Venezuela." ECF 294-1 ¶¶ 9–10; see Notice of OFAC Sanctions Actions, 83 Fed. Reg. 50,144, 50,145 (Oct. 4, 2018); Flores Mem. at 35.

### *2. January 2019 to January 2026: The Executive Withheld the Word and Continued the Dealings*

On January 23, 2019 the Executive recognized Mr. Guaidó as interim President. After the 2015 National Assembly dissolved his interim government in December 2022 the Executive extended formal recognition to no one. On the government's own account, it has recognized no government of Venezuela at all since that date, Segura Decl. ¶ 4, stating on January 3, 2023 only that it "continues to recognize the democratically elected 2015 National Assembly as the last remaining democratic institution in Venezuela." Decl. ¶ 23. What the Executive did during those seven years is as much a part of the record as what it said, and its conduct, across three administrations, treated the Maduro government as the government of Venezuela. The dealings, each documented in the Declaration, were these.[6] *See also* ECF 294 at 7 (OFAC "has granted, revoked, and modified commercial OFAC licenses in connection with negotiations between the United States and Venezuela"); Maduro Mem. at 25–27.

| **Date** | **The Executive's dealings with the Maduro government** | **Decl.** |
|---|---|---|
| Apr. 2019 | Three weeks after withdrawing its diplomats, the United States asked Switzerland to protect its interests in Caracas under Article 45(c) of the Vienna Convention on Diplomatic Relations, which lets a sending state entrust that protection to a third state "acceptable to the receiving State" — an arrangement that, as both governments announced, would become operative only upon Venezuela's acceptance, which Switzerland sought from the government to which it accredited ambassadors in May 2019 and October 2020. Vienna Convention on Diplomatic Relations art. 45(c), Apr. 18, 1961, 23 U.S.T. 3227, 500 U.N.T.S. 95; Digest of United States Practice in International Law 2019, ch. 9, at 290. | ¶¶ 9–10 |

[6] The table is a selection, not a catalogue. It sets out the dealings documented in the Declaration from the public record; neither the table nor the Declaration purports to be exhaustive of the two governments' contacts during the period, much of which the Executive has described to the courts as nonpublic. *Infra* Point I.C; Decl. ¶¶ 53, 83–85.

| **Date** | **The Executive's dealings with the Maduro government** | **Decl.** |
|---|---|---|
| Aug. 2019 | The President, asked whether the White House was "in contact with the Maduro regime": "Yes." "We are talking to the representatives at different levels of Venezuela," and "we are talking at a very high level." | ¶ 13 |
| June 2020 | The President, on the recognition of Mr. Guaidó seventeen months earlier: "I could have lived with it or without it"; "I wasn't necessarily in favor"; "I don't think it was very meaningful one way or the other." On meeting Mr. Maduro: "Maduro would like to meet. And I'm never opposed to meetings"; the next day, that he "would only meet with Maduro to discuss one thing: a peaceful exit from power" — a formula that presupposed who held it. | ¶ 16 |
| Mar. 2022 | "[T]he first visit by a White House official to Venezuela since the inauguration of Hugo Chávez," "to secure the release of detained Americans and to urge a return to the negotiating table"; two Americans released days later; the Press Secretary describes "our engagement with Maduro — who we don't recognize, as you know, as the leader of Venezuela but who is detaining American citizens." | ¶¶ 17–20 |
| Oct. 2022 | Two of Ms. Flores de Maduro's nephews released from federal custody because "it became clear in the course of negotiations that the release" of the nephews "was essential to securing the release of" seven detained Americans: "[t]hese were direct discussions between the United States and Venezuela." | ¶ 21 |
| Nov. 2022 | The Treasury licenses Chevron to resume operations in Venezuela upon the resumption of the Mexico City talks between "the Unitary Platform and the Maduro regime." | ¶ 22 |
| Sept. 2023 | In Doha, the delegations "de los Estados Unidos de América ('EEUU') y de la República Bolivariana de Venezuela ('Venezuela')" ("of the United States of America ('USA') and of the Bolivarian Republic of Venezuela ('Venezuela')") record a memorandum of understanding setting out "una serie de pasos que lleven a la normalización de las relaciones diplomáticas" ("a series of steps leading to the normalization of diplomatic relations"): a political agreement among Venezuelans and a presidential election in 2024, the release of 25 detainees and a joint "plan de acción" for detainees "de interés mutuo" ("of mutual interest"), a United States statement supporting the resumption of the talks, and United States licenses for oil, gas, debt and gold renewable "cada 6 meses" ("every 6 months"), ending in a phase in which "los Participantes normalizan las relaciones diplomáticas y consulares" ("the Participants normalize diplomatic and consular relations"). The document is non-binding by its terms, is signed for Venezuela, and bears initials on each page; the United States' signature line is blank. | ¶ 24 |

| Date | The Executive's dealings with the Maduro government | Decl. |
|---|---|---|
| Oct. 2023 | The Secretary of Homeland Security announces that the United States has "successfully negotiated an agreement with the country of Venezuela to repatriate" Venezuelan nationals; the Department of State says "both of our governments have discussed" the arrangement; the Department of Homeland Security says "[i]t is a principle of international law that governments should accept direct repatriations of their nationals"; the Government of Venezuela announces that it has "suscrito un acuerdo sobre migración" ("signed an agreement on migration") with "las autoridades de los Estados Unidos de América" ("the authorities of the United States of America"). | ¶¶ 25, 26 |
| Oct. 2023 | The Department of State "welcomes the announcement by Maduro representatives and the Unitary Platform to resume Venezuelan-led negotiations in Barbados," and the next day joins a statement welcoming "the Venezuelan-led political agreement reached today in Barbados"; upon the signing of that electoral roadmap "between Venezuela's Unitary Platform and representatives of Maduro," the Treasury suspends oil and gas sanctions under a license issued, as the memorandum of September 28 contemplated, for six months, and the Department of State reserves the authority to revoke the relief "should Maduro and his representatives fail to follow through on their commitments." | ¶¶ 27–32 |
| Dec. 2023 | The President pardons Alex Saab in an exchange for detained Americans: "I've made a deal with Venezuela that they'll hold free elections"; asked whether Mr. Maduro had committed to allow all candidates to run: "He's agreed to all of them." | ¶¶ 33–35 |
| Apr. 2024 | The Department of State allows the oil license to expire because "Nicolas Maduro and his representatives have not fully met the commitments made under the electoral roadmap agreement." | ¶ 37 |
| Sept. 2024 | The Department of State describes to the Senate "our discussions to date" and "a range of options to incentivize and pressure Maduro." | ¶ 39 |
| Jan.–Feb. 2025 | The President's envoy meets Mr. Maduro in Caracas and returns with six released Americans; the President announces that "Venezuela has agreed to receive, back into their Country, all Venezuela illegal aliens … Venezuela has further agreed to supply the transportation back." Ten days later two aircraft of Venezuela's state airline carry the first 190 returnees from a United States Army airfield at El Paso to Caracas, under the envoy's supervision. | ¶¶ 40–41, 42 |
| Feb. 2025 | The President announces that he is "reversing the concessions that Crooked Joe Biden gave to Nicolás Maduro, of Venezuela, on the oil transaction agreement, dated November 26, 2022." | ¶ 43 |

| Date | The Executive's dealings with the Maduro government | Decl. |
|---|---|---|
| Mar. 2025 | The Secretary of State: "Venezuela is obligated to accept its repatriated citizens from the U.S.," with "new, severe, and escalating sanctions" threatened unless "the Maduro regime accepts a consistent flow of deportation flights." Four days later the President of Venezuela's National Assembly announces that Venezuela has "acordado reanudar con el Gobierno de los EE.UU." ("agreed with the Government of the U.S. to resume") the repatriations, and the Department of State announces that the flights have "resumed." | ¶ 44 |
| July 2025 | The Secretary of State announces "an agreement for the release of all of our American detainees, plus the release of Venezuelan political prisoners." | ¶ 45 |
| Nov.–Dec. 2025 | The President: "We may be having some discussions with Maduro, and we'll see how that turns out." The repatriation flights run twice weekly through 2025 — seventy-three of them, carrying 13,656 people, by one count — and Venezuela's Ministry of Transport approves a further flight at the request of the United States, as had been occurring "desde el acuerdo suscrito entre nuestro Gobierno y la administración estadounidense" ("since the agreement signed between our Government and the United States administration"). | ¶¶ 46, 48 |
| Jan. 3, 2026 | The Secretary of State acknowledges that Mr. Maduro "was provided multiple very, very, very generous offers" to leave; the President: "I did have conversations with him, and I said, 'You've got to surrender.'" | ¶¶ 59, 61 |

The United States thus withheld a word and continued the dealings, and each of those dealings presupposed that the government in Caracas could speak for and bind Venezuela. The Executive said throughout that it was dealing with Mr. Maduro "who we don't recognize"; it never identified anyone else with whom Venezuela's agreements could be made, because there was no one else: after December 2022 the Executive formally recognized no government of Venezuela at all, Segura Decl. ¶ 4, and the only government it dealt with, as its own actions acknowledged, was the government of Mr. Maduro. Nor was the United States alone in dealing with that government. Of the states that had recognized Mr. Guaidó in 2019 — sixteen European states together with "the United States and more than 23 other countries," by the Department of State's count in February 2019, Decl. ¶ 95, and "[s]ome sixty" by the government's declarant's, Segura Decl. ¶ 4 — the European Union stopped describing Mr. Guaidó as interim president in January 2021 and committed itself to "engage and work with all stakeholders in Venezuela," Decl. ¶¶ 97–98; Peru,

Colombia, Chile, France, Spain and Brazil accredited ambassadors to Mr. Maduro's government between 2022 and 2024, Decl. ¶¶ 100–104; the negotiations the Executive rewarded with sanctions relief were conducted, under Norwegian facilitation, with "the Bolivarian Government of Venezuela," Decl. ¶ 105; and the United Nations General Assembly accepted the credentials of that government's representatives, without a vote, at every session from 2019 through 2025 — the United States recording its dissociation in five of those seven years, and a dwindling group of states (twenty in 2019, fifteen in 2021, four in 2025) placing on record that their acquiescence was not recognition. Decl. ¶¶ 106–113. The question the S5 raises is who governed Venezuela on January 3, 2026, and on that date no state in the world recognized any government of Venezuela other than the one in Caracas: the interim government had dissolved itself three years earlier; no rival government had been formed; the states that had recognized Mr. Guaidó had, one after another, sent ambassadors back to Mr. Maduro; and three weeks before the seizure the General Assembly had seated his government's representatives for the seventh consecutive year, by consensus, over the reservation of four delegations, none of them the United States.

### 3. *Formal Recognition of the Government of Acting President Rodríguez, March 2026*

Two months after the military operation in which Mr. Maduro and Ms. Flores de Maduro were seized, the United States recognized the government exercising Mr. Maduro's functions during his forced absence. On March 5, 2026, the Department of State announced that "[t]he United States and Venezuela's interim authorities have agreed to re-establish diplomatic and consular relations," Decl. ¶ 91 — the statement in which, as the Department's Legal Adviser has since put it, "the Department of State announced the recognition of President Delcy Rodriguez as the head of state of Venezuela." Rubinstein Ltr. at 1; *see* Segura Decl. ¶ 6. On March 7 the President stated that "this week, we have formally recognized the Venezuelan Government. We've

actually legally recognized them." Decl. ¶ 92. And on March 10 the Department's Senior Bureau Official for Western Hemisphere Affairs wrote to the United States Attorney for this District, for presentation to the judges of this District in four civil matters, that "the United States is recognizing Delcy Rodriguez as the sole Head of State, able to take action on behalf of Venezuela," and that "we are normalizing diplomatic and consular relations with Venezuela"; the same letter states that the United States "has not recognized Maduro as the Head of State of Venezuela" since January 23, 2019 and that "that nonrecognition continues to the present." Kozak Ltr. at 2–3; Decl. ¶ 93; *see* ECF 294 at 4–5 n.2 (the government's description of the letter in this case). The Department describes the recognized government as "able to speak for and take action on behalf of Venezuela." Segura Decl. ¶ 7. Acting President Rodríguez exercises the functions of the presidency by virtue of a January 3, 2026 decision of the Sala Constitucional of Venezuela's Supreme Tribunal that characterized the operation as a "foreign military aggression" carried out for the purpose of "abducting" the constitutional President, Nicolás Maduro Moros, classified his absence as forced, and directed the Executive Vice President to discharge the functions of the office in his absence while expressly declining to declare the office vacant. Tribunal Supremo de Justicia, Sala Constitucional, Sentencia No. 0001, Exp. No. 26-0001, at 2–3 (Jan. 3, 2026) ("TSJ Sentencia No. 0001") (unofficial translation at Pollack Decl. Ex. 1, ECF 321-2); Flores Mem. at 10–11. The Sala Constitucional has since continued to describe her, in reviewing the decrees she issues, as acting "en su carácter de Presidenta Encargada de la República Bolivariana de Venezuela, según sentencia N° 1 del 3 de enero de 2026" ("in her capacity as Acting President pursuant to the January 3 judgment"), most recently, on the record available, in decisions of June 10 and August 11, 2026. Tribunal Supremo de Justicia, Sala Constitucional, Sentencia No. 0724, Exp. No. 26-0495, at 2 (June 10, 2026) ("TSJ Sentencia No. 0724"); Sentencia No. 0824, Exp. No. 26-0987, at

1 (Aug. 11, 2026); Decl. ¶ 70. On July 20, 2026, at the request of the Venezuelan Embassy, the United States filed a suggestion of immunity for acting President Rodríguez as "the sitting head of state of the Bolivarian Republic of Venezuela" in a civil action in the Southern District of Florida. Kenemore SOI at 1, ¶ 7; Rubinstein Ltr. at 1; Segura Decl. ¶ 8. And on October 26, 2026, in a published background briefing on the fourth round of the transition talks, a Senior State Department Official described the sequence the official said had been agreed — a new Supreme Tribunal whose magistrates "are submitted to the National Assembly," then a reformed electoral council — after which "Delcy will have to declare a vacancy in the presidency, a permanent vacancy. Right now they haven't done that." Decl. ¶ 94.

**D. The Seizure, and Venezuela's Assertion of Ms. Flores de Maduro's Immunity**

In the early hours of January 3, 2026, in what the President described as "an extraordinary military operation in the capital of Venezuela," United States forces abducted Ms. Flores de Maduro and her husband in Caracas. Decl. ¶ 58. The Chairman of the Joint Chiefs of Staff described "an apprehension mission … to bring to justice two indicted persons, Nicolás and Cilia Maduro," conducted "in support of a request from the Department of Justice," Decl. ¶ 63; the Secretary of State called it "at its core … an arrest of two indicted fugitives of American justice." Decl. ¶ 62. The President announced: "We're going to run the country until such time as we can do a safe, proper, and judicious transition." Decl. ¶ 58. Of the acting President, he said: "She was sworn in as President just a little while ago. She had a long conversation with Marco," and "Marco is working on that directly." Decl. ¶ 73. The government's account in this Court is that "[t]he defendants entered United States law enforcement custody at approximately 11:30 a.m. on January 3 of 2026" and landed in this District at 4:31 p.m. Tr. of Jan. 5, 2026 (ECF 282) at 10:24–11:3.

Venezuela's response was immediate, formal, and sustained, and it named Ms. Flores de Maduro. Its assertions of her immunity, made before and after the United States recognized its present government, were these.

| **Date** | **Venezuela's assertion of the immunity of its President and First Lady** | **Source** |
|---|---|---|
| Jan. 3, 2026 | The Sala Constitucional issues Sentencia No. 0001, characterizing the operation as a "foreign military aggression" carried out for the purpose of "abducting" the constitutional President, Nicolás Maduro Moros, classifying his absence as forced, and directing the Executive Vice President to discharge the functions of the office while expressly declining to declare it vacant. | TSJ Sentencia No. 0001, at 2–3; *supra* Background C.3 |
| Jan. 3, 2026 | Venezuela circulates letters of protest to the Secretary-General and the President of the Security Council as official documents of the United Nations, condemning the operation as an armed attack in violation of Article 2(4) of the Charter. | U.N. Docs. A/80/586–S/2026/5 |
| Jan. 5, 2026 | At an emergency meeting of the Security Council at which the United States also speaks, Venezuela's Permanent Representative describes "the kidnapping of the constitutional President of the Republic, Nicolás Maduro Moros, and the First Lady, Cilia Flores," calls the seizure "a direct violation of an essential norm of the international legal order: the personal immunity of Heads of State in office" — "not an individual privilege" but "an institutional guarantee that protects the sovereignty of States and the stability of the international system" — and asks the Council, "first, that the Government of the United States of America be required to fully respect the immunities of President Nicolás Maduro and First Lady Cilia Flores and ensure their immediate release and safe return to Venezuela." The Secretary-General's representative reports that "President Maduro is being held in New York, accused by United States authorities, along with his wife, Cilia Flores," and that the Secretary-General "remain[s] deeply concerned that the rules of international law have not been respected with regard to the 3 January military action"; the Group of Friends in Defense of the Charter and the Non-Aligned Movement each reaffirm "the inviolability of the immunities accorded to Heads of State and Government under international law." | S/PV.10085, at 3, 22–23, 33, 36 |
| Jan. 8, 2026 | At the presidential palace, the National Assembly installs a "High-Level Commission for the Release of President Nicolás Maduro and First Lady Cilia Flores," chaired by the President of the National Assembly and composed of, among others, the Foreign Minister and the Procurador General, which, in its chairman's words, "will deploy all its effort, all its diplomatic, legal, political, human and multilateral capacities, until the release of our president and of the first lady is achieved." | Decl. ¶ 67 |

| **Date** | **Venezuela's assertion of the immunity of its President and First Lady** | **Source** |
|---|---|---|
| Jan. 2026 onward | The Procuraduría General — the office the S5 translates as "Attorney General," ¶ 8, its own declarant as the "Attorney General's Office," ECF 293-1 ¶ 2, and the government as part of the "Interim Government," ECF 294 at 20 — undertakes her defense from the first days of her detention. | ECF 293-1 ¶¶ 7, 10 |
| Feb. 12, 2026 | Three weeks before the United States recognizes her government, acting President Rodríguez tells an American network: "I can tell you President Nicolás Maduro is the legitimate president. I will tell you this as a lawyer, that I am. Both President Maduro and Cilia Flores, the first lady, are both innocent." | Decl. ¶ 68 |
| Feb. 20 and Mar. 3, 2026 | The Procuraduría's Chief of Litigation declares under penalty of perjury in this Court that under Venezuelan law the Procuraduría "is obligated to defend the nation's interests and represent its public servants both domestically and abroad," that those duties "are absolutely mandatory, non-delegable, and cannot be waived under any circumstances," and that the government "has a clear, legal obligation" to defend "the First Lady, who was also serving as a deputy in the National Assembly at the time of her abduction," an obligation it "has been meeting" — a representation Judge Hellerstein credited at the hearing of March 26, 2026: "The government of Venezuela said it will honor the indemnifications. That's sufficient, I think." | ECF 293-1 ¶¶ 4, 6, 7, 10; ECF 290-1 ¶¶ 4–7; Tr. of Mar. 26, 2026 (ECF 297) at 36:3–5; *see id.* at 25:1–3, 33:15–16 |
| June 2026 | After recognition, the acting President continues to describe her office as derivative of Mr. Maduro's: "I am the acting president because I was the executive vice president under President Nicolás Maduro." | Decl. ¶ 71 |

Venezuela has never waived Ms. Flores de Maduro's immunity, never disclaimed her or the offices through which she is alleged to have acted, and never characterized any act alleged against her as unauthorized. The government's only contrary evidence is that, in a civil damages action in Florida to which Ms. Flores de Maduro is not a party, Venezuela's May 14, 2026 diplomatic note requested a suggestion of immunity for its sitting acting President; a default judgment had been entered against Mr. Maduro on July 15, 2026, five days before the United States filed its suggestion. *Kenemore*, ECF 73, 74, 75; Rubinstein Ltr. at 1; Segura Decl. ¶ 8; Gov't Opp. at 6–7.

The public record set out above is not the whole of the record. The Executive has told the courts that its dealings with the government in Caracas are "nonpublic, sensitive, and high stakes,"

are conducted "outside the public view," and are "intensive and delicate," Decl. ¶¶ 53, 83–85, and the Secretary of State, asked what the acting President had agreed to in their conversations, answered that he was "not obviously going to have these conversations in the media." *Id.* ¶ 60. What the government of President Rodríguez has asked of the United States through those channels is, properly, not a matter for a public filing; Venezuela's public position is the one set out above.

## LEGAL STANDARD

The governing standard is set out in the Flores Memorandum at 11–13 and the Maduro Memorandum at 13–15, which Ms. Flores de Maduro incorporates. In brief: head-of-state immunity and foreign-official immunity present a threshold question of jurisdiction "distinct from the merits," *United States v. Türkiye Halk Bankası A.Ş.*, 16 F.4th 336, 344 (2d Cir. 2021) ("*Halkbank I*"), *aff'd in part, vacated in part*, 598 U.S. 264 (2023) ("*Halkbank II*"); they arise under the common law, *Halkbank II*, 598 U.S. at 274, 280–81; *Samantar v. Yousuf*, 560 U.S. 305, 324–25 (2010); and under the common law's two-step procedure, where the Department of State has not recognized the immunity, the court "ha[s] authority to decide for itself whether all the requisites for such immunity exist[]," asking "whether the ground of immunity is one which it is the established policy of the [State Department] to recognize." *Samantar*, 560 U.S. at 311–12 (quoting *Ex parte Republic of Peru*, 318 U.S. 578, 587 (1943), and *Republic of Mexico v. Hoffman*, 324 U.S. 30, 36 (1945)). The motion takes the S5's allegations as pleaded; to show that the acts alleged would be official is not to admit that they occurred. Flores Mem. at 5 n.3. On a jurisdictional motion the Court may consider matters outside the indictment, Maduro Mem. at 4 n.1, and a finding of immunity requires dismissal. *Id.* at 13–14.

# ARGUMENT

## POINT I

## MS. FLORES DE MADURO IS IMMUNE FROM THE CRIMINAL JURISDICTION OF THIS COURT BY VIRTUE OF HER STATUS, AND NEITHER THE PASSAGE OF TIME NOR THE EXECUTIVE'S NON-RECOGNITION OF MR. MADURO CAN STRIP VENEZUELA OF AN IMMUNITY THAT BELONGS TO IT

Ms. Flores de Maduro incorporates Point I of the Flores Memorandum (at 14–27) and Point I of the Maduro Memorandum (at 17–30), which establish that the immunity of a head of state has always extended to the members of his household, above all the spouse; that the United States has repeatedly certified that immunity to the courts; and that the immunity attached when the S4 was returned and when she was seized, and was violated by both. The government does not engage the spousal authorities. *See* Gov't Opp. at 17 n.7; Flores Mem. at 15–20. It rests on the propositions that non-recognition since 2019 ends the inquiry, that status is measured "at the time of court proceedings," and that the Executive's "determination" is entitled to "absolute deference." Gov't Opp. at 16–23. The first two are answered in Section A and the third in Point IV; Section B shows that, even on the government's theory, she retains a residual immunity for the acts alleged during the recognized period, and Section C that the government the United States recognizes has asserted her immunity.

### A. Ms. Flores de Maduro Shares the Status-Based Immunity of Venezuela's Head of State, Which Attached When the Indictment Was Returned and When She Was Seized

#### *1. The Immunity Belongs to Venezuela, and the Executive's Withholding of Formal Recognition From a Government It Dealt With as Venezuela's Did Not Strip It*

The government's lead proposition is that "[e]ach court to confront the issue in the civil context has afforded absolute deference to the Executive Branch's determinations of head-of-state immunity or non-immunity," and that the Executive has made such a determination here by

indicting and seizing the defendants. Gov't Opp. at 10–12, 16. The deference it claims for that position is addressed in Point IV. What matters here is what the civil decisions the government strings together were deferring *to*. They share a feature the government does not mention: in every one of them the foreign government had asked the United States to recognize the immunity of its head of state, the Department of State had done so at that government's request, and the court deferred to a grant. *Habyarimana v. Kagame*, 696 F.3d 1029, 1031–32 (10th Cir. 2012) (suggestion of immunity "at the request of the Rwandan Government"); *Manoharan v. Rajapaksa*, 711 F.3d 178, 179 (D.C. Cir. 2013); *Ye v. Zemin*, 383 F.3d 620, 626 (7th Cir. 2004); *Lafontant*, 844 F. Supp. at 131–33 (recognized, exiled President of Haiti); *Leutwyler v. Office of Her Majesty Queen Rania Al-Abdullah*, 184 F. Supp. 2d 277, 280 (S.D.N.Y. 2001) (the Queen of Jordan); *Tachiona v. Mugabe*, 169 F. Supp. 2d 259, 296–97 (S.D.N.Y. 2001); *Am. Justice Ctr. (AJC), Inc. v. Modi*, No. 14 Civ. 7780 (AT), 2015 U.S. Dist. LEXIS 177427, at *1–2, *4 (S.D.N.Y. Jan. 14, 2015) (Torres, J.) (suggestion of immunity for the sitting Prime Minister of India, filed after "the Embassy of the Republic of India … formally requested the Government of the United States to determine that Prime Minister Modi is immune," Suggestion of Immunity ¶ 2, *Modi*, ECF 3 (Oct. 19, 2014)). The one exception the government offers for a *denial* is *Yousuf v. Samantar*, 699 F.3d 763 (4th Cir. 2012), in which the Department filed a written statement of interest declining to recognize immunity for a former official of a state that, as the court stressed, had *no recognized government at all* "from which immunity would derive in the first place." *Id.* at 772, 777–78. In *Yousuf* there was no recognized government of Somalia to assert the immunity; here there is one, and it has.[7]

[7] When a recognized government of Somalia later came into being, the Executive treated its position — not the forum's view of the official — as the operative fact: the Somali Prime Minister wrote to the Secretary of State asking that immunity be obtained for Samantar, Somalia's presidency then identified its Attorney General as the official authorized to speak, and the Attorney General informed the Department that Somalia did not wish to request immunity. Brief for the United States as Amicus Curiae at 5–7, *Ali v. Warfaa*, No. 15-1345 (U.S. May 2017) (also describing the

The denial there also comported with the common law, which confines status immunity to incumbents and their households: Samantar was a former official, out of office for years and a permanent resident of the United States, with no government to claim him, 699 F.3d at 777 — the deference *Halkbank III* describes. *Infra* Point IV.A. What separates every one of these cases from this one is not the form of the Executive's statement but the position of the foreign state: in each, the immunity was recognized because the state asked for it, and in the one case of denial there was no state to ask. Not one of them involved a foreign state that asserted the immunity the Executive was said to have denied.

That matters because the deference the Fourth Circuit described in *Yousuf* — the passage the government repeats throughout its brief — was deference to the Executive's recognition of a foreign state and of its government, the act from which, in the court's words, immunity "would derive in the first place." 699 F.3d at 772; *see Halkbank III*, 120 F.4th at 52 n.8 (describing *Yousuf* as a recognition case). Here the state is recognized, and it has claimed the immunity. The Executive has made three acts of recognition that bear on this case. It recognized the government of Venezuela in which Ms. Flores de Maduro held office, continuously, until January 23, 2019. Segura Decl. ¶¶ 3–5. On that date it recognized Mr. Guaidó as interim President, a recognition that ended when the 2015 National Assembly dissolved his interim government in December 2022, after which — on the government's own account — the Executive formally recognized no government of Venezuela at all, *id.* ¶ 4, while dealing, as shown next, with the one in Caracas. And in March 2026 it formally recognized the government of acting President Rodríguez — a government that holds office in Mr. Maduro's forced absence by virtue of a judicial decision premised on his status as the "Constitutional President," that declares him "the legitimate

Executive's position that its immunity determinations bind the courts, *id.* at 14, 18). The government the United States recognizes in Caracas has done the opposite. *Infra* Point I.C.

president" and Ms. Flores de Maduro "the first lady," and that has demanded her release. *Supra* Background C–D. The government's statement that the United States has not recognized Ms. Flores de Maduro "as Venezuela's first lady since January 2019," Gov't Opp. at 5, misdescribes how the immunity arises. Recognition is an act directed at states and governments; a spouse's immunity is not conferred by a separate act of recognition addressed to her but follows from the recognized head of state's status — which is how the Executive has treated it each time it has recognized the immunity of a head of state's wife or household. Flores Mem. at 15–20. Her status follows her husband's and her state's.

Nor is the question answered by the Executive's refusal, between January 2019 and January 2026, to apply the word to the government it was dealing with. Recognition matters to immunity because it identifies the government "from which immunity would derive in the first place," *Yousuf*, 699 F.3d at 772 — the government that speaks for the state. The Second Circuit has long looked past the label to the dealings. Where the Executive had exchanged ambassadors with a government while its formal recognition was still pending, Judge Harlan wrote for the court that the exchange "certainly amounted at least to de facto recognition, if not more," that the State Department's statement to the contrary was "rather in the nature of a legal conclusion which adds little more to the significance of the already existing relations between that Government and our own," and that the court would not hold otherwise "[u]nless form rather than substance is to govern." *Murarka v. Bachrack Bros.*, 215 F.2d 547, 552 (2d Cir. 1954). Three decades later the court held that "the absence of formal recognition cannot serve as the touchstone for determining whether the Executive Branch has 'recognized' a foreign nation" for a particular legal purpose, because the Department of State "has sometimes refrained from announcing recognition of a new government because grants of recognition have been misinterpreted as pronouncements of

approval," and it answered the question by considering the Executive's dealings with the unrecognized government "in the aggregate." *National Petrochemical Co. of Iran v. M/T Stolt Sheaf*, 860 F.2d 551, 554–55 (2d Cir. 1988) (counting the Algiers Accords, the Claims Tribunal and a treaty of amity that "remains in full force and effect," *id.* at 555–56). A judge of this District, asked to treat a State Department letter reiterating non-recognition of the Khomeini government as decisive, held that the withdrawal of recognition from a government "does nothing to negate the underlying recognition that has been accorded to the state." *Iran Handicraft & Carpet Export Center v. Marjan International Corp.*, 655 F. Supp. 1275, 1279–81 & nn.2, 4 (S.D.N.Y. 1987), *aff'd*, 868 F.2d 1267 (2d Cir. 1988) (table). The courts of New York reached the same result decades earlier, holding that a government the United States had declined to recognize was nonetheless "immune from suit in its corporate capacity" for "governmental acts within its territorial jurisdiction," *Sokoloff v. National City Bank*, 239 N.Y. 158, 164 (1924) (Cardozo, J.) (describing *Wulfsohn v. Russian Socialist Federated Soviet Republic*, 234 N.Y. 372, 375 (1923) ("It is said that because of non-recognition by the United States such an action may be maintained. There is no relation between the premise and the conclusion.")); *Upright v. Mercury Business Machines Co.*, 13 A.D.2d 36, 39, 41–42 (1st Dep't 1961) (non-recognition serves "narrow purposes" whose consequences a court "will not exaggerate or compound"). The practice the Second Circuit described is the Department of State's own: its practice "has been to deemphasize and avoid the use of recognition in cases of changes of governments," because recognition had created "the impression among other nations that the United States approved of those governments it recognized and disapproved of those from which it withheld recognition." *Diplomatic Recognition: A Foreign Relations Outline*, 77 Dep't St. Bull. 462, 462–63 (Oct. 10, 1977). Its Legal Adviser's office has said the same to the Second Circuit: in *National Petrochemical*, having

told a court of this District by letter that the United States had not recognized the Khomeini government, it joined an amicus brief arguing that the letter "referred merely to the absence of formal recognition and was not intended to foreclose" the legal consequence before the court. 860 F.2d at 554. The Executive's course of dealing here is set out above, *supra* Background C.2, and it included the kind of dealings the Second Circuit counted: a request made under a treaty to which both states are parties — the protecting-power mandate the United States asked Switzerland to obtain from Caracas under Article 45(c) of the Vienna Convention on Diplomatic Relations; a written instrument negotiated directly with that government — the memorandum of understanding of September 28, 2023, in which the delegations "de los Estados Unidos de América ('EEUU') y de la República Bolivariana de Venezuela ('Venezuela')" ("of the United States of America ('USA') and of the Bolivarian Republic of Venezuela ('Venezuela')") recorded their intention "de dar una serie de pasos que lleven a la normalización de las relaciones diplomáticas" ("to take a series of steps leading to the normalization of diplomatic relations"), ending in a phase in which "los Participantes normalizan las relaciones diplomáticas y consulares" ("the Participants normalize diplomatic and consular relations"), and whose first phase the United States carried out within three weeks, by the statement welcoming the resumption of the talks, the licenses issued on the six-month term the memorandum specifies, and the exchange of detainees that followed; agreements the Executive enforced by licensing and revoking the sale of Venezuela's oil; performance demanded of Venezuela as "a principle of international law" and as something Venezuela "is obligated" to do; and bilateral treaties, among them the extradition treaty of 1922 and the mutual legal assistance treaty of 1997, that the Department of State listed as in force on January 1, 2026 without qualification. Decl. ¶¶ 9–10, 24, 26–35, 44, 49. The Department of Justice did more than list the extradition treaty. Its Office of Legal Counsel, in the opinion of December

23, 2025 that concluded the President could lawfully order the operation of January 3, considered whether any treaty prohibited the operation and concluded that none did, and relied on the extradition treaty's own terms — which do not require either party to extradite its nationals — as the protection of United States personnel against extradition to Venezuela. Memorandum from T. Elliot Gaiser, Assistant Attorney General, Office of Legal Counsel, for the Legal Advisor, National Security Council, *Re: Proposed War Department Operation to Support Law Enforcement Efforts in Venezuela*, at 19, 21 (Dec. 23, 2025) (public redacted version) ("OLC Venezuela Op."); Decl. ¶ 50. A treaty whose protections the Executive claims for its own personnel is a treaty in force, and a treaty in force is in force with the government that can perform it; in December 2025 that government was Mr. Maduro's. The Executive's formula, that it was engaging Mr. Maduro, "who we don't recognize … but who is detaining American citizens," Decl. ¶ 18, describes a decision to withhold the courtesies of recognition from a government the United States disapproved of; it does not describe a judgment that Venezuela had some other government. After December 2022 the United States formally recognized none, Segura Decl. ¶ 4, and dealt with none but Mr. Maduro's. The President said as much himself, in words the Executive has never retracted: the recognition of Mr. Guaidó was something he "could have lived with … or without," and was "not … very meaningful one way or the other." Decl. ¶ 16. Much of the world drew the same conclusion, and on January 3, 2026 no state recognized any other government of Venezuela. *Supra* Background C.2. The immunity Ms. Flores de Maduro asserts is Venezuela's; the government the United States dealt with as Venezuela's for seven years is the government she served; and the government it recognizes today has claimed the immunity for her. *Infra* Point I.C.

The government's answer is that recognition and immunity cannot be "divorce[d]," because immunity is "a paradigmatic consequence of recognition." Gov't Opp. at 17 (citing

*Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 11 (2015) ("Legal consequences follow formal recognition.")). Ms. Flores de Maduro does not ask the Court to divorce them. She asks the Court to give recognition its legal consequences. The United States has always recognized the *state* of Venezuela, and it is the state to which the immunity belongs. *Guaranty Trust Co. v. United States*, 304 U.S. 126, 137 (1938) ("the rights of a sovereign state are vested in the state rather than in any particular government which may purport to represent it"). The same passage holds that which government "is to be regarded here as representative of a foreign sovereign state is a political rather than a judicial question," and that the courts, bound by the Executive's answer, "are free to draw for themselves its legal consequences." *Id.* at 137–38; *see* Gov't Opp. at 17 n.8. Ms. Flores de Maduro asks for nothing else. The Executive has answered the political question — it recognized, until January 23, 2019, the government in which she served, and it recognizes the government that asserts her immunity today — and the legal consequences of those answers are for the Court to draw. The United States recognized the *government* of Venezuela during the thirteen years in which nearly every act alleged against her occurred, and recognition validates that government's acts as the acts of the state. *Infra* Point I.B. And the United States now recognizes a government of Venezuela that "speak[s] for and take[s] action on behalf of Venezuela," Segura Decl. ¶ 7, and that government asserts her immunity. *Infra* Point I.C. The one thing the recognition power does not include is the power to decide which foreign states' officials may be seized abroad and tried here. *Zivotofsky* itself was careful on this point. It noted that recognition "may also be implied — for example, by concluding a bilateral treaty or by sending or receiving diplomatic agents," 576 U.S. at 11; it held that "[t]he Executive's exclusive power extends no further than his formal recognition determination," *id.* at 30, and the Court "decline[d] to acknowledge" the "unbounded power" the Secretary had urged, because "[i]t is not for the President alone to determine the whole

content of the Nation's foreign policy." *Id.* at 20–21. The government's theory — that an Executive statement declining to recognize a foreign leader operates, without more, to lift the immunity of that leader's state and household from criminal process — would make the immunity of every foreign head of state and every head of state's family "nothing more than prosecutorial discretion." Maduro Mem. at 29. The weight the Executive's position in this prosecution carries is a question of deference, answered in Point IV.

### 2. *The Violation Is Measured When Criminal Process Issued and When Ms. Flores de Maduro Was Seized — Not "at the Time of Court Proceedings"*

The government next argues that "[s]tatus-based immunity, including head-of-state immunity, depends on status at the time of court proceedings, not at some earlier time," citing *Matar v. Dichter*, 563 F.3d 9, 14 (2d Cir. 2009), and *Sikhs for Justice v. Singh*, 64 F. Supp. 3d 190, 194 (D.D.C. 2014). Gov't Opp. at 19. *Matar* does not stand for that proposition: the cited page holds that *conduct-based* immunity "does not depend on tenure in office," so that a *former* official sued after leaving office retains it. 563 F.3d at 14. *Sikhs for Justice* was a civil suit against a sitting Prime Minister who left office while the motion was pending and before he had been served; the court held that he had been "absolutely immune from suit until May 26" — the day his successor was sworn in — that as a former head of state he "retains 'residual immunity' for official acts taken while he served in that capacity," and dismissed every claim arising from his decade in office on that basis. 64 F. Supp. 3d at 194–95. Neither case addresses the situation in which the process was issued, and the person seized, while the status subsisted. The authorities that do address it point one way. In this District, "criminal immunity precludes the exercise of jurisdiction by the courts over an individual whether the incident occurred prior to or during the period in which such immunity exists" (quoting State Department guidance), and "the Government may not proceed on an Indictment obtained when [the defendant] was immune from the jurisdiction of the Court."

*Khobragade*, 15 F. Supp. 3d at 387–88 (dismissing an indictment returned, and moved against, while the defendant held diplomatic immunity, "[e]ven if [she] had no immunity at the time of her arrest and has none now," and noting that "the standard for dismissing criminal and civil cases based on diplomatic immunity is the same"). The government's brief does not mention *Khobragade*. In the *Arrest Warrant* case the International Court of Justice held that the *issuance* of an arrest warrant against a sitting foreign minister, and its international circulation to "establish a legal basis for the arrest of Mr. Yerodia … abroad," each "failed to respect" and "effectively infringed" his immunity — the violation was complete when the process issued, regardless of what followed. 2002 I.C.J. 3, ¶¶ 70–71.

The dates are not disputed. The S4 was returned under seal on December 23, 2025, and alleged in the present tense that Mr. Maduro "is now, having remained in power despite losses in recent elections, the de facto but illegitimate ruler of the country" and that Ms. Flores de Maduro "is the de facto First Lady of Venezuela." S4 ¶¶ 5, 8. She was seized eleven days later, while a sitting deputy of the National Assembly, in the capital of a state with whose government the United States acknowledged it had been negotiating up to the day of the operation. *Supra* Background C–D; S/PV.10085, at 15 (United States: "He offered Maduro multiple off-ramps."). The first protection a status immunity affords is "the exemption of the person of the sovereign from arrest or detention within a foreign territory," *The Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116, 137 (1812) (quoted in *Halkbank III*, 120 F.4th at 46 n.4); *Doe No. 700*, 817 F.2d at 1110; and it protects the person "against any act of authority of another State which would hinder him or her in the performance of his or her duties." *Arrest Warrant*, 2002 I.C.J. 3, ¶¶ 54–55. The I.C.J. judged the warrant against the immunity "then enjoyed" by the minister and held the violation complete although he "never suffered arrest." *Id.* ¶ 70. Under English law, which the government elsewhere

invokes, a serving head of state "cannot be arrested or detained, let alone removed against his will to another country." *R v. Bow Street Metropolitan Stipendiary Magistrate, ex parte Pinochet Ugarte (No. 3)*, [2000] 1 A.C. 147, 280 (H.L.) (Lord Phillips); *see id.* at 268–69 (Lord Millett). An immunity that the prosecuting state could extinguish by committing the very act the immunity forbids — seizing the protected person and holding her until, in the government's phrase, her status has become "utterly irrelevant," Gov't Opp. at 19 — would be no immunity at all. Flores Mem. at 25; Maduro Mem. at 29–30. Nor does the S5 cure the defect. It was obtained while Ms. Flores de Maduro was held in this District as the direct result of the seizure that violated her immunity, and the status from which the immunity derives has not ended: Venezuela has waived nothing, its constitutional order treats Mr. Maduro's absence as forced and his Vice President as acting in his stead to this day, TSJ Sentencia No. 0724, at 2, and the government the United States recognizes calls him "the legitimate president." *Supra* Background C–D; Flores Mem. at 25 ("the immunity that barred the Indictment the day it was returned bars this prosecution today"). Judge Scheindlin's observation that there was "currently no bar to a new indictment" of Ms. Khobragade, 15 F. Supp. 3d at 388, rested on an immunity that had ended with her departure from the country; the immunity here has not ended, and the S5 is the product of the custody that violated it.

The government's remaining temporal point is that Mr. Maduro was unrecognized "when Maduro Moros was initially indicted in March 2020; when Maduro Moros and Flores de Maduro were indicted in December 2025; when the defendants were arrested in January 2026; and when the defendants' instant motion was filed or at any time thereafter." Gov't Opp. at 16. That restates the non-recognition argument, answered above. It is worth adding only that the government's own account of January 3, 2026 refutes the suggestion that Mr. Maduro had, by then, ceased to be the person through whom the state of Venezuela acted: the Executive was dealing with him directly,

and making him "offers," up to that day, Decl. ¶¶ 46, 61, treated his Executive Vice President as the person who would exercise his functions ("she was, as you know, picked by Maduro," Decl. ¶ 60), and within nine weeks recognized the government that holds office in his absence under a judgment declaring him the abducted Constitutional President. *Supra* Background C–D.

### 3. *The Government's Remaining Authorities Do Not Support Denying a Recognized State's Assertion of Immunity for Its Head of State's Household*

*a. Kadic, Noriega, Lafontant, and Saab (Gov't Opp. at 18–19).* The government offers these as cases in which courts "deferred to the Executive Branch's head-of-state immunity and non-immunity determinations even where the Executive's recognition and de facto control were indisputably at odds." None is such a case. In *Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995), Karadžić never asserted head-of-state immunity; the passage the government cites says only that "the mere possibility that Karadzic might at some future date be recognized by the United States as the head of state of a friendly nation" did not render the plaintiffs' claims non-justiciable, *id.* at 248, and the immunity Ms. Flores de Maduro asserts is not an enlargement "on new grounds" but the immunity of a recognized state's head of state and his household, which the Executive has certified in case after case. Flores Mem. at 17–20. In *United States v. Noriega*, 746 F. Supp. 1506 (S.D. Fla. 1990), *aff'd*, 117 F.3d 1206 (11th Cir. 1997), the defendant had "never been recognized as Panama's Head of State either under the Panamanian Constitution or by the United States," the United States "continued to recognize President Eric Arturo Delvalle as the legitimate leader of Panama while Noriega was in power," Panama "ha[d] not sought immunity for Noriega," and Noriega, who had never claimed to be Panama's constitutional head of state, "concede[d] that he d[id] not fit within traditional notions of a head of state as defined by customary international law." *Id.* at 1519–20; 117 F.3d at 1212. Every one of those facts is reversed here: Mr. Maduro was the constitutional President of Venezuela, recognized as such by the United States for six years; no

competing government of Venezuela was ever recognized in his place after 2022; under Venezuela's constitutional order he holds the office still, TSJ Sentencia No. 0001, at 2–3; and Venezuela has sought the immunity of both defendants by name. The government's reliance on the number of states that recognized Mr. Guaidó in 2019, Gov't Opp. at 2–3, 5; Segura Decl. ¶ 4, measures the wrong thing at the wrong time: the count is a 2019 count, and on the day of the seizure no state recognized any government of Venezuela but Mr. Maduro's. *Supra* Background C.2. *Lafontant* deferred to an Executive *grant* of immunity for a recognized head of state who had been driven into exile, and its holding — that immunity may be lost only by an "explicit" waiver of the recognized government, 844 F. Supp. at 134 — is the rule Ms. Flores de Maduro invokes. *United States v. Saab Moran*, No. 19 Cr. 20450 (S.D. Fla. Dec. 23, 2022), ECF 197, concerned a businessman's claim to *diplomatic* immunity as a "special envoy" — an immunity that, as the court explained, "is premised upon recognition by the receiving State, so that no person or government may 'unilaterally assert diplomatic immunity,'" and that, even for permanent missions, "requires reciprocity." *Id.* at 14–15 (quoting *United States v. Kuznetsov*, 442 F. Supp. 2d 102, 106 (S.D.N.Y. 2006)). Head-of-state immunity is not an incident of accreditation; it belongs to the state and attaches to the office. The court, moreover, assessed the defendant's status "[a]t the time of his arrest," *id.* at 7 — the measure Ms. Flores de Maduro asks the Court to apply. No head of state and no head of state's household was before that court, and the order was never reviewed: the defendant was pardoned in December 2023 and the indictment dismissed on the government's motion in March 2024. *Id.*, ECF 232, 233 (Mar. 28, 2024).

*b. Customary international law (Gov't Opp. at 21–23).* The government says that the defendants "muster only a handful of decisions of French and Italian courts" for the proposition that a head of state's immunity does not depend on the forum's recognition, and that "international

law does not establish any particular circumstances under which countries are legally obligated to recognize governments." The second point is true and irrelevant: the question is not whether the United States must recognize Mr. Maduro, but whether its decision not to formally do so strips Venezuela of an immunity international law accords to every state. On that question the authorities are not "a handful." The International Court of Justice has held it "firmly established" that heads of state "enjoy immunities from jurisdiction in other States, both civil and criminal," *Arrest Warrant*, 2002 I.C.J. 3, ¶ 51, that those immunities exist "to ensure the effective performance of their functions on behalf of their respective States," *id.* ¶ 53, and that only the sending State may waive them. *Id.* ¶ 52. The Executive Branch itself cited that judgment in July 2026, in describing the head-of-state immunity it recognized for Venezuela's acting President as "well established in customary international law." Kenemore SOI ¶ 5, at 4. In its formal comments to the International Law Commission it agreed that "personal immunity covers all acts" and that "a State, and only a State, may invoke the immunity of its official." Comments from the United States on the ILC's Draft Articles on Criminal Immunity of State Officials as Adopted by the Commission in 2022 on First Reading, at 7, 15 (submitted for the Commission's 2024 session), https://legal.un.org/ilc/sessions/75/pdfs/english/iso_us.pdf (viewed Oct. 19, 2026) ("U.S. ILC Comments"). The French Court of Cassation has held that the purpose of personal immunity "requires that it not be linked to the recognition of the status of Head of State by the forum State." Maduro Mem. at 23–25 (quoting Cour de cassation, ass. plén., July 25, 2025, No. C 24-84.393). Even if the decisions of two foreign courts do not by themselves establish custom, the government identifies no State practice, and no decision of any court anywhere, holding that a state's head of state and his wife may be seized and tried abroad because the forum state has withdrawn formal recognition from him, despite dealing with him as a head of state for years.

### B. Independently, Ms. Flores de Maduro Holds a Residual, Status-Derived Immunity for Every Act the S5 Alleges During the Period in Which the United States Recognized the Government She Served

The government's theory of the case is that the Executive's non-recognition of Mr. Maduro, beginning January 23, 2019, defeats status-based immunity for everything that follows. Gov't Opp. at 16–19. Ms. Flores de Maduro disputes that theory, *supra* Section A, but even following that logic she cannot be prosecuted for the case the S5 actually pleads. The acts the S5 attributes to Ms. Flores de Maduro personally are alleged to have occurred in 2006, 2007, 2010, 2013, 2014, and (as to one campaign) 2015, and over a span of 2004 to 2015. ¶¶ 10–13, 15, 19, 22–24; S4 ¶ 21(b), (d), (k). The only exception is the 2021 judicial commission and a 2022 meeting at which Mr. Maduro spoke. ¶ 16. For the whole of the period from 2006 through January 23, 2019, the United States recognized the government of Venezuela in which she served as a deputy, as President of the National Assembly, and as Procuradora General, and whose head of state she married in 2013. Segura Decl. ¶¶ 3–5; Gov't Opp. at 5; Maduro Mem. at 5, 28. Under the law of recognition, those acts are the acts of the state of Venezuela. Under the Executive's own established policy, a former head of state and a former senior official retain a residual immunity, derived from the office, for acts "exercising the powers of [the] office," and, as detailed below, that policy has been applied to exactly the kind of allegations the S5 makes. The government's theory therefore leaves it, at most, with the 2021–2022 allegations of ¶ 16 — that in June 2021 Mr. Maduro appointed her vice president of a commission on the judiciary, and that in 2022 she attended a meeting at the presidential palace at which he addressed judges. ¶ 16. Neither allegation describes an act of narcotics trafficking, weapons possession, or torture, or any act of hers at all beyond holding an appointment and attending a meeting.

### *1. Recognition Validated the Acts of the Recognized Government From Its Inception*

The legal consequence of recognition is settled by a line of Supreme Court decisions that the government itself invokes. Recognition of a government "is retroactive in effect and validates all the actions and conduct of the government so recognized from the commencement of its existence." *Oetjen*, 246 U.S. at 302–03. The Court applied that rule to the recognition of the Soviet government, holding that recognition, with the diplomatic relations established alongside it, operated "to validate, so far as this country is concerned, all acts of the Soviet Government here involved from the commencement of its existence," *Belmont*, 301 U.S. at 330, and applied it again in *United States v. Pink*, 315 U.S. 203, 223, 233 (1942). Once recognized, the acts of that government's officers "in the exercise of governmental authority, whether as civil officers or as military commanders," are the acts of the state, *Underhill v. Hernandez*, 168 U.S. 250, 252–53 (1897), and the officer's motive is beside the point: evidence that the defendant "was actuated by malice or any personal or private motive" was "not sufficient." *Id.* at 254. The government treats the Executive's non-recognition after January 23, 2019 as dispositive. Gov't Opp. at 16–19. If it is, so is the Executive's recognition during the thirteen years before, and the two cannot be separated: the same authority that gives the one its legal effect gives the other its own. *Zivotofsky*, 576 U.S. at 11 ("Legal consequences follow formal recognition."); *Guaranty Trust*, 304 U.S. at 137–38.

Nor is there anything to the suggestion, Gov't Opp. at 19 n.9, that giving effect to the recognized period would mean "multiple individuals could serve as head of state … simultaneously." The point is not that two persons were head of state at once. It is that for the period 2006 to January 2019 there was one recognized government of Venezuela, that the United States dealt with it as such — designating Ms. Flores de Maduro in 2018 as "Venezuela's First

Lady and former Attorney General and President of the National Assembly," ECF 294-1 ¶ 10 — and that the acts of its officers in the exercise of their offices are attributable to Venezuela.

#### 2. *The Executive's Established Policy Recognizes Residual Immunity for Former Heads of State and Senior Officials for Acts Exercising the Powers of Their Office*

The question under *Hoffman* and *Samantar* is "whether the ground of immunity is one which it is the established policy of the [State Department] to recognize." *Samantar*, 560 U.S. at 312 (quoting *Hoffman*, 324 U.S. at 36); *Halkbank III*, 120 F.4th at 48 (the court decides "whether it [is] the established policy of the State Department to recognize claims of immunity of this type" (quoting *Victory Transport Inc. v. Comisaria General*, 336 F.2d 354, 358–59 (2d Cir. 1964))). The Executive has articulated that policy, in writing and in court, with unusual consistency over the last twenty years.

In *Doe v. Zedillo*, the Department of State suggested the immunity of the former President of Mexico from a suit alleging responsibility for a massacre "carried out against local villagers by paramilitary groups allegedly trained or assisted by the Mexican army." Suggestion of Immunity, *Doe v. Zedillo Ponce de León*, No. 3:11-cv-1433 (D. Conn. Sept. 7, 2012), ECF 38 ("Zedillo SOI"), Ex. 1 (ECF 38-1), at 1. Its filing stated the governing principles:

> [A] sitting head of state's immunity is based on his status as the incumbent office holder and extends to all his actions. … [A]fter a head of state leaves office, however, that individual's residual immunity depends on the conduct at issue and generally applies only to acts taken in an official capacity while in that position. … [I]n determining whether certain acts were taken in an official capacity, the Department of State generally presumes that allegations relating to the official's exercise of the powers of his or her office fall into that category.

Zedillo SOI ¶ 7, at 5. The Legal Adviser's letter put the same rule more generally: "The residual immunity of a former official, by contrast, is based upon the character of that official's conduct

and extends only to acts taken in an official capacity. In a case involving conduct-based immunity, as here, the Department of State generally presumes that actions taken by a foreign official exercising the powers of his office were taken in his official capacity." Letter of Legal Adviser Harold Hongju Koh (Sept. 7, 2012), Zedillo SOI Ex. 1, at 1 ("Koh Ltr."). The Department identified what falls outside the presumption: "a suit challenging a former official's personal financial dealings, which generally would not be considered to constitute acts taken in an official capacity." Zedillo SOI at 6 n.5. The Tenth Circuit has recorded the Executive's articulation of that "residual immunity." *Habyarimana*, 696 F.3d at 1032 n.5.

In *Giraldo v. Drummond Co.*, the Department suggested the "residual immunity" of former President Uribe of Colombia "insofar as Plaintiffs seek information (i) relating to acts taken in his official capacity as a government official; or (ii) obtained in his official capacity as a government official," an immunity it described as extending to his prior offices as "a senator, governor of Antioquia Department, and President of Colombia." Statement of Interest and Suggestion of Immunity ¶¶ 1, 4–5, *Giraldo v. Drummond Co.*, No. 1:10-mc-00764 (D.D.C. Mar. 31, 2011), ECF 13 ("Uribe SOI"); *see id.* ¶ 4 ("Under international law, former heads of state have residual immunity from suit only for acts taken in an official capacity while in office." (citing *Arrest Warrant*, 2002 I.C.J. 3, ¶ 61)). The district court applied that suggestion to the topics the plaintiffs had identified — topics that mirror the S5's allegations here — the former President's "'illegal collaboration with and support of the AUC'; 'cooperation with illegal drug smuggling'; 'use of the Columbian military to assist the AUC[]'; 'targeting [of] some of [p]laintiffs' decedents for execution'" — and held that "mere allegations of illegality do not serve to render an action unofficial for purposes of foreign official immunity." *Giraldo v. Drummond Co.*, 808 F. Supp. 2d 247, 248–50 (D.D.C. 2011), *aff'd*, 493 F. App'x 106 (D.C. Cir. 2012). The court distinguished

"garden-variety 'crimes … in violation of his position and not in pursuance of it,'" *id.* at 250 (quoting *Jimenez v. Aristeguieta*, 311 F.2d 547, 558 (5th Cir. 1962)), from allegations that the official "acted within his official capacity but illegally," which do not defeat immunity. *Id.* at 251.

In *Matar v. Dichter* and *Rosenberg v. Lashkar-e-Taiba*, the Department recognized the immunity of former heads of Israel's and Pakistan's security services from suits alleging, respectively, a bombing that killed civilians and the Mumbai terrorist attacks. Its filings state the rule for identifying official acts: "On their face, acts of defendant foreign officials who are sued for exercising the powers of their office are treated as acts taken in an official capacity," Statement of Interest and Suggestion of Immunity at 11, *Rosenberg v. Lashkar-e-Taiba*, No. 10-cv-5381 (E.D.N.Y. Dec. 17, 2012), ECF 35 ("Rosenberg SOI"); whether an act is official "[t]urns on [w]hether the [a]ct [i]s [a]ttributable to the [s]tate, [n]ot on [w]hether [i]t [w]as [l]awful," Statement of Interest of the United States at 23, *Matar v. Dichter*, No. 05 Civ. 10270 (WHP) (S.D.N.Y. Nov. 17, 2006), ECF 36 ("Dichter SOI"); "the conduct of any person empowered to exercise governmental authority is considered conduct of the state under international law if the person acts in that capacity, even if the person exceeds his authority or contravenes his instructions," *id.* at 25 n.21 (citing Articles on Responsibility of States for Internationally Wrongful Acts art. 7); and "[b]y definition, a civil lawsuit against a foreign official will challenge the lawfulness of the official's acts. Hence, the official's immunity would be rendered meaningless if it could be overcome by such allegations alone." *Id.* at 23. The Department asserted that immunity while taking "no position … as to the lawfulness" of the attack. *Id.* at 1–2. The Second Circuit deferred to that position, *Matar*, 563 F.3d at 14–15, and a judge of the Eastern District, applying it, held immune former intelligence chiefs alleged to have "individually engaged in orchestrating the Mumbai attacks," observing that the Fourth Circuit's *jus cogens* exception "is

not recognized in this Circuit." *Rosenberg v. Lashkar-e-Taiba*, 980 F. Supp. 2d 336, 340, 343–44 (E.D.N.Y. 2013), *aff'd sub nom. Rosenberg v. Pasha*, 577 F. App'x 22 (2d Cir. 2014).

This is the "established policy" to which *Hoffman* and *Samantar* direct the Court. It has two elements, both of which the Executive has reduced to writing: (1) acts of a foreign official "exercising the powers of his office" are presumed official, and the presumption is not rebutted by allegations that the acts were unlawful, even grievously so; and (2) the presumption is reinforced where the foreign state requests recognition of the immunity, Rosenberg SOI at 9 (the Department "considers a foreign government's request (if there is such a request)"), and gives way only for conduct of a genuinely private character, of which the Executive's own example is "personal financial dealings." Zedillo SOI at 6 n.5; Rosenberg SOI at 9 ("purely private acts, such as personal financial dealings"). Judges of this District have described the practice in the same terms. *In re Terrorist Attacks on Sept. 11, 2001*, 122 F. Supp. 3d 181, 188–89 (S.D.N.Y. 2015); Flores Mem. at 34–36.

A court applied that policy without any Executive filing on the point in *Sikhs for Justice*. The Department of State had suggested the immunity of India's sitting Prime Minister; he left office while the motion was pending; and the court, noting that the government's papers were "silent on the subject" of his immunity for acts predating his premiership, held on its own authority that "[a]s a now-former head of state, he nonetheless retains 'residual immunity' for official acts taken while he served in that capacity," and dismissed every claim arising from his tenure — claims of torture and extrajudicial killing by state forces — "[r]egardless of whether this residual immunity is merely derivative of status-based immunity or is actually a conduct-based immunity." 64 F. Supp. 3d at 194. The residual immunity Ms. Flores de Maduro asserts attaches in the same

way to each office she held — deputy and President of the National Assembly, Procuradora General, and member of the head of state's household — for the acts the S5 assigns to each.[8]

### *3. The S5's Allegations Against Ms. Flores de Maduro Fall Within That Policy*

Ms. Flores de Maduro denies each of the allegations that follow; what matters on this motion is their character as the government has pleaded them. Measured against the Executive's own test, every act the S5 attributes to Ms. Flores de Maduro during the recognized period is an act "exercising the powers of [her] office." The 2010 allegation is that she "ordered the General Counsel of the Venezuelan National Assembly, which she ran at the time," to take a position on a prosecution. ¶ 15. The 2006 allegations are that she and Mr. Maduro directed "members of their security details" and "the Bolivarian National Guard," ¶¶ 10–11, 19 — the state's armed forces, assigned to them by the state. The 2007 allegations are that she offered "PDVSA contracts to assist in negotiations with" an armed group, ¶ 13, and brokered access to "the director of Venezuela's National Anti-Drug Office." S4 ¶ 21(b). The 2013 allegation is that she attended a meeting between the head of state and the leadership of the FARC "about money that MADURO MOROS owed the FARC," at which Mr. Maduro agreed to sell arms, ¶ 12 — and the government acknowledges that the defendants' dealings with the FARC included "diplomatic negotiations" for which "the defendants were not indicted." Gov't Opp. at 31. The 2014 allegations are that she attended meetings at which the President and the newly appointed head of a security service discussed "an intelligence report that there was dissension in the military ranks" and the detention and

[8] The court also held that the residual immunity derived from Mr. Singh's former status did not reach his earlier acts as Finance Minister, and retained jurisdiction over those claims while noting that he might be "protected by other immunities not yet asserted by the Government." 64 F. Supp. 3d at 194–95. The immunity claimed here for Ms. Flores de Maduro's earlier offices is that other immunity: the official-acts immunity the Executive has itself recognized for a former head of state's prior offices, Uribe SOI ¶¶ 1, 4–5 (residual immunity extending to Mr. Uribe's service "as a senator, governor of Antioquia Department, and President of Colombia"), asserted here by the recognized government. *Infra* Point I.C.

interrogation of officers, ¶¶ 22–24 — meetings of the head of state with the head of his intelligence service about a reported military conspiracy. The 2004–2015 allegation is trafficking "with the assistance of armed military escorts" in narcotics "previously seized by Venezuelan law enforcement." S4 ¶ 21(d). None of these allegations describes a "personal financial dealing"; each describes, in the Executive's words, the exercise of "the powers of [an] office" through "an entity that is undeniably a fundamental part of the Government." Rosenberg SOI at 11. The Executive's presumption applies, and the S5 pleads nothing to rebut it — only that the acts were criminal, which is the argument *Giraldo* rejected, the Dichter SOI rejected, and the Second Circuit declined to adopt in *Matar*.

The government's answer — that no court has ever found "drug trafficking activity … to be protected by conduct-based immunity," Gov't Opp. at 31 — is not accurate: the Executive's suggestion in *Giraldo* was applied to allegations of a former head of state's "cooperation with illegal drug smuggling." 808 F. Supp. 2d at 248–50. And the question under *Hoffman* is not whether a prior case matched the present charge, but whether the ground of immunity is one the Executive's established policy recognizes. The ground here — residual immunity of a former senior official of a recognized government for acts taken through the organs of that government — is one the Executive has recognized repeatedly, and the only limiting principle it has ever articulated (private acts, such as personal financial dealings) does not describe the S5.

### *4. The Authorities the Government Relies Upon Do Not Support Its Position*

Three authorities the government cites bear on this point, and each is addressed directly. The first is *Yousuf*'s statement that a former official "will … not be able to assert this immunity for private acts that are not arguably attributable to the state, such as drug possession or fraud." 699 F.3d at 775; Gov't Opp. at 15, 29. The sentence describes *private* acts — the Fourth Circuit's

examples are an individual's possession of narcotics and fraud — and it turns on whether the acts are "arguably attributable to the state." The S5 attributes every act to state organs. *Yousuf* went on to concede that even *jus cogens* violations "may well be committed under color of law and, in that sense, constitute acts performed in the course of the foreign official's employment by the Sovereign," *id.* at 775–76, and denied immunity on a different ground — a *jus cogens* exception, resting in part on the absence of "a recognized government … to assert or waive" the immunity, *id.* at 767, 777–78, that "is not recognized in this Circuit." *Rosenberg*, 980 F. Supp. 2d at 343–44; *see Matar*, 563 F.3d at 14–15; *Doğan v. Barak*, 932 F.3d 888, 896–97 (9th Cir. 2019) (declining to recognize a jus cogens exception to conduct-based immunity).

The second is *In re Doe*'s remark that "were we to reach the merits of the issue, we believe there is respectable authority for denying head-of-state immunity to a former head-of-state for private or criminal acts in violation of American law." 860 F.2d at 45; Gov't Opp. at 14, 24. The Second Circuit did not reach the merits; it decided the case on the Philippines' express waiver, and the sentence is dictum. Flores Mem. at 26. Its authorities were the Marcos cases themselves where the former ruler's own state had waived his immunity, and a passage of *The Schooner Exchange* concerning a prince's private property. The remark says nothing about a sitting head of state's household, nothing about a state that asserts rather than waives, and nothing about acts of a recognized government that the Executive's own policy presumes official. It is, in any event, a remark about *head-of-state* immunity for *private* acts; the acts alleged here are neither private nor, under *Belmont* and *Underhill*, anything other than the acts of Venezuela.

The third is *Arrest Warrant* ¶ 61, which the Uribe SOI itself cites: a former foreign minister may be tried abroad "in respect of acts committed prior or subsequent to his or her period of office, as well as in respect of acts committed during that period of office in a private capacity." 2002

I.C.J. 3, ¶ 61. The limitation is the same one the Executive applies — acts "in a private capacity" — and the S5 pleads no act of hers in that capacity. *Infra* Point II.A.

### C. The Government the United States Recognizes Has Asserted, Not Waived, Ms. Flores de Maduro's Immunity, in Every Form the Executive's Own Practice Treats as Sufficient

The government's third proposition — that "Venezuela has not asserted that Maduro Moros or Flores de Maduro are immune from prosecution in this case or in any other proceeding," Gov't Opp. at 6, so that its "non-assertion" "weighs heavily against immunity," *id.* at 26 (quoting *Broidy Capital Management LLC v. Muzin*, 12 F.4th 789, 800 (D.C. Cir. 2021)) — is the one the record most completely refutes, and it bears on every point in this memorandum. The law is not in doubt. The immunity "ultimately belongs to the sovereign and can be waived by the sovereign," Dichter SOI at 31; *Yousuf*, 699 F.3d at 767, 777 (quoting the Executive); it is lost only by waiver "by the foreign government recognized by the United States," *Lafontant*, 844 F. Supp. at 131–32; and the waiver "must be explicit," because the law does not permit "inadvertent, implied or constructive waiver in cases where the intent of the foreign state is equivocal or ambiguous." *Id.* at 134 (quoting *Libra Bank Ltd. v. Banco Nacional de Costa Rica*, 676 F.2d 47, 49 (2d Cir. 1982)); *In re Doe*, 860 F.2d at 46 (same); *Doe No. 700*, 817 F.2d at 1111 (waiver "by the sending State," by analogy to the Vienna Convention); *Arrest Warrant*, 2002 I.C.J. 3, ¶ 52 ("only the sending State may waive such immunity"); *Kaplun v. United Nations Relief & Works Agency*, No. 24 Civ. 4765 (AT), ECF 69, at 26–27 (S.D.N.Y. Sept. 30, 2025) (Torres, J.) (declining "to imply a waiver from … public statements," "especially where the [organization] has expressly invoked the immunity"). The Marcos cases, on which the government leans, were decided on a diplomatic note in which the Philippines "hereby waive[d] any residual sovereign, head of state, or diplomatic immunity"

of the former President and his wife — language the Second Circuit said "could scarcely be stronger." *In re Doe*, 860 F.2d at 43, 46.

Venezuela has done the opposite, through every organ a state has, before and after the United States recognized its present government: its Permanent Representative in the Security Council, who demanded by name that the United States "fully respect the immunities of President Nicolás Maduro and First Lady Cilia Flores and ensure their immediate release," S/PV.10085, at 23; its highest court; its National Assembly; its Procuraduría, in a sworn declaration filed in this Court; and its acting President, who declared three weeks before recognition that "[b]oth President Maduro and Cilia Flores, the first lady, are both innocent." Decl. ¶ 68; *supra* Background D. The United States recognizes that government as "able to speak for and take action on behalf of Venezuela." Segura Decl. ¶ 7; Kozak Ltr. at 3.

The recognized government is, moreover, the government the S5 describes. The S5 pleads its co-conspirators by office rather than by name — a "high-level Venezuelan official" who commanded military officers and had officers of military intelligence "assigned to [his] security detail," the intelligence services, and "military units," ¶¶ 5–6, 10, 22–24 — and those are organs of the state whose government the United States recognized in March 2026, deals with daily, and describes as a partner in "joint U.S.-Venezuela efforts." Segura Decl. ¶ 7. On the government's own pleading, the recognized government is the same state apparatus through which the charged conduct is alleged to have been carried out, and that government has declared Ms. Flores de Maduro innocent and demanded her return. There is no precedent for denying immunity in those circumstances. In every case the government cites for the weight of a foreign state's "silence," the state had in fact been silent or had disowned the official, and in each the court treated the state's position as the relevant datum. Qatar in *Broidy* had not "requested, approved, or even knew of"

the conduct of the private contractors who claimed immunity, 12 F.4th at 800; Panama in *Noriega* had a recognized government throughout his rule and "ha[d] not sought immunity for Noriega," 746 F. Supp. at 1519; 117 F.3d at 1212; the Philippines in the Marcos cases had waived in terms, *In re Doe*, 860 F.2d at 43, or disowned its former ruler, *Hilao v. Marcos (In re Estate of Ferdinand Marcos, Human Rights Litigation)*, 25 F.3d 1467, 1472 & n.7 (9th Cir. 1994); and Somalia in *Yousuf* had no recognized government at all. 699 F.3d at 772. The same datum here points the other way. The recognized government of Venezuela has objected.

*Broidy* does not help the government on the law, either. It does not hold that a state must "ratify" the charged conduct in terms; it holds that a foreign state's "apparent silence" weighs against immunity where the complaint alleged "an arms-length, general agreement to provide public relations services" by private contractors whose conduct the state had not "requested, approved, or even knew of." 12 F.4th at 800. The D.C. Circuit was explicit that it was addressing "private parties with the kind of loose and limited agency relationship that Broidy alleges," *id.* at 801, who "are not diplomats or heads of state" and claimed "only conduct-based immunity." *Id.* at 798. The S5, by contrast, charges the wife of a head of state who, on the indictment's own account, acted in and through the offices she held — the presidency of the National Assembly, the Procuraduría General, the Assembly's general counsel — and through the National Guard, the intelligence services and the state oil company; the relationship between official and state that *Broidy* called "loose and limited" is here the state itself, and the state is not silent. The Executive's own practice, which *Broidy* cited as the measure, *id.* at 799–800, "considers a foreign government's request (if there is such a request)" and whether the official was "exercising the powers of [the] office," Rosenberg SOI at 9, 11 — and it has recognized immunity on a foreign state's statement that the official's acts, "if taken at all," were official, without any concession that

they occurred. Zedillo SOI ¶¶ 7–8; Koh Ltr. at 1 (Mexico stated that "any actions that former President Ernesto Zedillo carried out in connection with the events alleged in the complaint were taken in the course of his official duties as head of state"); Flores Mem. at 35. A state is not required to have "formally ratified narcotics importation," Gov't Opp. at 26 n.13, in order to stand behind its official; it is required to claim her immunity, and Venezuela has.

Nor does the common law prescribe a form that Venezuela has failed to observe. The government says that courts "cannot be required to sift through public statements or foreign judicial decisions to divine a sovereign's position," and that Venezuela "could have" asserted immunity "directly to the relevant court[]." Gov't Opp. at 28–29. But Venezuela did assert its position directly in this Court: the Procuraduría's declaration was filed here, ECF 293-1, and Judge Hellerstein accepted it as the position of "[t]he government of Venezuela," Tr. of Mar. 26, 2026 (ECF 297) at 25:1–3, 33:15–16, 36:3–5 — as did the government, which called the funds at issue "Interim Government funds." ECF 294 at 20. A demand delivered by a state's Permanent Representative in the Security Council, at a meeting in which the United States set out its own position, is the most formal communication one state can address to another. And the cases the government itself distinguishes show that no particular form is required and that none of the communications they credited was a suggestion of immunity by the Department of State: a diplomatic note the Department never acted upon, *Doe 1 v. Buratai*, 318 F. Supp. 3d 218, 224, 231–33 (D.D.C. 2018), *aff'd on other grounds*, 792 F. App'x 6 (D.C. Cir. 2019); an ambassador's declaration filed with the motion, *In re Terrorist Attacks*, 122 F. Supp. 3d at 187–89; an ambassador's letter attached to the motion, *Belhas v. Ya'alon*, 515 F.3d 1279, 1282–84 (D.C. Cir. 2008). Flores Mem. at 34–35. The government's distinction — that in each of those cases "the foreign state attempted to intervene to the Executive Branch … for that particular case," Gov't

Opp. at 27 — describes Venezuela's Security Council demand exactly: it named these defendants, this seizure, and this prosecution, and it was addressed to the United States. S/PV.10085, at 13, 22–23. If a letter from an ambassador attached to a motion suffices, a sworn declaration of the state's legal representative filed in the prosecution itself, which Judge Hellerstein accepted as the position of "[t]he government of Venezuela," suffices a fortiori.

The government's observation that the Security Council statement was made "months before the United States recognized the Rodriguez government" and that Ambassador Moncada has since been replaced, Gov't Opp. at 28 n.14, does not help it.[9] A state's position does not lapse when its ambassador rotates, and the government that the United States recognized two months later had, by then, affirmed the position through its acting President, its National Assembly, and its Procuraduría, and has never retracted it. Nor does *Kenemore* supply the missing waiver. That is a civil damages action in Florida; Ms. Flores de Maduro is not a party to it; Venezuela's request, conveyed through its Embassy, was for a suggestion of immunity for its sitting acting President; and the default judgment against Mr. Maduro had been entered on July 15, 2026, before the United States filed its suggestion. *Kenemore*, ECF 73–75; Rubinstein Ltr. at 1; Segura Decl. ¶ 8. A state's request for a status-immunity certification for its acting head of state, in a private suit in which a co-defendant has defaulted, is not an "explicit" waiver of anyone's immunity, *Lafontant*, 844 F. Supp. at 134, least of all the immunity of a person who is not before that court. *See infra* Point IV.B.

Finally, the Segura declaration is not evidence that Venezuela has been silent, because it does not purport to describe the channel through which the two governments actually speak. Mr. Segura joined the Department of State in March 2026 and was sworn in as Assistant Secretary on

[9]The footnote dates the statement "January 5, 2025"; the meeting was held January 5, 2026. S/PV.10085 (Jan. 5, 2026).

August 14, 2026; he bases his declaration on his "expertise and experience in the Bureau of Western Hemisphere Affairs," and the only request he describes is the one received in *Kenemore*. Segura Decl. ¶¶ 1–2, 8. He does not say that he has reviewed, or is in a position to know, what has passed between the Secretary of State and the acting President of Venezuela since January 3, 2026. By the President's own account, "Marco speaks to her all the time"; "we are in constant communication with her and the administration"; the Secretary and the administration "have been in constant communication with Ms. Rodriguez and other members of the interim government in Venezuela." Decl. ¶¶ 74, 75; *see id.* ¶¶ 72, 76 (acting President: she speaks with the Secretary "[a]s many times as necessary"; officials describe "near daily contact"). Asked what the acting President had agreed to in those conversations, the Secretary answered that he was "not obviously going to have these conversations in the media. These are delicate and complicated things that require mature statesmanship." *Id.* ¶ 60. The Executive has told the courts, in sworn declarations and signed memoranda, that its negotiations with Venezuela are "nonpublic, sensitive, and high stakes" and are conducted "outside the public view," *id.* ¶¶ 79–81, that they are "intensive and delicate," *id.* ¶ 49; *see id.* ¶¶ 50–52, and that whom it talks to in Caracas is not a matter it discusses. *Id.* ¶¶ 82–83. Having told the courts that its communications with Venezuela are confidential, the government cannot ask this Court to infer from the absence of a public record of them that nothing was said, and a declarant who does not claim to know what was said cannot supply the inference. Ms. Flores de Maduro does not ask the Court to speculate about the content of that channel; she asks only that a declaration which does not describe it not be treated as proof that the recognized government of Venezuela — which has demanded her release in every public forum open to it — has been silent in private. Nothing in the Segura declaration contradicts a word of the public record set out above.

## POINT II

## INDEPENDENTLY, MS. FLORES DE MADURO IS ENTITLED TO CONDUCT-BASED IMMUNITY; ILLEGALITY UNDER VENEZUELAN LAW DOES NOT MAKE AN ACT OF STATE ORGANS A PRIVATE ACT, AND CORDONES DOES NOT RESOLVE THIS MOTION

Ms. Flores de Maduro incorporates Point II of the Flores Memorandum (at 27–38) and Point II of the Maduro Memorandum (at 30–42). Conduct-based immunity extends to all who act on the sovereign's behalf, because "the acts of the official representatives of the state are those of the state itself, when exercised within the scope of their delegated powers," Flores Mem. at 27–28 (quoting *Underhill v. Hernandez*, 65 F. 577, 579 (2d Cir. 1895)); the test is attribution, not lawfulness; and the S5, like the S4, alleges no act of hers in a private capacity. *Supra* Background B; Flores Mem. at 32–33; Maduro Mem. at 36–39. The government answers with the three grounds on which Judge Hellerstein denied immunity to Clíver Alcalá Cordones in 2022 — deference to the charging decision, Venezuela's "non-assertion," and illegality under Venezuelan law — and asks the Court to "adhere to" that decision. Gov't Opp. at 23–32.

The first two grounds have been answered above, and the answers apply to conduct-based immunity without change. The test the Executive applies to a former official's conduct — acts "exercising the powers of [the] office" are presumed official, the presumption is not rebutted by allegations of illegality, and it yields only for genuinely private conduct such as "personal financial dealings" — is set out, with the Executive's own filings, in Point I.B.2, and every act the S5 attributes to Ms. Flores de Maduro meets it. *Supra* Point I.B.3. The cases in which the Second Circuit has deferred to the Executive on a foreign official's immunity — *Matar*, *Doe v. De Leon*, 555 F. App'x 84 (2d Cir. 2014), and *Rosenberg v. Pasha*, 577 F. App'x 22 (2d Cir. 2014), Gov't Opp. at 24 — were deferrals to suggestions of immunity filed at the foreign state's request; the deference owed to the Executive's position in this prosecution is addressed in Point IV, and

Venezuela's assertion of her immunity in Point I.C. What remains for this Point is the government's third ground, and *Cordones* itself.

### A. Illegality Under Venezuelan Law Does Not Make an Act of State Organs a Private Act, and the Government's Authorities Hold Nothing to the Contrary

The government's third ground is that the defendants' conduct violated Venezuelan law and therefore cannot have been official. Gov't Opp. at 29–31. It identifies no judgment of any Venezuelan court, and no finding of any Venezuelan authority, that any act alleged against Ms. Flores de Maduro has been found unlawful under Venezuelan law, and the recognized government of Venezuela has said the opposite. *Supra* Point I.C. The government concedes, as it must, that "illegality under foreign domestic law does not automatically defeat conduct-based immunity." *Id.* at 30 (citing *Eliahu v. Jewish Agency for Israel*, 919 F.3d 709, 712–13 (2d Cir. 2019)). That concession is the law of this Circuit and the stated policy of the Executive Branch, *supra* Point I.B.2: whether an act is official "[t]urns on [w]hether the [a]ct [i]s [a]ttributable to the [s]tate, [n]ot on [w]hether [i]t [w]as [l]awful," Dichter SOI at 23; *see id.* at 25 n.21; *Giraldo*, 808 F. Supp. 2d at 249; *Underhill*, 168 U.S. at 254; Maduro Mem. at 36–40.

The government's authorities for the contrary do not hold what it says. *Kashef v. BNP Paribas S.A.*, 925 F.3d 53, 60–61 (2d Cir. 2019), is an act-of-state decision, and the Second Circuit has since explained that the act-of-state doctrine "is not a principle of abstention, a grant of immunity, or a bar on liability," but "a 'rule of decision' for the merits." *Celestin v. Caribbean Air Mail, Inc.*, 30 F.4th 133, 137–39 (2d Cir. 2022) (quoting *W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp.*, 493 U.S. 400, 406–08 (1990)); Flores Mem. at 37. The government now says that *Cordones* "never suggested that it was bound by *Kashef* on questions of immunity," Gov't Opp. at 30 n.15, which is correct, *see Kaplun*, No. 24 Civ. 4765 (AT), ECF 69, at 26 n.5 (Torres, J.) (*Kashef* "dealt with the court 'declaring invalid . . . the act of a foreign sovereign' under the 'act

of state doctrine,' not" immunity), and which leaves *Kashef* as an analogy — one that *Kadic* itself framed conjunctively: acts "taken in violation of a nation's fundamental law *and* wholly unratified by that nation's government." 70 F.3d at 250 (emphasis added); *accord Filartiga v. Pena-Irala*, 630 F.2d 876, 889 (2d Cir. 1980) (same formulation, quoted at Gov't Opp. at 29–30). The second condition is not met here. *Doe v. Qi*, 349 F. Supp. 2d 1258 (N.D. Cal. 2004) — the government's principal authority for the "violation of foreign law" factor, Gov't Opp. at 15, 26 n.13, 30 — applied the same conjunctive test and held that conduct "violative of domestic law but nonetheless ratified by the national government" *is* an act of the state, because "the second condition is essential to an act of state." 349 F. Supp. 2d at 1294. Its immunity holding, a pre-*Samantar* application of the FSIA to individuals, rested on the fact that China had "publicly disclaimed" the conduct, *id.* at 1287 — the opposite of this record. *Xuncax v. Gramajo*, 886 F. Supp. 162, 176 n.10 (D. Mass. 1995), was a default judgment in which "no … government[] of Guatemala" had characterized the acts as authorized; and *Cabiri v. Assasie-Gyimah*, 921 F. Supp. 1189, 1198 (S.D.N.Y. 1996), turned on the defendant's own concession that his acts fell outside his authority. As for *Noriega*, the sentence the government quotes — "whether those acts were taken on behalf of Noriega instead of Panama," 746 F. Supp. at 1522 — appears in the court's *act-of-state* analysis, and the court there stressed that the indictment did not allege that Noriega conspired to import cocaine "in furtherance of Panama's state policy." *Id.* The S5 alleges the opposite of Venezuela's officials: a system operated through "Venezuela's military, judiciary, and law enforcement agencies," ¶ 3, by officials "wielding the purported authority of the Venezuelan state," ¶ 5, and a torture conspiracy "under the color of law." ¶ 44. The government cannot plead state action to make out its case and disclaim it to defeat immunity.

The allegation that the defendants used their security details to collect "drug money" owed to them, ¶ 11 — an allegation Ms. Flores de Maduro denies, as she denies every allegation in the S5 — does not save the government, because the question is not whose debt is alleged to have been collected but whose power is alleged to have been exercised. The Executive's test asks whether the official was "exercising the powers of [her] office," Rosenberg SOI at 11. The law of state responsibility attributes to the state the conduct of a person "empowered to exercise governmental authority … if the person acts in that capacity, even if the person exceeds his authority or contravenes his instructions." Dichter SOI at 25 n.21 (quoting Articles on State Responsibility art. 7). And the Supreme Court held in *Underhill* that the acts of a government's military commander were the acts of the state although it was argued that he "was actuated by malice or any personal or private motive." 168 U.S. at 254. A uniformed National Guard detail acting on the orders of the official it is assigned to protect is the state's armed force acting in that capacity; the motive the government ascribes to the order goes to the merits, not to the capacity in which the force was used. That is why the Executive's examples of non-official conduct are acts that involve no exercise of state power at all — "personal financial dealings," Zedillo SOI at 6 n.5 — and why the cases that deny immunity for "private" crimes concern an official's embezzlement, theft, fraud, or possession, not his command of troops. *Jimenez*, 311 F.2d at 558; *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1361 (9th Cir. 1988) (en banc); *Yousuf*, 699 F.3d at 775. *Giraldo* drew the line in exactly this place: allegations that a head of state had used "the Columbian military to assist the AUC" and engaged in "cooperation with illegal drug smuggling" were allegations that he "acted within his official capacity but illegally," not "garden-variety 'crimes … in violation of his position and not in pursuance of it.'" 808 F. Supp. 2d at 248–51. The S5, moreover, does not plead a private frolic. It pleads a "system" operated through "Venezuela's

military, judiciary, and law enforcement agencies," ¶ 3, by officials "wielding the purported authority of the Venezuelan state," ¶ 5, including corrupt contracting that the state oil company's own leadership called "state policy," ¶ 13, sustained over twenty-five years; and the state whose organs are said to have been used stands behind the defendants today.[10]

The government's rejoinder that the proceeds "w[ere] not tucked safely away in the Venezuelan treasury," Gov't Opp. at 31, is the personal-enrichment argument the September memoranda answered. Flores Mem. at 32–33; Maduro Mem. at 36–40. Corrupt motive does not convert an exercise of state power into a private act, *Underhill*, 168 U.S. at 254; Dichter SOI at 25 n.21 (Articles on State Responsibility art. 7 and commentary), and the one case the government cites for distinguishing "the legal acts of a deposed ruler from his acts for personal profit that lack a basis in law," *Marcos*, 862 F.2d at 1361, was a civil RICO action brought *by the Republic itself* against its former ruler for embezzlement, in which the Marcoses "offered no evidence whatsoever" that their acts were acts of state and the Executive advised that the act-of-state doctrine had "no bearing" on the case. *Id.* The state that was the plaintiff in *Marcos* is, here, Ms. Flores de Maduro's defender.

## B. Cordones Does Not Resolve This Motion

The government opens its brief with Judge Hellerstein's statement in *Cordones* that "a rogue official of a rogue state is not entitled to immunity against a criminal prosecution," and says

[10]The contrary view — that an official who turns state power to personal ends acts "on behalf of [himself] instead of" the state — is the view Judge Hellerstein took of General Alcalá Cordones's conduct in *Cordones*, ECF 89 at 13, and that the *Noriega* court took of General Noriega's in its act-of-state analysis. 746 F. Supp. at 1522. Both decisions concerned defendants whose own states had disowned them or said nothing; neither considered a state that ratifies its official's acts. *Infra* Point II.B. If an allegation that state power was turned to personal gain were enough to make the act private, the exception would swallow the rule, because every prosecution of an official alleges as much; that is why the question is whether the recognized state claims the immunity, not whether it approves the conduct — the state need not endorse what its official is accused of, only assert that the acts, "if taken at all," were its own. Zedillo SOI ¶¶ 7–8; *Giraldo*, 808 F. Supp. 2d at 250 (a contrary rule "would eviscerate the protection of foreign official immunity").

that "[t]his Court's assessment … was correct, and controls here." Gov't Opp. at 7 (quoting *United States v. Cordones*, No. 11 Cr. 205 (AKH), 2022 WL 815229, at *7 n.2 (S.D.N.Y. Mar. 17, 2022) (ECF 89)). *Cordones* is Judge Hellerstein's considered decision on a different claim, on a different record, under a rule of Circuit law that has since been vacated, and it was careful about its own limits. Ms. Flores de Maduro addressed it in September, Flores Mem. at 36–38; Maduro Mem. at 40–42, and adds the following from the *Cordones* record itself.

*First*, Mr. Alcalá Cordones claimed conduct-based immunity only. His motion expressly distinguished status-based immunity as "only available to sitting heads of state" and did not claim it, ECF 71 at 9, and Judge Hellerstein decided only the conduct-based claim. ECF 89 at 7–8, 13 ("Defendant cannot bootstrap a claim for status-based immunity into a claim for conduct-based immunity."). Nothing in *Cordones* bears on Point I or Point I.B.

*Second*, the decision's principal ground was that *Halkbank I* bound Judge Hellerstein to treat the charging decision as the Executive's immunity determination — "the decision to bring criminal charges would have necessarily manifested the Executive Branch's view that no sovereign immunity existed," ECF 89 at 8–9 (quoting 16 F.4th at 351) — so that "under *Turkiye Halk Bankasi*, I must reject Defendant's claim of immunity." ECF 89 at 9. He said in the same breath that because no suggestion of immunity had been sought, "I must decide for myself whether such immunity exists." *Id.* at 7. The Supreme Court has since vacated *Halkbank I*'s common-law holding, and the rule the Second Circuit announced on remand conditions deference on the Executive's position comporting with the common law and reserves the case in which it does not. *Infra* Point IV.A. The government says *Halkbank III* "reinforce[s]" *Cordones*, Gov't Opp. at 25; it reinforces the deference Judge Hellerstein was prepared to give, but it conditions that deference in a way *Halkbank I* did not, and the condition is the question here.

*Third*, the alternative grounds rested on facts that are absent or reversed. Judge Hellerstein found that "[t]here is no indication that Venezuela has sought a suggestion of immunity for Defendant Cordones," ECF 89 at 7; the government told him that "no government, neither the official nor the de facto government, has come forth," Tr. of Mar. 15, 2022 (ECF 90) at 12:16–18. Both the government then in Caracas and the government the United States now recognizes have come forth for Ms. Flores de Maduro. *Supra* Point I.C. He found that the defendant did not "even dispute engaging in the conduct charged." ECF 89 at 10. Ms. Flores de Maduro denies every allegation and concedes nothing; her motion, like any jurisdictional motion, takes the indictment as pleaded. Flores Mem. at 5 n.3. The "abuse of power" holding, ECF 89 at 13, was an assessment of a defendant who had characterized his own conduct as a soldier's compliance with orders, ECF 71 at 13–14; it was not a holding that acts of state organs become private whenever they are alleged to be criminal — a proposition *Eliahu* rejects and the government disclaims. Gov't Opp. at 30.

*Fourth*, Mr. Alcalá Cordones had retired from the army in July 2013, had by 2014 become "a vocal and outspoken critic of the Maduro regime," and was, when arrested, planning an armed operation against it from Colombia. ECF 71 at 4–6. No Venezuelan government stood behind him, and none could have been expected to. Flores Mem. at 37. The S5 alleges that Ms. Flores de Maduro acted at the center of the Venezuelan state, with its President, through its organs; and the state has claimed her.

*Fifth*, the government told Judge Hellerstein in *Cordones* that "[t]he government is not alleging that the state itself and the individuals in their official capacity are committing the acts alleged in the indictment," but rather that "individuals that, yes, are in the government in Venezuela are part of another organization, a criminal organization, a drug cartel." Tr. of Mar. 15, 2022 at 17:12–18. The S5 alleges precisely what the government then disclaimed: a "power structure" that

"relied on MADURO MOROS's and FLORES DE MADURO's control over Venezuela's military, judiciary, and law enforcement agencies," ¶ 3, and a conspiracy "to commit acts under the color of law." ¶ 44. Whatever *Cordones* decided about a retired general said to be moonlighting for a cartel, it did not decide that a state's head of state and his wife lack immunity for acts the government itself pleads as acts of the state.

*Finally*, footnote 2. The sentence the government quotes appears in a footnote to the opinion's recital of the defendant's argument, cites no authority, and rests on two premises stated in the footnote itself — that narcotics trafficking is criminal in both countries, and that "[t]he United States has no formal diplomatic relations with Venezuela and does not recognize Maduro to be President." ECF 89 at 12 n.2. The first premise, the government now concedes, is not dispositive. Gov't Opp. at 30. The second has been overtaken: the United States has formally recognized the government of Venezuela, has normalized diplomatic and consular relations with it, Kozak Ltr. at 3; ECF 294 at 4–5 n.2, and that government stands behind Ms. Flores de Maduro. *Supra* Point I.C. A rule that "a rogue official of a rogue state is not entitled to immunity" cannot be applied to the officials of a state the United States recognizes and whose government asserts their immunity, without deciding that recognition means nothing. *Lafontant*, 844 F. Supp. at 133 (recognition decisions "are binding on the courts, and the courts must give them legal effect").

## POINT III

## COUNT TWO CHANGES NOTHING: STATUS IMMUNITY IS INDIFFERENT TO THE GRAVITY OF THE CHARGE, AND THE GOVERNMENT HAS PLEADED THE TORTURE CONSPIRACY AS THE EXERCISE OF STATE AUTHORITY "UNDER THE COLOR OF LAW"

The S5's new Count Two charges Ms. Flores de Maduro with conspiring, "under the color of law," to inflict severe pain and suffering on persons in the conspirators' custody. ¶ 44; 18 U.S.C. §§ 2340(1), 2340A(a), (c). The specific allegations against her are those set out above: the 2014

meetings and briefings, ¶¶ 22–24; the 2006 use of the couple's military protective details "to torture and intimidate," ¶ 19; and the 2021 appointment to a presidential commission on the judiciary. ¶ 16; *supra* Background B. She denies the conduct these allegations describe. The 2021 appointment is a matter of public record; the S5 attaches no act of hers to it, and it is pleaded, like the rest, as an act of the state. For present purposes what matters is that the government has pleaded every one of them as an act of the Venezuelan state, by state officers, through state organs, and that it must so plead, because § 2340A reaches only acts "under the color of law." 18 U.S.C. § 2340(1). Count Two is, by the government's own election, a charge of official conduct. The gravity of the offense charged does not alter the immunity analysis.

### A. Status-Based Immunity Admits No Exception for the Gravity of the Offense

The immunity Ms. Flores de Maduro asserts in Point I is a status immunity, and the character of the alleged act is irrelevant to it. The International Court of Justice, having "carefully examined State practice, including national legislation and those few decisions of national higher courts, such as the House of Lords or the French Court of Cassation," was "unable to deduce from this practice that there exists under customary international law any form of exception to the rule according immunity from criminal jurisdiction and inviolability to incumbent Ministers for Foreign Affairs, where they are suspected of having committed war crimes or crimes against humanity." *Arrest Warrant*, 2002 I.C.J. 3, ¶ 58. Treaties that oblige states to extend their criminal jurisdiction over serious crimes do not affect the immunity, because "jurisdiction does not imply absence of immunity, while absence of immunity does not imply jurisdiction," *id.* ¶ 59, and immunity is not impunity: "[i]mmunity from criminal jurisdiction and individual criminal responsibility are quite separate concepts." *Id.* ¶ 60. The House of Lords in *Pinochet (No. 3)* — a decision about *torture* — was unanimous on the point. "The appellants accepted that in English

courts a serving head of state is entitled (ratione personae) to immunity in respect of acts of torture which he has committed." [2000] 1 A.C. at 261 (Lord Hutton). The immunity of a serving head of state is not "removed in cases of torture," because "immunity ratione personae attaches to the office and not to any particular conduct of the office holder," *id.* at 265–66 (Lord Saville); it extends to "their families and servants," who are "not liable to be arrested or detained on any ground whatever," *id.* at 268–69 (Lord Millett); and "[s]uch immunities can only be removed by express agreement or waiver." *Id.* at 289 (Lord Phillips); *see id.* at 244 (Lord Hope). American courts agree. *Yousuf*, 699 F.3d at 777 & n.6 (head-of-state immunity, "based on status, is of an absolute nature and applies even against jus cogens claims"); *Habyarimana*, 696 F.3d at 1032; *Ye*, 383 F.3d at 627; *Lafontant*, 844 F. Supp. at 139–40 (TVPA suit against a head of state); *Tachiona*, 169 F. Supp. 2d at 296–97 (torture claims against a sitting head of state), *rev'd in part on other grounds*, 386 F.3d 205 (2d Cir. 2004); *Am. Justice Ctr.*, 2015 U.S. Dist. LEXIS 177427, at *4–5 (Torres, J.) (sitting head of government immune from TVPA and ATS claims "without regard to the specific conduct alleged" and "even when the alleged conduct took place prior to the assumption of office"); *Kaplun*, No. 24 Civ. 4765 (AT), ECF 69, at 25–27 (Torres, J.) ("no recognized jus cogens exception" to the immunity of an international organization's officials, following *Matar* and *Rosenberg*). The Executive Branch has said the same to the International Law Commission: personal immunity "covers all acts," and "there is no such exception to personal immunity" for the international crimes, torture among them, that the Commission proposed to carve out of the residual immunity of former officials. U.S. ILC Comments at 7, 11.

Nor does § 2340A displace the immunity. "In order to abrogate a common-law principle, the statute must 'speak directly' to the question addressed by the common law." *Matar*, 563 F.3d at 14 (quoting *United States v. Texas*, 507 U.S. 529, 534 (1993)); *Manoharan*, 711 F.3d at 180

(same, holding that the Torture Victim Protection Act did not abrogate head-of-state immunity); *Doğan*, 932 F.3d at 894 (TVPA "does not expressly abrogate any common law immunities"). Section 2340A says nothing about immunity. Congress enacted it in 1994 to implement the Convention Against Torture. The Executive's article-by-article analysis of the Convention, transmitted to the Senate with the treaty and reprinted in the Foreign Relations Committee's report, states that "[t]he application of immunities from criminal prosecution, such as those immunities enjoyed by diplomats under the Vienna Convention on Diplomatic Relations, was not explicitly discussed during the negotiation of the Convention," but that "Article 7(2), however, implicitly recognizes that such immunities are not affected by the Convention." S. Exec. Rep. No. 101-30, at 21–22 (1990) (reprinting the analysis transmitted with S. Treaty Doc. No. 100-20 (1988)). The House Report on the Torture Victim Protection Act, three years before § 2340A was enacted, confirmed that "nothing in the TVPA overrides the doctrines of diplomatic and head of state immunity." H.R. Rep. No. 102-367, pt. 1, at 5 (1991) (quoted in Dichter SOI at 34; *Lafontant*, 844 F. Supp. at 139). The Executive Branch has told the International Law Commission, in terms, that the torture statute "[n]either … addresses or explicitly abrogates the functional immunity of foreign officials," and that "[a]ny such prosecution in the future would be addressed by prosecutors and courts on a case- and fact-specific basis rather than by application of a categorical rule denying immunity." U.S. ILC Comments at 10. The United States has formally objected to the Commission's proposal to except torture from the residual immunity of former officials as one that "does not reflect customary international law." U.S. ILC Comments at 9.

### B. The Government Has Pleaded Count Two as Official Conduct, and the Conduct Alleged Falls Within the Recognized Period and the Executive's Own Residual-Immunity Practice

For the residual immunity of Point I.B and the conduct-based immunity of Point II, the government's pleading decides the question. An offense under § 2340A can be committed only by a person "acting under the color of law," 18 U.S.C. § 2340(1), and the S5 pleads Count Two accordingly: torture by "military units," the intelligence services, and "individuals wielding the purported authority of the Venezuelan state," ¶¶ 5, 20–39, in "government-controlled detention facilities." ¶ 26. That is a pleading of attribution to the state. The Second Circuit has held that where a violation such as "official" torture requires action under color of law, the "color of law" jurisprudence of 42 U.S.C. § 1983 "is a relevant guide to whether a defendant has engaged in official action," so that a person acts under color of law "when he acts together with state officials or with significant state aid." *Kadic*, 70 F.3d at 245. The Eleventh Circuit, construing § 2340 itself, has held the same: there is "no material difference" between acting "under the color of law" in § 2340 and acting "in an official capacity" within the meaning of the Convention, and the phrase carries the meaning it bears in the civil-rights statutes — the exercise of "power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *United States v. Belfast*, 611 F.3d 783, 808–09 (11th Cir. 2010) (quoting *West v. Atkins*, 487 U.S. 42, 49 (1988), and citing *Kadic*, 70 F.3d at 245). *See also Giraldo*, 808 F. Supp. 2d at 249–51; *Yousuf*, 699 F.3d at 775–76; *Saudi Arabia v. Nelson*, 507 U.S. 349, 361 (1993) ("however monstrous such abuse undoubtedly may be, a foreign state's exercise of the power of its police has long been understood … as peculiarly sovereign in nature"). The acts alleged against Ms. Flores de Maduro in support of Count Two are the 2006 use of the couple's protective details, ¶ 19, and the 2014 meetings and briefings, ¶¶ 22–24 — both within the period in which the United States recognized her government; the only later allegations, her 2021 appointment to a commission on

the judiciary and her presence at a 2022 meeting of judges, ¶ 16, describe no act of torture at all. The Executive has recognized residual immunity for former officials accused of directing exactly this kind of conduct — a massacre by paramilitary groups allegedly trained or assisted by the army, the targeting of civilians for execution and the use of the national military to assist a paramilitary organization, a bombing that killed civilians, and a terrorist attack — in each case without endorsing the conduct and in each case over the objection that the acts were criminal. *Supra* Point I.B.2 (Zedillo, Uribe, Dichter and Rosenberg suggestions).

Nor is there any tension between the element and the immunity. The element pleads official capacity — the very thing that brings an act within the immunity — and the immunity belongs to the state, which alone can waive it. *Supra* Point I.C. A statute written in those terms has its field where the state disavows its official or declines to claim the immunity, which, as the Ninth Circuit explained of the TVPA's identical "color of law" language, is the ordinary case: Congress expected that foreign states "would generally disavow conduct that violates the TVPA," so that "in the great majority of cases, an official sued under the TVPA would never receive common-law immunity in the first place." *Doğan*, 932 F.3d at 895–96 (discussing *Hilao*, 25 F.3d at 1472, and *Filartiga*, 630 F.2d 876). That is how every prosecution under § 2340A has proceeded: no state has asserted the immunity for any defendant charged under it. *See* Indictment ¶¶ 12–14, *United States v. Correa*, No. 20-cr-148 (D. Colo. June 2, 2020), Doc. 1; Press Release, U.S. Dep't of Justice, *Man Charged for Torturing Prisoners* (Dec. 14, 2023); Press Release, U.S. Dep't of Justice, *Former Syrian Assad Prison Official Convicted of Torture and Immigration Fraud* (Mar. 16, 2026). This is not that case. Venezuela has not disavowed Ms. Flores de Maduro's acts or waived her immunity; it has asserted the immunity of its President and First Lady in writing, S/PV.10085, at 22–23; U.N. Docs. A/80/586–S/2026/5, and demanded their release. *Supra* Point I.C.

## POINT IV

## UNDER HALKBANK III, THE DEFERENCE THE GOVERNMENT INVOKES IS OWED ONLY TO AN EXECUTIVE POSITION THAT COMPORTS WITH THE COMMON LAW, AND THE POSITION TAKEN IN THIS PROSECUTION DOES NOT

Ms. Flores de Maduro incorporates Point III of the Flores Memorandum (at 38–41) and Point III of the Maduro Memorandum (at 42–48). The government invokes deference against every immunity she asserts: "absolute deference" to the Executive's "determination" of head-of-state non-immunity, "near-conclusive deference" on conduct-based immunity, and, as to both, the proposition that the determination is expressed by the decision to indict her. Gov't Opp. at 1, 7–16, 24–25. Under *Halkbank III*, deference to an Executive denial of immunity is owed where the denial comports with the common law, and the Court of Appeals reserved the case in which it does not. This is that case.

### A. Halkbank III Deferred to a Denial of Immunity Because It Comported With the Common Law, and Reserved the Case in Which the Executive's Position Does Not

The government reads *Halkbank III* as "extend[ing] principles of Executive deference" to "grants and denials of immunity, in both the civil and criminal context," Gov't Opp. at 25, and as answering the "dicta" point, because the Second Circuit held that *Matar*'s "traditional rule of deference" is binding. *Id.* at 21 n.12, 25 (quoting 120 F.4th at 48 n.5). It is binding, and so it did, but only for a denial that comports with the common law. The Second Circuit held that a prosecution may *express* the Executive's position on a state-owned corporation's commercial immunity, 120 F.4th at 48–49; but it deferred to that position "because that determination is consistent with the scope of such immunity recognized at common law," *id.* at 46, confined its holding to "a foreign, state-owned corporation" prosecuted "for its commercial activity," *id.* at 55 n.12, and twice reserved "whether deference to the Executive in this context should be cabined if,

unlike here, the Executive's denial of immunity to a foreign sovereign derogated from the common law — for instance, if the Executive indicted a state qua state." *Id.* at 58–59; *see id.* at 43, 46. It recorded the government's concession that "the United States would not subject Turkey — a state qua state — to criminal prosecution; indeed, the government acknowledges that doing so would be 'in derogation of the common law.'" *Id.* at 52. The Solicitor General described the decision to the Supreme Court in the same terms: the Second Circuit "did not grant 'conclusive deference'" and "repeatedly refused to decide whether it would apply the same deference if the Executive Branch's position were not in fact consistent with the substance of the common law." Brief for the United States in Opposition at 8, *Türkiye Halk Bankası A.Ş. v. United States*, No. 24-1144 (U.S. Aug. 6, 2025), *cert. denied* (Oct. 6, 2025). The Supreme Court had itself vacated the Second Circuit's first decision, which treated the charging decision as dispositive, "express[ing] no view" on the contention that "the Executive Branch cannot unilaterally abrogate common-law immunity by initiating prosecution." *Halkbank II*, 598 U.S. at 280–81.

The condition follows from the ground of the deference. *Hoffman* bounds it in both directions: courts may not "deny an immunity which our government has seen fit to allow," and they may not "allow an immunity on new grounds which the government has not seen fit to recognize." 324 U.S. at 35. The deference keeps the courts in step with the immunities the Executive recognizes as the established policy of the United States; it does not license a position taken in one case to displace the law the Executive professes in every other. That is why the Second Circuit deferred in *Halkbank III* only after it had itself examined the common law and found the denial consistent with it, 120 F.4th at 46, and why it reserved the case in which the denial is not. *Id.* at 58–59; *see also Kaplun*, No. 24 Civ. 4765 (AT), ECF 69, at 16–17 (Torres, J.) (declining to afford "controlling authority to the Government's statement of interest" on a question of immunity

where the governing law was clear, because on a question of law the government's views "merit no special deference").

**B. The Executive's Position in This Prosecution Derogates From the Common Law, as Its Own Conduct Toward Venezuela in 2026 Confirms**

The question the Court of Appeals left open is the question this motion presents, and the common law supplies the answer. Head-of-state immunity "is premised on the concept that a state and its ruler are one for purposes of immunity," *Lafontant*, 844 F. Supp. at 132; it "is primarily an attribute of state sovereignty, not an individual right," *Doe No. 700*, 817 F.2d at 1111; *In re Doe*, 860 F.2d at 45; and it is "tied closely to the sovereign immunity of foreign states." *Halkbank III*, 120 F.4th at 52 n.8. At common law it extends to the head of state's household, *supra* Point I.A; it is lost only by the explicit waiver of the state, *supra* Point I.C; and the former officials of a recognized government retain a residual immunity for the acts of their offices, *supra* Point I.B.2 — each a rule the Executive has stated to the courts, in writing, as its own. A state the United States recognizes — Venezuela — has claimed the immunity for its head of state and his wife. To deny it is to do to Venezuela, through the persons of its President and his wife, what the government has conceded it may not do to Venezuela directly.

The Executive's own conduct confirms the derogation. In March 2026, in the same weeks in which the United States Attorney was pressing these charges, the Department of State announced the re-establishment of diplomatic and consular relations and told this District's United States Attorney that "the United States is recognizing Delcy Rodriguez as the sole Head of State, able to take action on behalf of Venezuela." Kozak Ltr. at 3; Decl. ¶¶ 91–93. On June 11, 2026, at the request of the Venezuelan Embassy, the Department's Legal Adviser advised the Department of Justice that "[t]he Department of State recognizes and allows the immunity of President Rodriguez as the sitting head of state," Rubinstein Ltr. at 1, and on July 20 the Department of

Justice presented to a federal court that Venezuela's acting President — who exercises the presidency during an absence that Venezuela's highest court has declared forced, because Mr. Maduro is in this Court's custody — is immune from suit "even for acts committed prior to assuming office." Kenemore SOI ¶¶ 1, 7. And on October 26, 2026 the Department's own account of the transition proceeded from the premise that the presidency has not been vacated: "Delcy will have to declare a vacancy in the presidency, a permanent vacancy. Right now they haven't done that." Decl. ¶ 94. The Executive has twice keyed its position on who holds Venezuela's presidency to that country's constitution and its provision for a vacant office — in January 2019, when it recognized Mr. Guaidó on the strength of the National Assembly's invocation of "the Venezuelan constitution to declare the office of the presidency vacant," Segura Decl. ¶ 3, and in October 2026, when its own plan makes the declaration of a vacancy the step not yet taken. On those mechanics the office is occupied today by Mr. Maduro, in an absence the Executive itself treats as not yet permanent. The government identifies no instance in which the United States, while maintaining relations with a foreign state whose recognized government had asked that the immunity of its head of state or his household be respected, denied that immunity on the strength of a prosecution, and Ms. Flores de Maduro is aware of none; the one prosecution the government cites in which the foreign state objected concerned a state-owned bank's commercial activity, and the Court of Appeals was explicit that it decided nothing more. *Supra* Point IV.A. Judge Hellerstein recognized at the hearing of March 26, 2026 that "we have no case like this." Tr. of Mar. 26, 2026 (ECF 297) at 4:16–17. The government's position is that the same Executive, in the same months, "determined" through this prosecution that the wife of the President whose forced absence created the office it now certifies as immune is a "former rogue official[] of a formerly rogue state," Gov't Opp. at 7, entitled to nothing. That is not a denial that comports with the common law; it is a

departure from the common law and from the Executive's own stated practice, Flores Mem. at 41, and *Halkbank III* does not require deference to it.

*Noriega*'s statement that "by pursuing [the defendant's] capture and … prosecution, the Executive Branch has manifested its clear sentiment that [the defendant] should be denied head-of-state immunity," Gov't Opp. at 9, 16 (quoting 117 F.3d at 1212), does not change this. The facts on which that statement rested — a defendant who had never been, or claimed to have been, Panama's constitutional head of state, a government the United States recognized throughout his rule, a state that had not sought his immunity, and a concession that he was not a head of state under customary international law — are set out above, and every one of them is reversed here. *Supra* Point I.A.3. The Eleventh Circuit did not choose between the deference standards before it; it held that Noriega's claim "fail[ed] under either," and it contemplated that a court might have "to make an independent determination regarding the propriety of immunity." 117 F.3d at 1212. The Executive's "sentiment," manifested by seizing the protected persons, cannot be the measure of an immunity whose first function is to forbid their seizure.

### C. The Rule the Government Proposes Is One the United States Has Rejected for Itself

Finally, the consequence the government's rule would have for the United States is not hypothetical; the Executive has described it. The President has determined that "any effort" by a foreign tribunal "to investigate, arrest, detain, or prosecute" current or former United States officials "without consent of that person's country of nationality" is "an unusual and extraordinary threat to the national security and foreign policy of the United States," that such efforts "threaten[] to infringe upon the sovereignty of the United States," and that other nations "must respect the decisions of the United States and other countries not to subject their personnel to [that tribunal's] jurisdiction, consistent with their respective sovereign prerogatives." Exec. Order No. 14203, 90

Fed. Reg. 9369, 9369–70, § 1(a)(ii)(A), § 8(d) (Feb. 12, 2025). The Department of State has long placed "particular importance on the appropriate assertion of head of state immunity because of its implication for reciprocal treatment of our President if subject to the jurisdiction of a foreign state." Flores Mem. at 6 (quoting Sofaer Affirmation ¶ 6, *Mumtaz v. Ershad*, Index No. 74258/89 (Sup. Ct. N.Y. Cnty. May 30, 1990)); *see* Dichter SOI at 2, 22 (a refusal to recognize official immunity "could seriously harm U.S. interests, by straining diplomatic relations and possibly leading foreign nations to refuse to recognize the same immunity for American officials"). A rule under which the forum state's refusal to recognize a foreign head of state, followed by his seizure, extinguishes the immunity of his state and his household is a rule the United States has told the world it will not accept for itself. It should not be adopted here against Venezuela.

## CONCLUSION

For the foregoing reasons, and for the reasons stated in the Flores Memorandum and the Maduro Memorandum, Ms. Flores de Maduro respectfully requests that the Court hold that she is immune from its jurisdiction — as a member of the household of Venezuela's head of state, as a former senior official of the government the United States recognized for the acts alleged during that period, and for the official acts alleged — and dismiss the Fifth Superseding Indictment as to her, with prejudice, for lack of jurisdiction.

Dated: November 9, 2026

Respectfully submitted,

/s/ M. Andrés Sánchez-Ross
M. Andrés Sánchez-Ross
Mark E. Donnelly
PARKER SANCHEZ & DONNELLY, PLLC
700 Louisiana Street, Suite 4520
Houston, Texas 77002
(713) 659-7200
andres@psd.law

*Counsel for Cilia Adela Flores de Maduro*